**MANDATE**

SANT EDNY
97-CR-1010
FILED Platt

UNITED STATES COURT OF APPEALS IN CLERK'S OFFICE
FOR THE SECOND CIRCUIT   U.S. DISTRICT COURT E.D.N.Y

**SUMMARY ORDER**     ★   MAY 23 2005   ★

**THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL LONG ISLAND OFFICE
REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS
OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS
OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A
RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL
OR RES JUDICATA.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the
Thurgood Marshall United States Courthouse, at Foley Square, in the City of New York, on the
27th day of August two thousand and three.

Present:    ROSEMARY S. POOLER,
            ROBERT D. SACK,
            RICHARD C. WESLEY,
                        Circuit Judges.

*(seal: UNITED STATES COURT OF APPEALS FILED AUG 27 2003 SECOND CIRCUIT)*

-------------------------------------------------------------------------

UNITED STATES OF AMERICA,

                        Appellee,

            - v. -                          02-1528(L), 02-1529(CON)

MICHAEL J. VONDETTE, also known as Steven, also
known as Big, also known as Big Guy, also known as
Mike, also known as Michael J. Von Dette, also known
as M. J. Vondette, also known as Glenn Titus,

                Defendant-Appellant.

-------------------------------------------------------------------------

Appearing for Defendant-Appellant:  PAULA SCHWARTZ FROME, Kase & Druker (James O.
                                    Druker, on the brief), Garden City, NY
Appearing for Appellee:             BURTON T. RYAN, JR., Assistant United States Attorney,
                                    Eastern District of New York (Roslynn R. Mauskopf, U.S.
                                    Attorney, Cecil C. Scott, Charles P. Kelly, Assistant U.S.
                                    Attorneys, on the brief), Brooklyn, NY

        Appeal from the September 6, 2002, judgment of the United States District Court for the
Eastern District of New York (Thomas C. Platt, Judge), convicting defendant after a jury trial of

**ISSUED AS MANDATE:** 5-16-05

conspiring to distribute hashish, marijuana, and methaqualone in violation of 21 U.S.C. § 846 and of conspiring to launder money in violation of 18 U.S.C. § 1956(h).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED**.

Michael J. Vondette appeals his conviction following a jury trial on one count of conspiring to distribute hashish, marijuana, and methaqualone and on one count of conspiring to launder money. The prosecution involved a drug trafficking organization, which the government calls the "Vondette/Tremblay group." The conspiracy charge against Vondette encompassed a time period from January 1980 until October 1997.

This particular prosecution arose directly out of a large shipment of hashish arriving from Asia that was destined for Canada. Patrick Bowler, one of the organizers of the hashish shipment, had worked with Vondette before. Undercover Drug Enforcement Administration ("DEA") agents, who had infiltrated the operation, told Bowler and the other organizers that the small boat that was supposed to take the hashish from the high seas to Canada had mechanical problems and would have to stop in Los Angeles first. Although the organizers were not happy about this change because of the "draconian" American drug laws, they ultimately agreed to a brief stop in Los Angeles. The small DEA-controlled boat then traveled to Los Angeles.

Around that time, Bowler recruited Vondette to transport some of the hashish to Montreal. Vondette assumed responsibility for transporting two tractor-trailer shipping containers, each holding four to four-and-a-half tons of hashish. After the first container arrived in Newark, Vondette arranged for a Staten Island customs broker to pick it up. The broker contracted the job to a Staten Island-based trucking company. By following the truck, DEA agents were able to find co-conspirators who chose to cooperate, and the DEA eventually was able to identify and locate Vondette.

Due to problems finding and keeping counsel, Vondette began the first trial pro se, but then retained attorneys. The first trial resulted in a mistrial when the jury could not reach a verdict. The attorneys who represented Vondette at the first trial asked to be relieved because of Vondette's inability to pay them and his unwillingness to plead guilty. The court relieved the attorneys. Another attorney was appointed to be Vondette's advisor at the second trial. Evidence at the trial included testimony about the large hashish shipment as well as evidence about earlier drug transactions. Various aspects of the trial will be discussed at greater length below. The trial lasted for three weeks, and resulted in a guilty verdict. After the verdict, the jury heard further arguments regarding forfeiture and returned a special verdict indicating what sums of money were subject to forfeiture. The court found that the offense level was 42, after the grouping of the two counts. The court sentenced Vondette to 480 months incarceration, five years supervised release, a $25,000 fine, a $200 special assessment, and forfeiture of $2,027,845.

This appeal followed. Vondette challenges several aspects of his trial. He argues that 1) the government engaged in outrageous conduct by manufacturing federal jurisdiction; 2) the

2

court erred in refusing to give a multiple conspiracy charge; 3) the court's conduct during trial deprived him of a fair trial; 4) the court's charge was improper; 5) venue in the Eastern District of New York was improper; and 6) the court abused its discretion by empaneling an anonymous jury. Vondette also challenges the court's application of the sentencing guidelines and the forfeiture order.

Defendant contends that the government should be foreclosed from prosecuting him because prior to the government's intervention, the hashish shipment part of the case involved only a potential violation of the laws of Canada. He relies on United States v. Archer, 486 F.2d 670, 682 (2d Cir. 1973) (preventing prosecution where federal officers themselves supplied the interstate element and acted to insure that this element was present). Defendant also notes that a district court in California dismissed the importation charges against some of the importer-defendants because the government interfered with the conspirators' pre-existing plan and brought the drugs into the United States against their wishes.

However, defendant's situation is clearly distinguishable from Archer and from the case of the importer-defendants. In United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996), we noted that "[c]ourts that have construed Archer have taken pains to limit its applicability." Id. at 1065. The Court elaborated on the manufactured jurisdiction theory at some length:

> These cases make clear that the "manufactured jurisdiction" concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime.

Id. at 1065–66 (internal citations omitted). Although Vondette contends that each of the theories apply in his case, only the third theory merits discussion. The Wallace Court explained:

> Courts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the FBI introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met, despite the surface similarity to Archer.

Id. at 1066. Even if the government created federal jurisdiction by bringing the hashish into the United States, Vondette then took the voluntary step of agreeing to transport the drugs.

Vondette argues that the evidence at trial clearly established the existence of multiple conspiracies, in contrast to the single charged conspiracy. The government stresses that all the

3

proof involved drug trafficking by the Vondette/Tremblay group. It is true that "where the proof
is susceptible to the inference that there was more than one conspiracy, the question of whether
one or more than one conspiracy has been established is a question of fact for a properly
instructed jury." United States v. Alkins, 925 F.2d 541, 553–54 (2d Cir. 1991) (internal
quotation marks omitted). On the other hand, "[i]f the evidence admits of no possibility that
there was more than one conspiracy, a multiple conspiracies charge is not necessary." Id. at 554.

The appellant must also show that the failure to give the requested charge created
prejudice. Even if a multiple conspiracies charge was appropriate, reversal is necessary only if
appellant "demonstrate[s] both the likelihood of multiple conspiracies having existed, and
substantial prejudice resulting from the failure to give the requested charge." Id. (internal
quotation marks omitted). Although Vondette could possibly demonstrate that the proof was
susceptible to the interpretation of either a single conspiracy or multiple conspiracies, he did not
demonstrate prejudice. Prejudice is particularly difficult for a defendant to demonstrate in cases
involving one defendant. See United States v. Cusimano, 123 F.3d 83, 89 (2d Cir. 1997).
Prejudice is also more difficult to demonstrate when the alleged multiple conspiracies involve
"substantially the same conduct." Id. The admission of evidence of a few earlier drug deals
which may or may not have involved a common purpose and mutual dependence and assistance
did not cause Vondette prejudice.

Vondette claims that the district court made inappropriate comments which would have
left the jury with the impression that the district court believed Vondette was guilty. We have
explained:

> The [Circuit] court's role is not to determine whether the trial judge's conduct left
> something to be desired, or even whether some comments would have been better left
> unsaid. The test is whether the jury was so impressed with the judge's partiality to the
> prosecution that it became a factor in determining the defendant's guilt, or whether it
> appeared clear to the jury that the court believed the accused was guilty.

United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996) (internal citations, quotation marks and
brackets omitted).

Vondette proceeded pro se (with standby counsel) below. The trial court did rebuke him
on a number of occasions when he persisted in pursuing lines of questioning or strategies to
which the district court had already sustained objections. The district court does appear to have
been frustrated by Vondette at various points. On the other hand, Vondette did need to be reined
in quite frequently in order to ensure an orderly trial. See United States v. Pisani, 773 F.2d 397,
403–04 (2d Cir. 1985) (finding that the court's comments did not deprive defendant of a fair trial
because at least some of the comments "were provoked by counsel's continuing to do things that
the court had specifically cautioned him to avoid"). Here, given that the trial court's comments
were largely directed towards Vondette's activities as advocate, the jury would not have been
convinced that the judge believed Vondette was guilty. Nonetheless, we emphasize that the
judge would have been well-advised to have crafted a more careful instruction to tell the jury not

4

to treat his corrections of defendant as signs of his thoughts about the defendant's guilt, but rather as necessary steps to maintain order in the courtroom.

Vondette argues that some of the jury instructions were erroneous and confusing. In addition, he contends that the district court constructively amended the indictment. The wording of the indictment did indeed cause some initial confusion. The court originally instructed the jury on the drug conspiracy count as follows:

> The first question is: Do you find that the government proved beyond a reasonable doubt that the conspiracy charged in the indictment involved hashish, marijuana and a mixture of a substance containing marijuana or methaquaalone?
> B, do you find that the government proved beyond a reasonable doubt that the defendant conspired to distribute with the intent to distribute 1,000 kilograms or more of hashish?
> Two, 1,000 kilograms or more of a substance - of a mixture containing marijuana and methaquaalone?

Tr. at 1542–43 (emphasis added). The district court also altered the written special verdict sheet. The government attempted to convince the court to instruct the jury that it should consider whether the conspiracy involved 1,000 kilograms of a substance containing marijuana or methaqualone, but the court initially denied this request because it believed this would alter the indictment.

However, after the district court received a question from the jury asking if the special verdict applied to both counts, it opined that "what is confusing about count one is how badly this whole thing is worded." The government again tried to convince the judge that the special interrogatory questions about drug quantity were only necessary for sentencing purposes, and therefore could be changed without constructively altering the indictment. This time the court agreed with the government, and reinstructed the jury on count one. If the jury found the defendant guilty of the base offense, the court instructed that the jury should then turn to the special interrogatories. The court first asked the jury to find whether the government proved beyond a reasonable doubt that the conspiracy involved 1000 kilograms or more of hashish. It then changed the second part of the interrogatories: "So it would be [changed to] read 1,000 kilograms or more of marijuana, or a substance [ ]or a mixture containing marijuana." The end result is that the jury was no longer instructed to find any amount of methaqualone.

It does appear that some confusion resulted from the original jury instructions. However, the court's alteration of the interrogatories remedied the confusion and was in accordance with the law. The removal of methaqualone from the special interrogatories did not constructively amend the indictment. It was unnecessary for the jury to find any particular amount of methaqualone for sentencing purposes. See 21 U.S.C. § 841(b)(1)(C). The jury was instructed to make specific findings regarding the hashish and the marijuana, and these findings allowed the court to impose a sentence of ten years to life under the statute. 21 U.S.C. § 841(b)(1)(A); see also United States v. Thomas, 274 F.3d 655 (2d Cir. 2001) (en banc).

5

Vondette also claims that the trial judge's charge to the jury on the money laundering count suffered from vacillation and confusion. In particular, Vondette claims that because the indictment had been charged in the conjunctive, the government could not prove its case in the disjunctive. However, "[a]n indictment charging a conspiracy to achieve two or more unlawful goals, in the conjunctive, can properly be supported by proof of any of the alleged goals." United States v. Thomas, 54 F.3d 73, 81 (2d Cir. 1995). Therefore, the variation between the conjunctive in the indictment and the disjunctive in the charge was not error.

Vondette contends that no acts sufficient to support venue for the narcotics conspiracy charge occurred in the Eastern District. However, with a conspiracy offense, venue is appropriate "in any district in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987). The acts relied on here by the government to establish venue in the Eastern District were overt acts in furtherance of the conspiracy. Most notably, Vondette engaged a customs broker in Staten Island, who arranged for the load to be transported to its upstate destination.

Defendant argues that the district court's decision to empanel an anonymous jury was not properly justified. He also takes issue with the court's failure to offer the jurors an explanation for their anonymity, although he did not request any instruction. We review the decision to empanel an anonymous jury for abuse of discretion. United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994). An anonymous jury may be appropriate if there is strong reason to believe that the jury needs protection and reasonable precautions are taken to minimize any prejudicial effects on the defendants. United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991). The evidence in this case most notably included threats made to cooperating witnesses by other participants in the transactions. Thus, given the abuse of discretion standard, the empaneling of the anonymous jury was not in error.

However, Vondette's argument that the court did not give the jury any explanation whatsoever for the empaneling of an anonymous jury is more substantial. The Court has suggested that "reasonable precautions must be taken to minimize the effect that [an anonymous jury] might have on the jurors' opinions of the defendant[ ]," United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985) (emphasis added), and that a "court should not order the empaneling of an anonymous jury without . . . taking reasonable precautions to minimize any prejudicial effects on the defendant," United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991) (emphasis added). This would seem to support Vondette's argument.

In United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989), the Court noted approvingly that the district court had instructed the jury that the anonymous jury was "a common practice . . . [and] is in no way unusual," which would minimize any prejudicial effect on the defendant. However, in United States v. Vario, 943 F.3d 236 (2d Cir. 1991), the Court took this principle a step further:

Although the district judge here did not instruct the jury in order to explain their anonymity, there is no reason to believe that the absence of instructions led the jurors to

6

conclude other than that "[i]t is a common practice" to keep jurors' names and identities in confidence, an instruction we approved when given explicitly in [Tutino].

Id. at 241. Vario was approvingly cited in Wong, 40 F.3d at 1377, for the proposition that "[n]o request was made for [an explanation to the jurors about their anonymous status], so the issue was waived." Following this precedent, we cannot say that the failure to instruct the jury was plain error. Nonetheless, an instruction would certainly have been preferable.

Vondette makes a number of challenges to his sentence, but they all lack merit. Vondette argues that the amount of hashish involved was improperly calculated. However, the evidence at trial demonstrated that Vondette agreed to transport two tractor trailers of hashish. The 8,164.8 kilograms represents the hashish in the two trailers. Vondette also argues that the evidence at trial does not support the court's finding that he was an organizer within the drug organization. He contends that he was a mere courier and that he was subordinate or at most equal to the other members of the conspiracy. However, the court did not commit clear error in adopting the PSR's finding that Vondette directed the activities of numerous other participants.

Vondette argues that because he has no assets, the court should not have imposed a fine. The PSR had agreed that Vondette could not afford to pay a fine, given the forfeiture order. However, the fact that the district court was aware that Vondette had retained appellate lawyers by the time of sentencing strongly suggests that he was not without assets. United States v. Rivera, 22 F.3d 430, 440 (2d Cir. 1994) (noting that even the fact that defendant was contemplating retaining counsel raised the district court's finding beyond mere speculation). Therefore, the fine appears to have been properly imposed in this instance.

Vondette makes various challenges to the court's forfeiture order: 1) the forfeiture was excessive because the government had already obtained the full forfeitable proceeds from other members of the conspiracy; 2) forfeiture of proceeds which Vondette merely transferred as a courier and in which he had no interest was not proper; 3) Vondette's IRA accounts were not forfeitable under the anti-alienation provisions of ERISA; 4) Vondette's home was not forfeitable because he had personally built the house with material purchased with his legitimate earnings; and 5) the statute of limitations had run on some of the transactions forming the basis of the forfeiture. These challenges have no merit.

The jury returned a special verdict finding Vondette liable for well over eight million dollars. The court found Vondette liable for only a portion of that amount, however, resulting in a total forfeiture order of $2,027,845. The order of the district court took into consideration the amounts forfeited by co-conspirators. Vondette does not point to any particular item ordered forfeited by the court which one of his co-conspirators already forfeited. Nor did the court err in finding that Vondette had an interest in each of the amounts forfeited. Vondette's protestation that he was a mere courier is belied by the record, which supports an enhancement for managerial status.

The question of whether the IRA accounts are forfeitable appears to be one of first

7

impression in this Circuit. Vondette relies on the anti-alienation provision of 29 U.S.C. § 1056, which he contends have been and should be interpreted strictly. We find the Seventh Circuit's analysis of analogous RICO forfeiture provisions convincing. We agree with the Seventh Circuit's holding that ERISA accounts were not meant to be protected from criminal forfeiture. United States v. Infelise, 159 F.3d 300, 303–04 (7th Cir. 1998).

Vondette argues that he proved to the court that he had personally built his home in Oregon, purchasing construction materials with his legitimate earnings. The court properly found that the home and the IRAs were forfeitable as substitute property. Given the court's finding that the government was unable to find any other property belonging to Vondette "despite the exercise of due diligence," the application of the substitute property provisions was appropriate. 21 U.S.C. § 853(p)(1)-(2). Lastly, because the jury convicted Vondette of conspiracy, his statute of limitations argument fails. The last acts of the conspiracy fell within the statute of limitations, so the court may consider earlier acts in creating the forfeiture order.

We have considered all other arguments raised by Vondette and find them to be without merit. We therefore affirm the judgment of the district court in all respects.

FOR THE COURT:
ROSEANN B. MACKECHNIE, Clerk
By: _Lucille Carr_

Roseann B. Mackechnie, CLERK
by _Ralph_
DEPUTY CLERK

8