

GA          1

JA:BTR:br
F.#1996R0415
VondetteS2.Ind

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MICHAEL J. VONDETTE,
  also known as "Glenn Titus,"
  "Big Guy," "Big," "Harry,"
  "Steve," and "Upstate Steve,"

          Defendant.

- - - - - - - - - - - - - - X

F I L E
IN CLERK'S
U.S DISTRICT C
LONG ISLA

NOV   9

P.M
TIME A.M.

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 97-1010 (S-2) (TCP)
(T. 21, U.S.C., §§
 841(b)(1)(A)(vii),
 841(b)(1)(C) 846 and
 853; T. 18, U.S.C.
 §§ 1956(h), 982, 2
 and 3551 et seq.)

THE GRAND JURY CHARGES:

COUNT ONE
(Conspiracy to Distribute and
Possess with the Intent to Distribute)

    1. In or about and between January 1980 and October

30, 1997, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendant MICHAEL

J. VONDETTE, also known as "Glenn Titus," "Big Guy," "Big,"

"Harry," "Steve," and "Upstate Steve," after a prior conviction

for a felony drug offense had become final, together with others,

did knowingly and intentionally conspire to distribute and to

possess with intent to distribute  in excess of one thousand

kilograms of hashish, in excess of one thousand kilograms of a

mixture and substance containing marijuana and methaqualone,

Schedule I controlled substances, in violation of Section

841(a)(1) of Title 21, United States Code.

(Title 21, United States Code, Sections 846, 841(b)(1)(A)(vii) and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

## COUNT TWO
### (Conspiracy to Launder Money)

2. In or about and between October 27, 1986 and January 30, 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. VONDETTE, also known as "Glenn Titus," "Big Guy," "Big," "Harry," "Steve," and "Upstate Steve," together with others, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire to conduct financial transactions affecting interstate commerce, to wit: the transfer of currency, which transactions in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances, in violation of Title 21, United States Code, Section 841, with the intent to promote the carrying on of said specified unlawful activity, and knowing that the transactions were designed in whole and in part to disguise the nature, source, ownership and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## FORFEITURE ALLEGATION FOR COUNT ONE

3.  The allegations in Count One are hereby realleged and incorporated by reference as if fully set forth herein.

4.  As a result of his commission of the offense set forth in Count One, the defendant MICHAEL J. VONDETTE shall forfeit, pursuant to Title 21, United States Code, Section 853, to the United States the following property:

(a) All right, title and interest in any and all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of such offense. The property subject to forfeiture as proceeds of the aforesaid offense amounts to approximately $10,000,000.

(b) Any and all of defendant's property used or intended to be used, in any manner or part, to commit or to facilitate the commission of the offense alleged in Count One including, but not limited to, the property in paragraph 4(a) above.

5. If as a result of any act or omission of defendant MICHAEL J. VONDETTE any of the forfeitable property

a.   cannot be located upon the exercise of due
     diligence;

b.   has been transferred or sold to, or deposited
     with, a third party;

4

      c.    has been placed beyond the jurisdiction of the
           Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which
           cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 2,

United States Code, Section 853(p) and Title 18, United States

Code, Section 982(b)(1) to seek forfeiture of any other property

of said defendant MICHAEL J. VONDETTE up to the value of the

property described in subparagraphs 5(a) through (e) above.

      (Title 21, United States Code, Section 853; Title 18,

United States Code, Section 982)

FORFEITURE ALLEGATION FOR COUNT TWO

      6.  The allegations in Count Two are hereby realleged

and incorporated by reference as if fully set forth herein.

      7.  As a result of his commission of the offense set

forth in Count Two, the defendant MICHAEL J. VONDETTE shall

forfeit, pursuant to Title 18, United States code, Section 982,

to the United States the following property:

      (a) All right, title and interest in any and all

property, real and personal, involved in said offense and all

property traceable to such property.  The property and interest

of the defendant MICHAEL J. VONDETTE subject to forfeiture to the

United States pursuant to Title 18, United States Code, Section

982, include property, realy and personal, in the amount of

GA      5

5

approximately $10,000,000.

        8.   If as a result of any act or omission of defendant

MICHAEL J. VONDETTE any of the forfeitable property.

      a.   cannot be located upon the exercise of due
           diligence;

      b.   Has been transferred or sold to, or deposited
           with, a third party;

      c.   has been placed beyond the jurisdiction of the
           Court;
      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which
           cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 2,

United States Code, Section 853(p) and Title 18, United States

Code, Section 982(b)(1) to seek forfeiture of any other property

of said defendant MICHAEL J. VONDETTE up to the value of the

property described in subparagraphs 8(a) through (e) above.

        (Title 21, United States Code, Section 853; Title 18,

United States Code, Section 982)

                        A TRUE BILL

                        *Pascal E. Fenane*

                        FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:

**ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.131**

NEW YORK FEDERAL COURT

**INFORMATION SHEET**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1. Title of Case: United States v. Michael J. Vondette "also known as "Glenn Titus," "Big Guy," "Big," "Harry," "Steve," and "Upstate Steve,"

2. Related Magistrate Docket Number(s)

   97M 0572

   None ()

3. Arrest Date:                10/28/97

4. Nature of offense(s):    ☒   Felony
                            ☐   Misdemeanor

5. Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3 of the Local E.D.N.Y. Division of Business Rules):_____
   US. Vondette        97-1010 (JEP)

6. Projected Length of Trial:   Less than 6 weeks   (XX)
                                More than 6 weeks   ( )

7. County in which the cause of action arose: Nassau

8. Has this Indictment been ordered sealed? ( ) Yes   (X) No

9. Have arrest warrants been ordered?        ( ) Yes   (X) No

UNITED STATES ATTORNEY

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By: _____
Burton T. Ryan, Jr.
Assistant U.S. Attorney

GA    7

## CALENDAR MINUTES
## ON GRAND JURY PRESENTMENT

Before Magistrate/Judge _____ Date _11-9-00_

The Grand Jury of ___3-27-00___ handed up

_____1_____ Indictments(s) which were ordered filed
(number)

by the Court.

_____O_____ Indictment(s) were ordered sealed by
(number)

the Court

_____O_____ Bench Warrant(s) were ordered by the Court.
(number)

The Grand Jury thereupon

_____√_____ returned for further deliberations

_____ was dismissed with the thanks of the Court.



## INTERROGATORY
## TYPE AND QUALITY OF DRUGS

A. DO YOU FIND THAT THE GOVERNMENT PROVED BEYOND A REASONABLE
DOUBT THAT THE CONSPIRACY CHARGED IN COUNT ONE OF THE INDICTMENT
INVOLVED HASHISH, MARIJUANA, A MIXTURE OR SUBSTANCE CONTAINING
MARIJUANA OR METHAQUALONE.

        YES    _____

        NO     _____

B. DO YOU FIND THAT THE GOVERNMENT PROVED BEYOND A REASONABLE
DOUBT THAT THE DEFENDANT CONSPIRED TO DISTRIBUTE OR POSSESS WITH
THE INTENT TO DISTRIBUTE:

    1.    ONE THOUSAND KILOGRAMS OR MORE OF HASHISH

          YES    _____

          NO     _____

    2.    ONE THOUSAND KILOGRAMS OR MORE OF MARIJUANA OR A
          SUBSTANCE OR MIXTURE CONTAINING MARIJUANA ~~Aron Methaqualone~~

          YES    _____

          NO     _____

## SPECIAL VERDICT

WE, THE JURY, return the following special verdict as to the government's

Drug Trafficking Conspiracy

1.      We find that a money judgment should be entered against the defendant for the

sum total of the following amounts we have found are subject to forfeiture as consisting or

derived from the proceeds received directly or indirectly as proceeds of the drug trafficking

conspiracy in violation of 21 U.S.C. § 853 (a) (1) or as funds used to facilitate the drug

trafficking conspiracy in violation of 21 U.S.C. § 853 (a) (2), as alleged in Count 1.

| Amount | | Yes–Subject to forfeiture | No–Not subject to forfeiture |
|---|---|---|---|
| $1,509,170 U.S. | (Monies delivered to Mr. Sherett in Oregon by defendant after couriers transported it) | Yes–Subject to forfeiture  ✓ | No–Not subject to forfeiture |
| $2,555,000 U.S. | (Balance of gross proceeds received from sale of 3,009 lbs. of Thai marijuana) | Yes - Subject to Forfeiture  ✓ | No - Not Subject to Forfeiture |
| $450,000   U.S. | (NY deliveries from Defendant in New York  to Messrs. Auchard/Matsusaki for delivery to Mr. Fitzgerald in California) | Yes–Subject to forfeiture  ✓ | No–Not subject to forfeiture |
| $200,000   U.S. | (Transferred from Defendant to Mr. Matsusaki for payment to "Patty" to assist in Mr. Timewell's prison release) | Yes–Subject to forfeiture  ✓ | No–Not subject to forfeiture |
| $110,000  U.S. | (Transferred from Defendant to Mr. Auchard in New York for delivery to Mr. Bowler in Switzerland) | Yes–Subject to forfeiture  ✓ | No–Not subject to forfeiture |

Court exhibit
#14
6/6/01

GA    10

2

| Amount | | Yes–Subject to forfeiture | No–Not subject to forfeiture |
|---|---|---|---|
| $110,000 U.S. | (Transferred from Defendant to Mr. Auchard in Santa Monica for delivery to others for release of hashish) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |
| $300,000 Canadian currency | (Delivered by Mr. Auchard to the Defendant in Montreal) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |
| $770,000 U.S. | (Proceeds of sale of Indos marijuana) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |

Money Laundering Conspiracy

2.  We find that a money judgment should be entered against the defendant for the total sum of the following amounts, which we have found are subject to forfeiture as property involved in the money laundering conspiracy  in violation of 18 U.S.C. § 1956(h), or as property traceable to such property,  as alleged in Count 2:

| Amount | | Yes–Subject to forfeiture | No–Not subject to forfeiture |
|---|---|---|---|
| $1,509,170 U.S. | (Monies delivered to Mr. Sherett in Oregon by defendant after couriers transported it) | Yes–Subject to forfeiture ✓ | No–Not subject to forfeiture |
| $450,000  U.S. | (NY deliveries from defendant in New York  to Messrs. Auchard/Matsusaki for delivery to Mr. Fitzgerald in California) | Yes–Subject to forfeiture ✓ | No–Not subject to forfeiture |

GA  11

3

| Amount | | Yes–Subject to forfeiture | No–Not subject to forfeiture |
|---|---|---|---|
| $200,000 U.S. | (Transferred from defendant to Mr. Matsusaki for payment to "Patty" to assist in Mr. Timewell's prison release) | Yes–Subject to forfeiture ✓ | No–Not subject to forfeiture |
| $110,000 U.S. | (Transferred from defendant to Mr. Auchard in New York for delivery to Mr. Bowler in Switzerland) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |
| $110,000 U.S. | (Transferred from defendant to Mr. Auchard in Santa Monica for delivery to others for hashish) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |
| $300,000 Canadian currency | (Delivered by Mr. Auchard to the defendant in Montreal) | Yes - Subject to Forfeiture ✓ | No - Not Subject to Forfeiture |
| $11,050 U.S. | (Money obtained from sale of gold and then used in purchase of vehicle) | Yes - Subject to Forfeiture | No - Not Subject to Forfeiture ✓ |
| $27,019 U.S. | (Balance of purchase price of two vehicles) | Yes - Subject to Forfeiture | No - Not Subject to Forfeiture ✓ |

Dated:  June 6, 2001

Juror # 1

FOREPERSON

GOVERNMENT
EXHIBIT

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

                                              **MEMORANDUM
                                                   AND
                                                  ORDER**

     -against-                       97 CR 1010 (TCP)

MICHAEL J. VONDETTE, also known as
 "Glenn Titus," "Big Guy," "Big," "Harry,"
"Steve," and "Upstate Steve,"
                              Defendant.
-------------------------------------------------------X
PLATT, District Judge.

        In his second deliberate defiance and willful contempt of this Court's

order directing defendant not to serve and file any additional[1] motions except through

his court appointed counsel and a showing of good cause, defendant served a letter

motion dated March 23, 2001, which this Court forwarded (unread) to defendant's

counsel for an explanation of this contemptuous act.

        The Government has now furnished the Court with its reply to a

number of requests, including (presumably) all or some of the requests included in

defendant's March 23 letter.

        The only pending and open motion which this Court has not decided

is the Government's motion for an escorted and anonymous jury.  Based on the

---

1. By this Court's count, defendant has filed during the last three or more years approximately
eighty motions.

ground that associates of Vondette are "at large" and represent a potential threat to

the safety and lives of jurors selected in this case on April 17, 2001, the date fixed for

the commencement of the trial[2] and given the history of the defendant's associates as

outlined in the Government's letter to this Court dated April 10, 2001 and the prior

representations made by the Government herein, the motion must be and hereby is

granted. The Government is directed to advise the jury clerk immediately to prepare

the necessary designation of each of the jurors by number and the ensealment of all

of their names and addresses until after the completion of the trial. The jurors

selected and sworn for duty will be under the supervision and the escort of the U.S.

Marshals from such point forward until the conclusion of this service. The

Government will have to make provisions and arrangements for all of the foregoing.

    The Court will instruct the jurors that necessary precautions are being

taken in this case because the nature and extent of the anticipated testimony require

the same and they are to draw no adverse inferences to the defendant because any of

the precautions which are being taken.

---

2. The defendant has made two or more motions to dismiss on the ground that he has not been
accorded a speedy trial by the Court and the Government, the last of which this Court denied in
open court a month and a half ago immediately prior to the point when the defendant demanded
and was given a final six week extension to prepare for his trial.

The trial will commence on April 17, 2001 at 9:30 a.m..

SO ORDERED.

Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York
       April 11, 2001



GOVERNMENT
EXHIBIT
4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs.    ) | PRESENTENCE INVESTIGATION REPORT |
| ) | |
| MICHAEL J. VONDETTE    ) | DOCKET NO. 97-CR-1010(S-2)-01 |

---

Prepared for:    The Honorable Thomas C. Platt
                 Senior United States District Judge

Prepared by:     Andrew M. Jingeleski
                 United States Probation Officer

<u>Assistant U.S. Attorney</u>            <u>Defense Counsel</u>
Burton T. Ryan, Esq.               Michael J. Vondette (Pro se)
                                   Howard L. Jacobs, Esq.(CJA legal advisor)
                                   401 Broadway, Suite 1092
                                   New York, New York 10013
                                   (212) 431-3710

Sentence Date:    June 21, 2002 at 9:30 a.m.

Offense:          <u>Count One</u>: 21 U.S.C. §§ 846 and 841(b)(1)(A), CONSPIRACY
                  TO DISTRIBUTE AND POSSESS WITH INTENT TO
                  DISTRIBUTE HASHISH, MARIJUANA AND
                  METHAQUALONE, a Class A Felony.

                  <u>Count Two</u>: 18 U.S.C. §§ 1956(a)(1)(A), CONSPIRACY TO
                  LAUNDER MONEY, a Class C Felony.

Arrest Date:      October 20, 1997

Release Status:   In custody since arrest.

Detainers:        None.

Other Defendants: Numerous related defendants have pleaded guilty before Your Honor
                  and are awaiting sentence.

Date Report Prepared: April 18, 2002          Addendum: Yes
                                              Date: May 9, 2002

2

## Identifying Data

| | |
|---|---|
| Date of Birth: | 08-27-50 |
| Age: | 51 |
| Race: | White, Non-Hispanic |
| Gender: | Male |
| | |
| Social Security #: | 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[1] |
| FBI #: | 281618P5 |
| USM #: | 50936-198 |
| CASID#: | 05677892 |
| PACTS #: | 18798 |
| | |
| Education: | College |
| Dependents: | 0 |
| Citizenship: | United States |
| | |
| Legal Address: | Undomiciled[2] |

---

[1] The above social security number was verified by the Social Security Administration.

[2] The defendant provided an address of 12922 Harbor Boulevard #677 in Garden Grove, California, during the presentence interview. A ChoicePoint Governmental Services inquiry revealed that this address is a mail receiving service.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  On June 5, 2001, the defendant was found guilty by jury verdict to both counts of a two count second superseding indictment. Count One charges that between January 1980 and October 30, 1997, the defendant, after a prior conviction for a felony drug offense had become final, together with others, did knowingly and intentionally conspire to distribute in excess of one thousand kilograms of hashish, and in excess of one thousand kilograms of a mixture and substance containing marijuana and methaqualone, Schedule I controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).

2.  Count Two charges that between October 27, 1986 and January 30, 2000, the defendant, together with others, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conspired to conduct financial transactions affecting interstate commerce, to wit: the transfer of currency, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: distribution of controlled substances, in violation of Title 21, United States Code, Section 841, with the intent to promote the carrying on of said specified unlawful activity, and knowing that the transactions were designed in whole and in part to disguise the nature, source, ownership and control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(A). The underlying indictment and superseding indictment remain pending.

3.  On March 18, 2002, the Court granted the Government's motion for a Proposed Order of Forfeiture for a money judgment in the amount of $2,027,845, and adopted it as an order of the Court.

### The Offense Conduct

### Overview of the Drug Organization

4.  In 1996, the United States Customs Service (USCS) and the Drug Enforcement Administration (DEA) began working with local and federal law enforcement agencies to identify and prosecute individuals who were successful in promoting the distribution of multiple-ton quantities of marijuana and other illegal drugs in the New York metropolitan area.

5.  This investigation identified a series of New York wholesale drug distributors who shared common sources of supply and warehouses maintained for the wholesale drug trade. These common sources of supply were identified as a series of independently operated large-scale international drug smugglers.

4

6. These New York wholesale marijuana distributors include David Kaplan, Irvin Kletter, **Michael Vondette**, Marc Johnson, Gary Winkle, Jay Dworkin, Robert Gordon Thach, James Slattery, Thomas Pashun, James McCann, Dennis Podes, Nick Kyranious, Matthew Posnick, Glenn Sirickman, Scott Hogan, William Lynas, Joseph Rizzo, and James Greene, among others.

### The Smugglers

7. While a number of the wholesale distributors independently occasionally arranged to obtain bulk quantities of marijuana from Thailand, Mexico and other source countries, a number of large drug smuggling organizations were identified as providing bulk quantities of drugs to New York metropolitan drug dealers. The following is a description of two of the largest drug smuggling organizations, both of which were also involved in the laundering of millions of dollars in drug proceeds:

### Rice Organization

8. Glen Moore Rice headed the Rice Organization. According to case agents, Rice had residences in Mexico and the United States, and he purchased all of the marijuana for the organization from a marijuana farm in Mexico. Further, Rice was responsible for smuggling the marijuana from Mexico into Texas and California, and he controlled the distribution of the marijuana throughout the United States. Most often, the marijuana would be smuggled into this country via drug couriers. Sandra Pearl Eames supervised much of the marijuana distribution process. Rice was responsible for collecting the marijuana proceeds. The marijuana would ultimately be shipped to New York, North Carolina, Ohio, and Illinois. Agents from the USCS and the DEA estimate that between approximately 1992 and May 1996, the aforementioned organization distributed over 50,000 pounds (25 tons) of marijuana.

9. In order to help facilitate the distribution of the marijuana, Rice and Eames stored the marijuana in several warehouses located in California and Texas. Case agents advise that not only would the marijuana be "shrink-wrapped" in plastic (by using heat-sealing equipment), but Rice and Eames would use "bar-coding" equipment (similar to devices used in grocery stores) to code the marijuana in order to keep track of the shipments. In supervising the distribution of marijuana, Eames traveled to the warehouses in Texas and California, where she guaranteed that the warehouse workers were packaging the marijuana properly.

10. Eames and Rice hired truck drivers (who already had established delivery routes) to transport the marijuana across the country. Since these truck drivers usually transported furniture, the marijuana would be hidden behind the furniture and sawdust packaging.

11.    Case agents further advise that Jill Crawford, who was the owner of Rocket Travel, a company located in Toms River, New Jersey, handled the travel arrangements for Eames. Further, Eames usually traveled under fictitious names. Crawford's husband, Vincent Ricciuti, assisted his wife in running the travel agency, and also introduced Eames to suppliers who wanted to purchase marijuana from Rice's organization. One such marijuana supplier was Gary Winkel, who had operated a marijuana distribution business in the Northeast section of the United States. After Winkel was introduced to Eames in approximately 1994, Winkel became the sole recipient of the organization's marijuana shipments. Case agents advise that between 1994 and mid-1995, Winkel received approximately 15,000 pounds of marijuana from Eames, and utilized a warehouse for marijuana storage in Connecticut.

Bowler Organization

12.    Patrick Bowler headed the "Bowler Organization," a large-scale smuggling and distribution drug organization that distributed at least 100,000 pounds (50 tons) of hashish throughout the United States and Canada. Gregory Paul Timewell, Marc Johnson and Michael Vondette assisted in the distribution and sale of these drugs. Bowler arranged for the delivery and distribution shipments of hashish from Pakistan and, occasionally, of marijuana from Thailand. Bowler operated from Switzerland, France and Indonesia. Timewell, Johnson and Michael Vondette participated from both Canada and the United States.

13.    Additionally, the Rice and Bowler Organizations had common ties through the New York marijuana wholesale distribution network to other marijuana and hashish organizations, such as those headed by Nicholas Kyrianious, Donald Segoura, and Robert Gordon Thach. These individuals were responsible for distributing marijuana and hashish throughout the United States and Canada.

14.    It should be noted that as a result of the aforementioned investigation, many individuals have been arrested by the USCS and the DEA.

Defendant's Participation

15.    According to information from the Government, case agents and trial testimony, from the late 1980's to 1997, Michael Vondette was an importer and distributer of marijuana and hashish into the United States and North America. Vondette is responsible for the distribution of approximately 18,000 pounds of hashish and 3,000 pounds of marijuana during this time period. It is noted that according to the case agent and trial testimony, in the summer of 1996, Vondette sold 3,000 units of quaaludes to Randall Resnick for the purpose of distribution. In addition, the Government advised that between October 27, 1986 and January 30, 2000, Vondette conspired to launder $5,800,000 in drug proceeds from the above noted narcotics trafficking.

6

16.    Vondette was arrested on October 20, 1997, and offered no post-arrest statements.
       For guideline purposes, Vondette is responsible for the 18,000 pounds (8,164.8
       kilograms) of hashish, 3,000 pounds (1,360.8 kilograms) of marijuana and the
       3,000 units of quaaludes which he participated in importing and distributing in the
       United States from the late 1980's until his arrest in 1997. Application Note 10 of
       the Commentary to Guideline 2D1.1 specifies that in order to combine differing
       controlled substances to obtain a single offense level, they must be converted to
       their marijuana equivalent. According to the Drug Equivalency Table of
       Guideline 2D1.1, 8,164.8 kilograms of hashish is equivalent to 40,824 kilograms of
       marijuana and 3,000 units of quaaludes is equivalent to 3 kilograms of marijuana
       (since quaaludes are Schedule I substances). Therefore, for guideline purposes,
       Vondette is responsible for 42,187.8 kilograms of marijuana.

17.    In addition, case agents advised that Vondette directed the activities of at least
       five other participants to include Randall Resnick, Charles Richards, Jason Vass,
       Thomas Sherrett, Gary Matsuzaki, Brian Auchard, Lawrence Marcus, Robert
       Singer, as well as numerous other individuals who have not been convicted, in the
       course of the instant offense which is considered otherwise extensive. Per
       Guideline 3B1.1(a), a 4-level aggravating role adjustment is applicable.

       Adjustment for Obstruction of Justice

18.    The probation officer has no information suggesting that the defendant impeded or
       obstructed justice.

       Adjustment for Acceptance of Responsibility

19.    The defendant put the Government to its burden of proof at trial by denying the
       factual elements of guilt; therefore, an adjustment for acceptance of responsibility
       is not warranted. The probation officer asked no questions about the instant
       offense, since the defendant's CJA legal advisor allowed the presentence interview
       to be conducted on the condition that no such questions be asked.

       Offense Level Computation

20.    The Probation Department has determined that an ex post facto issue would exist
       if the Guidelines in effect at the time of the sentence were employed. Therefore,
       per the guidance found in U.S. v. Adeniyi, 912 F.2d 615 (2d Cir. 1990) and Miller v.
       Florida, 482 U.S. 423 (1987), the offense level in this case was computed using
       guidelines in effect at the time the offense was committed. (1998 Guideline
       Manual).

.7

Count One:

21.   Base Offense Level: The guideline for this 21 U.S.C. § 846 offense is 2D1.1(a)(3),
      which provides a base offense level of 38 for offenses involving 30,000 kilograms or
      more of marijuana. Since the instant offense involved 42,187.8 kilograms of
      marijuana, the base offense level is 38.                                    <u>38</u>

22.   Specific Offense Characteristics: None.                                     <u>0</u>

23.   Victim-Related Adjustment: None.                                            <u>0</u>

24.   Adjustment for Role in the Offense: As noted above, the defendant was an
      organizer in the instant offense. Per Guideline 3B1.1(a), a 4-level aggravating role
      adjustment is applicable.                                                   <u>+4</u>

25.   Adjustment for Obstruction of Justice: None.                               <u>0</u>

26.   Adjusted Offense Level (Subtotal):                                         <u>42</u>

Count Two:

27.   Base Offense Level: The guideline for this 18 U.S.C. § 1956 offense is 2S1.1(a)(1),
      which provides a base offense level of 23.                                 <u>23</u>

28.   Specific Offense Characteristic: As the defendant was aware that the funds were
      the proceeds of narcotics trafficking, the base offense level is increased 3 levels
      per Guideline 2S1.1(b)(1).                                                 <u>3</u>

29.   As detailed above, the Government estimated that the defendant is accountable
      for laundering approximately $5,800,000. Thus, the offense level is increased by 7
      levels pursuant to Guideline 2S1.1(b)(2)(H).                               <u>7</u>

30.   Victim-Related Adjustment: None.                                          <u>0</u>

31.   Adjustment for Role in the Offense: None.                                 <u>0</u>

32.   Adjustment for Obstruction of Justice: None.                             <u>0</u>

33.   Adjusted Offense Level (Subtotal):                                        <u>33</u>

8

### Multiple-Count Adjustment

| | | Units |
|---|---|---|
| 34. | Counts One and Two are grouped, per Guideline 3D1.2(c). | |
| 35. | Counts One and Two: Adjusted Offense Level...42 | 1 |
| 36. | Total Number of Units: | 1 |

37.    Greater of the Adjusted Offense Levels Above:                    42

38.    Increase in Offense Level (see Guideline 3D1.4):                  0

39.    Combined Adjusted Offense Level:                                  42

40.    Adjustment for Acceptance of Responsibility:  The defendant was convicted of the instant offense following a jury trial.  Therefore, an adjustment for acceptance of responsibility under Guideline 3E1.1 is unwarranted.                    0

41.    Total Offense Level:                                             42


## PART B.  THE DEFENDANT'S CRIMINAL HISTORY

### Convictions/Adjudications

| | Date of Arrest | Offense/Court | Disposition | Guidelines/ Points |
|---|---|---|---|---|
| 42. | 09-10-75 (Age 25) | Narcotics Distribution/ U.S. District Court District of Vermont Dkt#: 75-CR-65 Holden, J. | 12-19-75: 9 Months Custody, 2 Years Special Parole 12-01-77: Discharged from Parole | 4A1.2(e)(3)  0 |

The United States Probation Department for the District of Vermont advised that on September 10, 1975, the defendant was arrested by the Drug Enforcement Administration in Burlington, Vermont, for attempting to import 1,741.2 grams of hashish oil into the United States from Morocco.  The defendant entered the United States by way of Montreal, Canada, via a greyhound bus.  The defendant's case was transferred to the Central District of California.  The United States Probation Department for the Central District of California was unable to provide any information regarding the defendant's adjustment while under parole supervision.

9

## Criminal History Computation

43.    The total criminal history points are 0. According to the Sentencing Table
       (Chapter 5, Part A), 0 criminal history points establishes a criminal history
       category of I.

### Other Arrests

| Date of Arrest | Charge/Court | Disposition |
|---|---|---|
| 44. 01-18-76 (Age 25) | Possession of a Controlled Substance, Transport/ Sale of a Controlled Substance/ Los Angeles, California | Unknown |

The above information was provided by the United States Probation Department
for the Central District of California and is not reflected on the defendant's NCIC
report. An inquiry of local records failed to reflect disposition for this case or a
description of the offense. It is noted that the defendant was in custody on the
above noted federal conviction during this time.

| | | |
|---|---|---|
| 45. 08-07-80 (Age 29) | Trespassing/ Minden, Nevada | 11-21-80: Acquitted |

The United States Probation Department for the District of Nevada was not able
to find a record of this arrest. The above information was obtained from the
defendant's NCIC report.

### Other Criminal Conduct

46.    A California Department of Motor Vehicle record provided by the United States
       Probation Department for the Central District of California reflects that the
       defendant's license was suspended on October 21, 1997, for a October 13, 1997
       violation for excessive blood alcohol. It is noted that the defendant was arrested
       pursuant to a warrant for the instant offense following this violation.

# PART C.  OFFENDER CHARACTERISTICS

### Family Ties, Family Responsibilities, and Community Ties

47.    As verified by the Utah State Department of Health, the defendant was born on
        August 27, 1950, in Salt Lake City, Utah to the marital union of John Vondette
        and Jean Shirey.  The defendant's father (age 73) is a retired aerospace engineer.
        His mother (age 73) is a homemaker.  The defendant's parents both enjoy good
        health and reside in Hot Springs Village, Arkansas.

48.    The defendant has four siblings.  Jane Vondette (age 49) is unmarried with no
        children and resides in Asheville, North Carolina, where she is employed as a
        teacher.  Scott Vondette (age 42) is married with two children and resides in
        Mission Viejo, California, where he is employed as the manager of an optics
        business.  Lisa Vondette (age 40) is married with one child and resides in Simi
        Valley, California, where she is employed as a certified public accountant.  Katie
        Vondette (age 35) is married with no children and resides in Salt Lake City, Utah,
        where she is employed as a controller for Boeing.  The defendant advised that all of
        his siblings enjoy good health.  He informed that he was not able to provide
        telephone numbers with which to contact his siblings, and none could be
        independently obtained using directory assistance.

49.    The defendant recalled being raised in a middle-income setting in Salt Lake City,
        Utah (while his father was a student) and various residences in California, where
        he enjoyed a happy childhood.  He noted that the family lived in Salt Lake City
        until he was two years of age and then relocated to California.  The defendant
        advised that his father supported the family through his employment in the
        aerospace industry.  The defendant advised that he has always had a good
        relationship with his family, which continues today.

50.    The defendant's father provided the undersigned officer with an interview, wherein
        he corroborated the defendant's entire personal history.  He related that the
        defendant's arrest was a shock to the family and advised that he has never
        discussed legal matters with them.  Mr. Vondette described the defendant as a
        person of good character, relating that he has always been good to the family.  He
        stated the defendant has never caused them any trouble, noting that he has lived a
        fairly independent life since approximately 1972.  Mr. Vondette advised that the
        family is supportive of the defendant in his current legal situation and hopes the
        Court will be lenient in his sentence.

51.  According to the defendant, from 1968 to 1976, he was involved in a relationship with Shelly Deaton, which produced one child Kimberly Potowski[3]. The defendant advised that his daughter (age 30) is unmarried, with no children and resides in Chicago, Illinois, where she is employed as a linguistics professor at the University of Illinois. The defendant advised that Ms. Deaton (age 47) resides in Reno, Nevada, where she runs a ceramic tooth company. He advised that their relationship ended in 1976 because he left to travel outside the United States. He informed that he was not able to provide telephone numbers or addresses with which to contact either Ms. Deaton or his daughter. No information could be found for Ms. Deaton via directory assistance. Directory assistance had a listing for a Potowski in Chicago, Illinois; however, this individual was not the defendant's daughter.

52.  The defendant reported that he has been engaged in an "on and off" relationship with Suzanne Schoonover since his college years. Ms. Schoonover (age 45) resides in Seattle, Washington, where she is employed as a computer programmer. Their union produced one child, Amy Vondette (age 19), who resides with Ms. Schoonover in Seattle. Amy is a student. The defendant advised that they are both supportive of him in his legal situation; however, he informed that he was not able to provide telephone numbers or address information for either Ms. Schoonover or his daughter Amy. No information could be found on either individual via directory assistance. In addition, the defendant's father could not provide a telephone number for either individual.

53.  As noted above, the defendant related that he was born in Salt Lake City, Utah, but spent most of his youth in various places in California, noting that he left the family home in 1970 at the age of 20. He related that he has traveled around the world throughout his life, visiting Europe, Africa and Scandanavia. In addition, he advised that he lived in New York City from 1985 to 1990. The defendant informed that in 1994 he completed construction on a home in Sisters, Oregon, one of the places he was reportedly residing prior to his arrest. He indicated that his legal address is 12922 Harbor Boulevard #677 in Garden Grove, California; however, a ChoicePoint Governmental inquiry revealed that this is a mail drop location. A home visit could not be completed, as no one is living at either address provided by the defendant.

Mental and Emotional Health

54.  The defendant reported that he has no history of mental or emotional problems. The defendant's father corroborated this information.

---

[3] It is noted that the defendant advised that his daughter was put up for adoption after her birth. The defendant's father corroborated this information.

## Physical Condition

55.    The defendant advised that he is currently healthy and reported no history of serious injury or illness. The defendant's medical records have been requested from the Nassau County Correctional Center, and a response is awaited. The defendant's father corroborated his statements regarding his health.

## Substance Abuse

56.    The defendant reported that he first used marijuana when he was 16 years of age and has used the substance "recreationally" once or twice per week until his arrest for the instant offense. He noted that he did not use marijuana from 1980 to 1984, during a stay in North Africa, for cultural reasons. The defendant reported that he used LSD "periodically" from 1966 to 1967 and "sporadically" until he ceased use in 1978. He stated that he first consumed alcohol when he was 13 or 14 years of age and related that he occasionally went on drinking binges. He advised that he would drink to "get drunk," noting that he believes he would never have been arrested if it had not been for his alcohol consumption. The defendant's father stated that the defendant does not use illegal narcotics. He advised that the defendant consumes alcohol and, to his knowledge, used to consume alcohol to excess roughly ten years ago, noting that, to his knowledge, the defendant never received any substance abuse treatment.

## Education and Vocational Skills

57.    The defendant declined to sign the necessary authorization forms to verify his scholastic history and, unless otherwise noted, the following information has not been verified. The defendant's father corroborated the following educational history.

58.    As verified by a copy of his transcript, the defendant attended Crafton Hills College in Big Bear Lake, California, from 1983 to 1984. The transcript notes that the defendant completed 12 credits and had a grade point average of 3.4167. The defendant advised that he took paramedical classes.

59.    The defendant reported that from 1978 to 1983, he attended the University of California at Santa Barbara in Santa Barbara, California. He provided a copy of a verification of enrollment from this university which indicated that he received a Bachelor of Arts Degree in Linguistics on June 10, 1983.

60.    According to the defendant, from 1969 to 1971, he attended Cypress College, a junior college in Cypress, California. From 1965 to 1968 he reportedly attended Western High School in Anaheim, California, and from 1962 to 1965 he attended

MAR 10 '03 14:57 FR US ATTY OFFICE        631 234 8725 TO 917182546325    P.14/22
Case 9:97-cr-01010-JS    Document 468-2    Filed 08/10/06    Page 31 of 59 PageID #:
524

13

Oak Junior High School in Los Alamitos, California. He could not recall where in California he completed his elementary education.

Employment Record

61.  The defendant declined to sign the necessary authorization forms to verify his employment history and, unless otherwise noted, the following information has not been verified or corroborated.

62.  The defendant has been in custody since October 20, 1997.

63.  The defendant reported that from 1990 until his arrest, he was self employed as a contractor in Bend, Oregon, earning a gross income of approximately $20,000 per year. He provided a copy of the Oregon Construction Contractors Board web page as verification of his employment. This web page indicated that he had a contractor's license from May 30, 1998 until May 30, 1990. The defendant's father corroborated this employment.

64.  According to the defendant, from 1985 to 1990, he owned and operated Household Moving Company and Sports Moving Company in New York, New York, where he earned a gross income of approximately $9,000 to $15,000 per year. He provided no supporting documentation. The defendant's father corroborated this employment.

65.  From 1983 to 1985, the defendant was reportedly employed by a ski lift company in Big Bear, California. He stated that he was not able to remember any details regarding this employment, nor could he provide any supporting documentation.

66.  The defendant advised that he was a student from 1979 to 1983 and supported himself through odd jobs.

67.  According to the defendant, in 1980, he was employed as a cook at Caesars Tahoe, a restaurant in Nevada, where he earned a gross annual income between $12,000 and $15,000. He provided no supporting documentation for this employment. Directory assistance had no listing for Caesars Tahoe in the state of Nevada, therefore, this employment could not be verified.

68.  The defendant reported that from 1970 to 1979, he supported himself through odd jobs in the United States and throughout the world, consisting of, but not limited to, restaurant work, autobody work, ski lift work and grape picking. He provided no supporting documentation for this employment and noted that he was in federal custody from 1975 to 1976 (see Criminal History Section). The defendant advised that prior to 1970, he was primarily supported by his family.

MAR 10 '03 14:57 FR US ATTY OFFICE    631 234 8725 TO 917182546325    P.15/22
Case 9:97-cr-01010-JS    Document 468-2    Filed 08/10/06    Page 32 of 59 PageID #: 525

14

69.    The defendant advised that he has consistently filed both federal and state personal income tax returns. The defendant's Internal Revenue Service records have been received and are summarized in the chart below. It is noted that the defendant provided verification of his payment of state income tax in New York State from 1992 to 1995; Oregon from 1993 to 1996 and California from 1990 to 1991 and 1993 to 1996.

| Tax Year | Adjusted Gross Income |
|----------|----------------------|
| 1990 | $23,570 |
| 1991 | $30,537 |
| 1992 | $14,972 |
| 1993 | $19,631 |
| 1994 | $14,726 |
| 1995 | $15,091 |
| 1996 | $11,741 |

Financial Condition: Ability to Pay

70.    In a signed personal financial statement, the defendant reported his assets to consist of a home valued at $200,000 located at 17465 Mountain View Road in Sisters, Oregon, which he constructed himself and completed in 1993 or 1994. In addition, he reported approximately $2,000 in a Bank of America checking account and approximately $67,000 in Merrill Lynch investment accounts. The defendant declined to provide the account numbers or sign the proper authorizations with which the account information could be verified. He related that he declined to do so because the Government is in possession of the information pertaining to these accounts.

71.    It is noted that in a Preliminary Order of Forfeiture prepared by the Government dated October 19, 2001, the Bank of America account numbers are listed as 09325-01415; 09324-85140; 09322-85141; 09329-86355; 09327-86356; 09328-86979; and 09324-89680 with balances totaling approximately $19,478 on November 27, 2000. The Merrill Lynch account numbers are listed as 207-85k24; 207-85k27; and 207-78610 with balances totaling approximately $55,526 on November 20, 2000. It is noted that the home in Sisters, Oregon, was included in the forfeiture order.

72.    The defendant reported no liabilities.

15

73.    An Equifax credit check and an asset, judgment and lien inquiry conducted with Westlaw Services revealed no additional financial information regarding the defendant. Furthermore, an inquiry conducted with ChoicePoint Government Services provided no additional financial information.

74.    Since the Court granted the Government's motion for an Order of Forfeiture in the amount of $2,027,845, the defendant appears to be unable to pay a fine.

## PART D. SENTENCING OPTIONS

### Custody

Statutory Provisions:

75.    Count One:  The minimum term of imprisonment is 10 years, and the maximum is life. 21 U.S.C. § 841(b)(1)(A).  However, if the Court determines that the defendant has satisfied the mitigating factors in 18 U.S.C. § 3553(f), the statutory minimum term does not apply.

76.    Count Two:  The maximum term of imprisonment is 20 years. 18 U.S.C. § 1956(a)(1)(A).

77.    Guideline Provisions:  Based on a total offense level of 42 and a criminal history category of I, the guideline imprisonment range is 360 months to life.

### Supervised Release

Statutory Provisions:

78.    Count One:  A supervised released term of at least 5 years is required.  21 U.S.C. § 841(b)(1)(A).  However, if the Court determines that the defendant has satisfied the mitigating factors in 18 U.S.C. § 3553(f), the statutory minimum does not apply.

79.    Count Two:  If a term of imprisonment is imposed, a term of supervised release of not more than 3 years may be imposed, per 18 U.S.C. §§ 3583(a) and 3583(b)(2).

Guideline Provisions:

80.    Count One:  A supervised release term of 5 years is required per Guidelines 5D1.1(a) and 5D1.2(b).  However, if the Court determines that the defendant has satisfied the mitigating factors in 18 U.S.C. § 3553(f), the guideline term of supervised release is 3 to 5 years per Guideline 5D1.2(a)(1).

81.    Count Two:  If a term of imprisonment is imposed, a supervised release term of at
       least 2 but not more than 3 years is required pursuant to Guidelines 5D1.1(a) and
       5D1.2(a)(2).

### Probation

82.    Statutory Provisions: Counts One and Two: Since Count One is a Class A felony,
       the defendant is ineligible for probation by statute.  18 U.S.C. § 3561(a)(1) and 21
       U.S.C. § 841(b)(1)(A).

### Fines

Statutory Provisions:

83.    Count One:  The maximum fine is $11,600,000.
       18 U.S.C. § 1956(a)(1)(A).

84.    Count Two:  The maximum fine is $4,000,000.
       21 U.S.C. § 841(b)(1)(A).

85.    A special assessment of at least $200 ($100 each count) is mandatory.
       18 U.S.C. § 3013.

86.    Guideline Provisions:  The fine range for the instant offense is from $25,000 to
       $15,600,000 per Guidelines 5E1.2(c)(3) and (c)(4).

### Denial of Federal Benefits

87.    Pursuant to 21 U.S.C. § 862 upon the first conviction for distribution of a
       controlled substance, the Court may declare the defendant ineligible for certain
       Federal benefits for up to 5 years after such conviction.  This provision, however, is
       not applicable for any defendant who cooperates with the Government.

MAR 10 '03 14:58 FR US ATTY OFFICE    631 234 8725 TO 917182546325    P.18/22
Case 9:97-cr-01010-JS    Document 468-2    Filed 08/10/06    Page 35 of 59 PageID #:
528

17

## PART E.  FACTORS THAT MAY WARRANT DEPARTURE

88.    Per Application Note 1 of the Commentary to Guideline 5D1.1, the Court may
       downwardly depart by not imposing a term of supervised release, if it determines
       that supervised release is neither required by statute nor required for any of the
       following reasons: (1) to protect the public welfare; (2) to enforce a financial
       condition; (3) to provide drug or alcohol treatment or testing; (4) to assist in the
       reintegration of the defendant into the community; or (5) to accomplish any other
       sentencing purpose.

                                        RESPECTFULLY SUBMITTED:

                                        JAMES M. FOX
                                        CHIEF U.S. PROBATION OFFICER

Prepared by:


_____
Andrew M. Jingeleski
U.S. Probation Officer

Approved by:


_____
James J. Fonti
Senior U.S. Probation Officer

Defendant: Michael J. Vondette
Docket No: 97-CR-1010(S-2)-01
For Sentence: June 21, 2002

## ADDENDUM TO THE PRESENTENCE REPORT

Since disclosure of the presentence report (PSR), the Government has advised the Probation Department that a Prior Felony Information was filed for the defendant's prior conviction of Possession of a Controlled Substance with the Intent to Distribute, a violation of 21 U.S.C. 841 (see ¶ 42 of the PSR). The defendant was sentenced pursuant to a plea of guilty in the United States District Court for the District of Vermont on September 9, 1975, to a term of 9 months imprisonment followed by 2 years special parole. As a result, the sentencing options are amended as follows:

75.    Count One: The minimum term of imprisonment is 20 years, and the maximum is life. 21 U.S.C. § 841(b)(1)(A). However, if the Court determines that the defendant has satisfied the mitigating factors in 18 U.S.C. § 3553(f), the statutory minimum term does not apply.

RESPECTFULLY SUBMITTED:
JAMES M. FOX
CHIEF U.S. PROBATION OFFICER

Prepared By:

_____
Andrew M. Jingeleski
U.S. Probation Officer

Approved by:

_____
James J. Fonti
Senior U.S. Probation Officer
Date: May 9, 2002

Defendant: Michael J. Vondette
Docket No: 97-CR-1010(S-2)-01
For Sentence: July 12, 2002

## SECOND ADDENDUM TO THE PRESENTENCE REPORT

## OBJECTIONS

### By The Government

To date, the Government has not submitted any objections to the presentence report
(PSR).

### By The Defendant

We are in receipt of the defendant's letter dated June 27, 2002, which is attached. The
defendant makes a number of objections concerning factual information contained in the
offense conduct section of the PSR relating to the narcotics conviction on count one of
the superseding indictment, as well as objections to the money laundering conviction on
count two of the superseding indictment and the issue of forfeiture. With regard to the
information contained in the offense conduct and the resulting guideline computation,
the defendant accuses the Probation Department of using "unsubstantiated and
uncorroborated conclusory statements" and an "apparent failure to exercise due
diligence." It is noted that the information contained in the offense conduct section of
the PSR was taken directly from trial testimony and affirmed by the Government prior to
disclosure of the PSR. Additionally, upon re-interview of the Assistant U.S. Attorney
assigned to this case, he reaffirmed the accuracy of this information, noting that this
information comes directly from the trial testimony that lead to the defendant's
conviction. As a result, the Probation Department maintains no revisions to the offense
conduct section or total offense level are warranted. Additionally, the defendant argues
that he is entitled to a role reduction in the instant offense. The Probation Department
maintains that the defendant is not deserving of a role reduction. To the contrary, as
detailed in the PSR, evidence reflects that the defendant was an organizer in the instant
offense and as such, a 4 level aggravating role adjustment is applicable.

For clarification purposes, as stated in the PSR, application Note 10 of the Commentary to Guideline 2D1.1 specifies that in order to combine differing controlled substances to obtain a single offense level, they must be converted to their marijuana equivalent. Therefore, all of the narcotics the defendant is responsible for are combined together to arrive at a total weight of 42,187.8 kilograms of marijuana, which properly results in a base offense level of 38.

Additionally, it is noted that Guideline 1B1.11(a) states, "The court shall use the Guidelines Manual in effect on the date the defendant is sentenced," unless, as in the instant case, an ex post facto issue exists which directs the court to use the Guidelines Manual in effect on the date the offense of conviction was committed. Further, Guideline 1B1.11(b)(2) states, "The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual..."

The defendant objects to the use of his 1975 federal conviction in Vermont for Narcotics Distribution "in order to enhance the potential sentence" under 21 U.S.C. §841(b). He argues that the Government is precluded from using this sentence as it is an ex post facto violation, he was adjudged a young adult offender,[1] the statute of limitations has run, the "Rule of Lenity," the doctrine of "collateral consequences" and for reasons articulated in Apprendi v. New Jersey 530 U.S. 466 (2000). Simply put, 21 U.S.C. § 841(b) provides that "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment ..." The above provision makes no reference to a time limit, a statute of limitations or an age limit which would suggest that the conviction is not applicable. It is noted that the Government filed a prior felony information citing the defendant's conviction of a felony offense on September 9, 1975, in the United States District Court, District of Vermont.

In addition, the defendant wishes to note that his legal address is 12922 Harbor Boulevard, #677, Garden Grove, California 92640. The defendant also notes that he was not arrested on January 18, 1976, as stated in ¶ 44 of the PSR, but rather was being transferred to FCI Lompoc, California, to finish his sentence.

---

[1] It is noted that the defendant was 25 years of age.

Further, the defendant seeks downward departures, arguing they are warranted due to disproportionate sentencing disparity, substandard non-federal presentence confinement, lengthy pretrial confinement, unusual stress due to incarceration and the contraction of Hepatitis C while in custody.    The Probation Department takes no position regarding the defendant's downward departure motions.


RESPECTFULLY SUBMITTED:
JAMES M. FOX
CHIEF U.S. PROBATION OFFICER

Prepared By:


_____
Andrew M. Jingeleski
U.S. Probation Officer

Approved by:


_____
Carmen E. Leichtle
Supervising U.S. Probation Officer
Date: July 11, 2002



UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
  UNITED STATES OF AMERICA,

                Plaintiff,  :

   -vs-

                       :

  MICHAEL VONDETTE,
                       :

                Defendant.
--------------------------------------X

97-CR-1010 (S-2)(TCP)


MOTION FOR JUDGEMENT OF ACQUITAL AND/OR
FOR A NEW TRIAL

     NOW COMES Michael Vondette, defendant <u>pro se</u> ("Defendant"), in the above cap-tioned case, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, and hereby moves this Honorable Court to grant this motion for acquital and/or for a new trial.

     This instant motion is based upon the instant motion, the trial records, files, and records of the instant action, and the incorporated memorandum of law.

     This instant motion is made pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, which states in relevant part:

       "[I]f a verdict of guilty is returned the Court may on such motion
       set aside the verdict and enter a judgement of acquital."

and Rule 33 of the Federal Rules of Criminal Procedure, which states in relevant part:

       "[T]he court on motion of a defendant may grant a new trial to that
       defendant if required in the interest of Justice."

     The Defendant hereby moves for the herein relief requested for the reasons, as set forth in detail below.

## 1. <u>Outrageous Government Misconduct</u>

     Wherein, United States District Court Judge LETTS  found "<u>misconduct</u>" by the Government in connection with this case (See <u>U.S. v. KULICK</u> (JSL)(C.D.CA.) 97-CR-110), however, the Court improperly denied the Defendant from submitting the relevant and material facts to the jury.  See <u>U.S. v. PARDUE</u> 983 F2 843 (8th Cir 1993); <u>U.S. v. ARCHER</u> 486 F2 670 (2d Cir 1973); <u>U.S. v. TWIGG</u> 588 F2 373 (3d Cir 1978).

     As stated in <u>U.S. v. ROMANO</u> 706 F2 370 (2d Cir 1983), the Circuit wrote:

     "[I]n <u>TWIGG</u> [588 F2 373 (3d Cir 1978)], the defendant's were incapable
     of committing the crime charged, ..., without the active intervention
     and supervision of the Government ..."

and such is the case here.

2.  **Jurisdictional Entrapment -- Manufactured Jurisdiction**

As held in U.S. v. LaPORTA 46 F3 at 160 (2d Cir 1994), the Circuit stated:

> "[T]he due process requirement of fundamental fairness may have a special pertinence when [the] government creates opportunities for criminal conduct in order to apprehend ..."

U.S. District Court Judge LETTS explicitly found the Government Agents clearly and fraudulently "manufactured jurisdiction" in the United States in connection with the instant case.  Furthermore, this Court incorrectly addressed the "entrapment" issue (also found by Judge LETTS), as being entraped to do the crime itself -vs- entraped as to a specific ELEMENT of the alleged offense, i.e. "INTENT" -- the correct issue at bar.  This Court was clearly erroneous in both not holding the proper pre-trial hearing, and by denying this issue to be submitted to the jury.  See U.S. v. RUSSELL 411 U.S. 423, 93 SCt. 1637 (1973); U.S. v. CHIN 934 F2 393 (2d Cir 1991).  See also TWIGG, supra; ARCHER, supra.

As the Supreme Court made explicitly clear in JACOBSEN v. U.S. 503 U.S. 540 (1992), this Court is mistaken in claiming that the Government's conduct prior to the alleged conspiracy is irrelevant.  The Supreme Court previously held in SORRELLS v. U.S. 287 U.S. 435 (1932), that the Government may NOT punish an individual:

> "for an alleged offense which is the product of the creative activity of its own officials"

and as further stated in JACOBSEN, supra:

> "[I]n their zeal to enforce the law, however, Government agents may not originate a criminal design."

Clearly, in the instant action, as per the files and records, it is beyond cavil that; "If NOT for the actions of the Government Agents there is NO criminal offense committed".

3.  **Lack of Proper VENUE**

Both the U.S. Constitution and Rule 18 of the Federal Rules of Criminal Procedures require prosecution of an offense in a district where the offense was "committed".  According to the Supreme Court, venue is proper only where an act constituting an "essential conduct element" of the charged offense occurs.  See U.S. v. CABRALES 524 U.S. 1, 118 SCt. 1772 (1998); U.S. v. RODRIGUEZ-MORENO 526 U.S. 275, 119 SCt. 1239 (1999).

This court made a finding of law pertaining to Venue on Count One only, albeit attenuated at best, and clearly subject to further scrutiny, however, this Court did NOT make a finding pertaining to Count Two, Conspiracy to Laundry Money.  Thus, as clearly shown at trial, Count Two must be dismissed due to lack of Venue in the E.D.N.Y.  See CABRALES, supra; U.S. v. SMITH 198 F3 377 (2d Cir 1999); U.S. v. BRENNAN 183 F3 139

-2-

(2d Cir 1999); U.S. v. STRAWBERRY 892 FSupp 519 (SDNY 1995).

4.  **VARIANCE**

There exists a real and tangible difference between the allegations in the
Indictment and the proof offered in its support.  This difference is both substantial
and material wherein the evidence offered at trial proved facts materially different
from those alleged in the Indictment.  This variance includes, but may not be limited
to the following:

A.  **Multiple -vs- Single Conspiracy**

The evidence at trial provided a sufficient basis for the jury to find that
several separate and distinct conspiracies transpired -- contrary to the Indictment's
single conspiracy allegation.  This fact, combined with the Court's error of not sub-
mitting a limiting instruction, nor a multiple conspiracy instruction, creates prejudice
sufficient enough to mandate acquital and/or a new trial.  See U.S. v. JOHANSSEN 56 F3
347 (2d Cir 1995); U.S. v. BERGER 224 F3 107 (2d Cir 2000); U.S. v. BERTOLOTTI 529 F2
149 (2d Cir 1975).

B.  Statute of Limitations — Improper Time Frame

Although an indictment need only be on or around a specific given date, and
not on that exact date, the instant indictment, in contrast to the evidence submitted
at trial, is far, far to attenuated to be proper.  In Count One the government has
an approximately EIGHT(8) YEAR error as to when that alleged conspiracy begins; and in
Count Two an approximately THREE(3) YEAR error as to when that alleged conspiracy ends.
Therefore, the government clearly proved facts materially different from those alleged
in the indictment.

C.  Improper Retroactive Misjoinder

By the improper misjoinder of separate, distinct, and disparate multiple con-
spiracies into a manufactured alleged single "MASTER" conspiracy lacking the requisite
common scheme, plan, and overriding goal, the Defendant was clearly prejudiced by the
inappropriate spillover evidence.  Thus, the government has charged multiple crimes in
a single count for both Count One and Count Two, and improperly manufactured and created
a non-existent "enterprise conspiracy".  See U.S. v. BIAGGI 705 FSupp852 (SDNY 1988);
U.S. v. MUNOZ-FRANCO 986 FSupp 70 (D.PR. 1997).

In short, the government has clearly shown, inter alia, evidence of separate and
distinct networks of individuals operating completely independent of each other.  Further-
more, the goals of a "single conspiracy" can NOT, as shown by the government at trial,
be at "cross-purposes", for example, CANADA -vs- UNITED STATES.  Thus, for all the fore-
going reasons, this Court should grant the herein requested relief.  See U.S. v. ARENA

-3-

918 FSupp 561 (NDNY 1996); U.S. v. HEINEMANN 94 LED2 163 (1987); U.S. v. MALDONADO-RIVERA 922 F2 934 (2d Cir 1990); JOHANSEN, supra.

## 5. LACK OF UNANIMITY

The government's case-in-chief at trial with its improper multiple alleged "enterprise conspiracy" theory raises the real and tangible uncertainty of whether the general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another.  See U.S. v. ARACHI 968 F2 1512 (2d Cir 1992); U.S. v. MARGIOTTA 646 F2 729 (2d Cir 1981); U.S. v. RICHARDSON 143 LEd2 985 (1999).

This unanimity issue is particularly applicable to Count Two, the Conspiracy to Laundry Money, wherein the Court improperly allowed the disjunctive interpretation of the two(2) separate and discrete "Prongs" which must be proved individually.  This error by the Court clearly mandates a dismissal of Count Two.  See U.S. v. SHVARTS 90 FSupp2 219 (EDNY 2000); U.S. v. MONACO 194 F3 391 (2d Cir 1999); U.S. v. CALDERON 169 F3 718 (11th Cir 1999); U.S. v. STUDLEY 47 F3 569 (2d Cir 1995).

Applying the well recognized policy considerations to the instant action, it is clear that certain alleged and uncorroborated activities relied upon by the government during its case-in-chief at trial to substantiate their claim, do not assure 'UNANIMITY' within the jury, and moreover, do not adequately account for double jeopardy and other sentencing concerns.  See JONES 526 U.S. 227 (1999); CASTILLO 120 SCt. 2090 (2000).

## 6. DUE PROCESS VIOLATION(S)

This Court seriously undermined the Defendant's U.S. Constitutional right(s) to properly defend himself and submit evidence in support of his case, by refusing to hold the proper "evidentiary hearings", including, but not limited to the following issues:

### A. Anonymous and Escorted Jury — Insufficient Voir Dire

This Court improperly allowed an unsubstantiated, uncorrobotated, and unsupported government allegation for an "anonymous and escorted" jury — combined with insufficient and inadequate voir dire questions as  requested by Defendant.

### B. Tainted Evidence — Suppression

Evidence that is the "fruit of the poisonous tree", as clearly demonstrated by 'clear and convincing' evidence as found by U.S. District Court Judge LETTS pertaining to the instant action, mandated a pre-trial hearing.

### C. Manufactured Jurisdiction and Outrageous Government Misconduct

Again, as found by 'clear and convincing' evidence from U.S. District Judge LETTS.

### D.  Welty and/or Cursio Hearings

Wherein this Court failed to hold the proper hearing(s) regarding the Defen-
dant's fully retained counsel of choice, Robert Kalina, Esq. and his unsubstantiated
and self-serving claim of "conflict of interest". This Court further improperly and
erroneously allowed two(2) different retained "counsel of choice" to withdraw **against
Defendant's wishes**; and further failed to appoint an attorney to advise Defendant during
the periods wherein the Defendant was neither pro se, nor represented by counsel. See
U.S. v. CURSIO 680 F2 81 (2d Cir 1982); U.S. v. FAN 36 F3 240 (2d Cir 1994).

### E.  Rebuttal Hearing

This Court failed to hold the proper hearing pertaining to Defendant's meri-
torious motion for "Vindictive Prosecution" and 'prosecutorial misconduct" -- in con-
junction with the action filed pursuant to 42 U.S.C. §1983, regarding prosecutorial
misconduct within the instant case. See KING 126 F3 394 (2d Cir 1997); GODWIN 457 US 368 (1987).

### F.  Perjury

Wherein the Defendant submitted "irrefutable proof" of perjury from either the
government's primary witness (RESNICK) and/or from its primary investigative detective
(HOLMES) -- both of which testified at the trial of the matter. See BOISSON 926 F2 230 (2d '91).

### G.  Overt Acts

This Court refused and denied to add real, tangible, and material "overt acts"
to the indictment, as requested by the Defendant; and further refused to conduct the
necessary hearings pertaining to these "overt acts".

### H.  Violations of 18 U.S.C. §201, the anti-gratuity statute

All the alleged co-conspirators who testified on behalf of the government at
trial were promised charging, sentencing, and/or financial considerations by the gov-
ernment in exchange for their testimony (to wit, "something of value"), in clear vio-
lation of 18 U.S.C. §201. See U.S. v. SUN DIAMOND 119 SCt. 1402 (1999), in conjunction
with HRC 4286, the Citizens Protection Act ("CPA"), effective April 19, 1999, and impli-
menting 28 U.S.C. §530(B). See also U.S. v. LOWERY 166 F3 1119 (11th Cir 1999); U.S. v.
MONGELLI 794 FSupp 529 (SDNY 1992).

### I.  "Findings of Fact" and "Conclusions of Law"

This Court refused to submit, in writting, its specific "findings
of fact" and "conclusions of law" in response to the Defendant's disposi-
tive motions, as requested by the Defendant.

### J.   Suspect Government Audio-tape

This Court refused, after having granted the Order, to have the government's <u>One and Only</u> audio-tape analyzed by an independent sound pro- fessional to determine what the Defendant, Joel Weiss, Esq. (appointed counsel), and Robert Kalina, Esq. (retained counsel), <u>ALL</u> agreed clearly appeared to be an altered and/or tampered with audio-tape.

### K.   Judge Recusal

Wherein, this Court refused to even consider the Defendant's pre- trial motion to recuse the Judge pursuant to 28 U.S.C. §455, the the sub- sequent refusal to submit its "conclusions of law" and "findings of fact" pertaining to this motion.

All the foregoing clearly demonstrate an overwhelming prejudice to the Defendant's ability to properly defend himself by denying him the proper opportunity to develop a defense.   Furthermore, the relevant and material evidence refused and denied by this Court's improper rulings fur- ther demonstrate an animus towards the Defendant so strong that it has clearly infected the Court's decisions and prejudiced the proceedings to the extent of necessitating a new trial.   See <u>U.S. v. MORRISON</u> 449 U.S. 365 (1983); <u>SEGURA v. U.S.</u> 468 U.S. 796 (1986); <u>NIX v. WILLIAMS</u> 467 U.S. 431.

### 7.   BRADY Violations

#### A.   Government Withheld Audio-tape

The Defendant requested for audio-tapes from both the TIMEWELL and SHERRETT cases in 1998, with repeated requests after the initial request.   However, the Defen- dant was <u>NEVER</u> provided with the opportunity to properly review these tapes.   In fact, the tapes were <u>NOT</u> turned over directly to the <u>pro se</u> Defendant until <u>AFTER</u> mid-way through the trial; and <u>after</u> both parties had already testified (i.e. around May 30, 2001).   Even then, the Defendant, being housed at Nassau County Correctional Center, was <u>NOT</u> afforded sufficient, nor adequate time or means to listen to these relevant and material audio-tapes.   It was not until <u>after</u> the conclusion of the trial that the Defen- dant was finally able to listen to these very essential and important audio-tapes.

#### B.   Travel Records

The Defendant, again beginning in 1998, repeatedly requested the "Travel Records" of the government's proposed witnesses.   Including, but not limited to, <u>Passports</u>, air- line tickets, rental agreements — all of which is relevant and material to the defense.

## C.  Bill of Particulars

This court granted a motion for a Bill of Particulars, however, <u>never</u> compelled the government to fullfill its obligation.  For example, the Defendant's November 24, 2001, Bill of Particulars specifically requests the relevant and material facts concern‐ ing the alleged money laundry conspiracy ⁻ which was <u>NEVER</u> submitted by the government, thus failing to provide proper NOTICE and denying the Defendant the ability to properly defend himself.  See <u>U.S. v. TRAMUNTO</u> 513 F2 1087 (2d Cir 1975); <u>U.S. v. BAIEY</u> 444 U.S. 394 (1980).

## D.  Civil Action 99‐CV‐05257 (TCP)

This action against the Department of Justice (i.e. DEA, FBI, BOP, U.S. Attor‐ neys Office) specifically requested the Defendant's <u>unredacted</u> files pursuant to the Freedom of Information Act ("FOIA").  However, even though filed in 1999, this Court re‐ fused to rule on this case and improperly granted stay after stay for the government. Even going so far as to ignore the Defendant's timely and proper "Motion for Summary Judgement".  The Defendant claims he has <u>STILL NOT</u> received his "unredacted" FOIA files from the various U.S. Government Agencies, including the U.S. CUstoms Service ⁻ to this day.

## E.  Rule 17(c) Subpoena(s)

This court granted the Defendant use of subpoena(s) pursuant to Rule 17(c), how‐ ever, refused to "issue and order" those subpoena(s); and further refused to compel the government to disclose the information requested.  The Defendant submitted subpoena(s) for the DEA, U.S. Customs Service, and U.S. Attorney Office requesting specific relevant and material evidence to defend himself ⁻ all of which was ignored.

The foregoing BRADY violations caused severe and injurious prejudice to the Def‐ endant by denying material and relevant evidence essential to the defense of his case. Thereby mandating a new trial, if not an outright judgement of acquital.  See <u>U.S. JOHN SON</u> 114 SCt. 418 (1993); <u>U.S. AGURS</u> 427 U.S. 97 (1976).

Finally, <u>APPRENDI v. NEW JERSEY</u> 530 U.S. ___, 120 SCt. 2348 (2000), holds that the prosecution must clearly define the facts that demonstrate and support <u>ALL</u> the sub‐ stantive elements whose proof is essential to the establishment of any criminal liability. The foregoing "material" omissions clearly indicate the government has failed to do so.

## 8.  Improper, Insufficient, and Erroneous Indictment

The Instant indictment (i.e. [S‐2]), simply attempts to improperly <u>gild</u> an iden‐ tical earlier charge.  The Courts have clearly established that dismissal is required be‐ cause the indictment merely;

"... 'gilds' an earlier charge." or sets forth a "... mere difference in
accusational dates"

See <u>U.S. v. GIAMBRONE</u> 920 F2 176 (2d Cir 1996); <u>U.S. v. BILLOTA</u> 645 FSupp 396 (EDNY 1990);
<u>U.S. v. NAPOLITANO</u> 761 F2 138 (2d Cir 1985).

    The Indictment, as pled, improperly and impermissibly <u>alters</u> the presentation
of the charges so as to impermissibly modify the "essential elements" of the alleged of-
fense.  Thus, the Defendant was found by the grand jury of an alleged offense other than
that charged in the indictment.  Specifically, the government alleges "multiple conspira-
cies" concerning and including the simple sale of "methaqualone", or, as the indictment
reads in relevant part:

    "... in excess of one thousand kilograms of a mixture and substance
    containing marijuana <u>and</u> methaqualone "        (emphasis added)
this clearly improper and inaccurate pleading creates a resulting "UNANIMITY" concern as
to what the grand jury actually found.

    Furthermore, the government has purposefully evaded the U.S. Constitutional re-
quirements associated with the characterization of a fact as an element, wherein the Def-
endant's <u>prior</u> was never an "<u>element</u>" of any crimes alleged in the indictment.  Either the
prosecution purposefully refused and/or failed to properly investigate the Defendant's
1975 prior, thereby tainting the entire grand jury proceeding, or, on the other hand,
knew the prior to be non-applicable and therefore purposefully "prejudiced" the grand jury
proceeding with its inclusion.  Either way, the grand jury was impermissibly misled into
believing they could consider the <u>prior</u>.  It is well established by the Courts that the
mere mention or knowledge of a prior conviction is prejudicial to the Defendant in both
grand and petit jury setting.

    Additionally, the indictment, judged on its face (e.g. improper inclusion of the
1975 prior, and multiple conspiracies), is Constitutionally deficient in violation of
the Double Jeopardy Clause.  The U.S. Constitution's Double Jeopardy Clause supports a
claim to a charge, as here, that the government may <u>NOT</u> Constitutionally include, so long
as it is clear from  'the face of the record the government had no power to enter the
prior conviction', to wit, the government had almost FOUR(4) years to verify and confirm
that the 1975 conviction was prohibited via Double Jeopardy; ex-post facto; statute of
limitations; and the Federal Youth Corrections Act ("FYCA").  See <u>TUTEN v. U.S.</u> 460 U.S.
660 (1983); <u>U.S. v. BEAULIEAU</u> 959 F2 375 (2d Cir 1992); <u>DOE v. PATAKI</u> 120 F3 1263 (2d Cir
1997).

    Finally, contrary to the Supreme Court's findings in <u>APPRENDI</u>, supra,
by pleading an unspecified, non-particular, and unitary alleged "<u>conspiracy enterprise</u>",
the Defendant is impermissibly prejudiced because the structure of the pleading unfairly

suggests to the grand jury that they may consider any offense their imagination can conjure up. Moreover, by failing to allege specific, discrete, and identifiable "conspiracies", the indictment has impermissibly left out essential "<u>SUBSTANTIVE ELEMENTS</u>" of the alleged criminal offense. In fact, the government's indictment has failed to demonstrate or even allege "<u>a conspiratorial act, in itself, subject to criminal sanction</u>", this error is fatal.

Ultimately, the fundamental inquiry within any single defendant indictment must concern itself with the individual defendant's conduct, <u>NOT</u> the conduct of others. Perforce, neither an <u>actus reus</u>, nor a <u>mens rea</u> need be present, however, because the <u>grand jury was not provided any quantifiable or discernable facts or conduct</u>, it was impossible to determine whether or not the Defendant's alleged conduct has risen to the level of a violation.

Therefore, this indictment, improperly and insufficiently pled with its multiple conspiracies, unanimity, and fact -vs- element errors, is clearly tainted and should be dismissed. See <u>U.S. v. DIGRIGORIO</u> 795 FSupp 630 (SDNY 1992); <u>U.S. v. DUBO</u> 186 F3 1177 (9th Cir 1999); <u>U.S. v. SPINNER</u> 180 F3 514 (3d Cir 1999).

## 9.  Speedy Trial Violations

The right to a Speedy Trial has both Constitutional and statutory underpinnings. Federal statutes of limitations; the Due Process Clause of the Fifth Amendment to the U.S. Constitution; the Sixth Amendment's speedy trial guarantee; and the Speedy Trial Act of 1974 ("STA"), as codified in Title 18 U.S.C. §§3161 - 3174 (1994) -- <u>ALL</u> of which, the Defendant submits, have been violated within the instant action.

As aptly stated by U.S. Circuit Justice LEVANTHAL in 1988:

"[I]f the government, police, and prosecutor could always be trusted to do the right thing, there would have never been a need for the BIll of Rights."

### A.  Due Process Violation

The government's <u>forty-three(43) months</u> of pre-trial detention clearly caused substantial and injurious prejudice to the Defendant. To have been continuously incarcerated, absent set bail, and <u>presumed innocent</u> for this amount of time has crossed the Court's clearly established threshold into <u>PUNISHMENT</u>. See <u>BARKER v. WINGO</u> 407 U.S. 514 (1972); <u>U.S. v. DOGGETT</u> 505 U.S. 652 (1992).

### B.  Impermissible Government "Tactical Advantage"

The instant action has the government's improper, erroneous, and falacious

-9-

allegation of a "complex-case". It is well established that the Courts are pro-
hibited from granting an "ends-of-justice" exclusion unless it balances the factors
specified in Title 18 U.S.C. §3161(h)(8), of the Speedy Trial Act ("STA"), at the
outset of the period to be excluded -- something which this Court FAILED to do.

   The Courts are also very clear in that the "ends-of-justice" exclusions
intended by Congress is to be "**rarely used**", and that the Courts failure to set
forth the specific "ends-of-justice" findings when granting continuances, as here,
means the entire subsequent period of time is NOT EXCLUDABLE; and retroactive finding
insufficient to make the contested time excludable. See U.S. v. SPRING 117 SCt. 385
(1996); U.S. v. KELLY 45 F3 45 (2d Cir 1995); U.S. v. CLYMER 25 F3 824 (1994).

   This case has ONLY one(1) solitary defendant, with ONLY two(2) Counts; and
the same evidence from the same witnesses being used for both Counts. This case
clearly demonstrates a blatant government "**ploy and maneuver**" designed to "**manipu-
late the Court calander**" for an impermissible "**TACTICAL ADVANTAGE**". See U.S. v.
HOLYFIELD 479 U.S. 1090 (1987); U.S. v. GOMEZ 116 SCt. 737 (1996); U.S. v. CLARK 83
F3 1350 (1996).

   Furthermore, the trial of this case took ONLY SEVEN(7) **days**, clearly demon-
strating that the case was neither "complex", or even difficult. Such a short trial,
with so few Counts; and ONLY **one(1) solitary Defendant** proves that the spurious gov-
ernment allegation was clearly a misrepresentation of the issue.

   It is further well established that juries are presumed capable of "compart-
mentalizing Counts and evidence", hence, very few trials require the unique status
due to their 'complexity'. The instant trial was for ONLY SEVEN(7) **days**, and there-
fore the jury would have NO problems remembering the pertinent facts, evidence, and
legal issues. Furthermore, "complex-case" status is NOT necessary, as specific "jury
instructions" are sufficient to satisfy the case requirements. See U.S. v. HOULIHAN
92 F3 1271 (1996); U.S. v. HERNANDEZ 85 F3 1023 (2d Cir 1996). See also, U.S. v.
GORDON 990 FSupp 171 (E.D.N.Y. 1998)(case includes six(6) defendants and seventy-
three(73) Counts, and NOT deemed COMPLEX).

   Indeed, the falacious complex-case allegation, wherein the government con-
tends that this Court is unable and/or "incapable" of explaining and communicating
the simple facts concerning one(1) solitary defendant with only two(2) related
charges -- even with additional "jury instructions" -- indicates that the govern-
ment believes this Court to be incompetent.

Unless, on the other hand, as the Defendant argues, this "conspiracy" is a purposeful, egregious, and illegal "**ploy and maneuver**" perpetrated upon the Defendant by both the government and this Court. Moreover, both the government's and this Court's misplaced, unreasoned, and illconceived "**misuse**" of the mantra of alleged "complexity" has subjected the Defendant to severe, compelling, and injurious prejudice –– and, thus, this case must be dismissed. See U.S. v. DRAGONE 78 F3 65 (2d Cir 1996); U.S. v. UPTON 921 FSupp100 (EDNY 1995); U.S. v. GAMBINO 59 F3 353 (2d Cir 1995); KELLY, supra; U.S.v. BEECH-NUT 871 F2 1181 (2d Cir 1989).

## 10.  Insufficient and Improper Evidence

The court improperly allowed inadmissible hearsay, wherein: a) statements were offered and allowed to support an implied assertion; b) statements showing 'state of mind' were allowed to prove truth of the inderlying facts asserted; c) contested and clearly questionable alleged hearsay (e.g. "irrefutable proof" of PERJURY), was impermissibly allowed to become alleged "fact-evidence" against the Defendant.  See LILLY v. VIRGINIA 527 U.S. ___, 144 LEd2 117 (1999); U.S.v. BOURJAILY 107 SCt. 2775 (1987); Federal Rules of Evidence 104 and 801.

Furthermore, the Court erroneously allowed the inclusion of evidence of an alleged "**alias**" (to wit, GLEN TITUS), that was never shown to be connected or related in any way to any of the alleged charges within the indictment –– and, which was never demonstrated to be related, connected, and/or involved with any of the government's witnesses at trial.  This improper evidence was, however, extremely prejudical to the Defendant.

Therefore, other than the government's clearly payed-for ("bribed") testimony (see 18 U.S.C. §201), including inadmissible "perjured" statements; and the impermissible, irrelevant, and immaterial "**alias**" evidence, the government's case is lacking the requisite standard of evidence sufficient enough to support the jury's findings.  Moreover, without the inclusion of this clearly improper and inadmissible evidence (wherein this Court erroneously denied a pre-trial evidentiary hearing), the jury would surely have found differently.  See U.S. v. DELANOY 867 Fsupp 117 (NDNY 1994);  U.S. v. D'AMATO 39 F3 1249 (2d Cir 1994); U.S. v. TRAMUNTI 500 F2 1334 (2d Cir 1974).

## 11.  Denied Opportunity to Present Viable Defenses

Contrary to the Supreme Court's holding in U.S. v. JOHNSON 114 SCt. 418 (1993), wherein the Court stated:

-11-

> "a criminal defendant is entitled to submit <u>any defense</u> theory for
> which there **may be** a foundation in the evidence."          (emphasis added)

and as previously held in <u>U.S. v. CRANE</u> 106 SCt. 2146 (1986);

> "the Constitution guarantees criminal defendants a meaningful oppor-
> tunity to present a complete defense."

the Defendant was clearly denied the opportunity to submit several viable defense
positions and theories.

These denied defenses include, but may not be limited to the following:

A. Defense of "<u>entrapment by estoppel</u>", see <u>KELLY</u>, supra.

B. Defense of "<u>multiple conspiracies</u>", see <u>JOHANSSEN</u>, supra.

C. "<u>Alibi</u>" defense because of BRADY violations; including <u>NO</u> proper 'notice' via
omitted "bill of particulars".

D. Defense of "<u>withdrawal</u>" from the money laundry conspiracy allegation due to
'incarceration' (i.e. "variance").

E. Defense of "<u>manufactured jurisdiction</u>" (i.e. 'jurisdictional entrapment'), as
found by a U.S. District Court Judge.

F. Defense of "<u>outrageous government misconduct</u>", as found by a U.S. District Court
Judge -- including "fraud" and "entrapment" by U.S. Government Agents.

G. Defense including the inclusion of specific and factual "<u>overt acts</u>" by U.S.
Government Agents to be added to the indictment, as read to the jury.

H. Defense concerning <u>statute of limitations</u> pertaining to the improper "<u>Variance</u>"
within the government's indictment.

I. Defense including verified, relevant, and material evidence of college records,
employment records, job licenses, and tax records.

Clearly, this Court erroneously <u>denied</u> the Defendant both the opportunity and
the ability to submit various viable defenses.

## 12.   Defendant Denied Means By Which To Defend Himself

The Defendant was housed at Nassau County Correctional Center ("NCCC"), for
the entire duration of his trial.  This County facility, i.e. <u>a NON-Federal facility</u>,
was clearly inadequate for a <u>pro se</u> Defendant to defend himself.

The prevailing overwhelming problems concerning NCCC have been itemized and
outlined by LORETTA LYNCH, the U.S. Attorney for the Eastern District of New York, in
her Department of Justice ("DOJ"), investigation report submitted around September 10,
2000.

As applied to the instant case, in addition to <u>all</u> the inadequacies and prob-
lems as discussed by the E.D.N.Y. U.S. Attorney, NCCC does <u>NOT</u> provide adequate, essen-
tial, and meaningful means by which a <u>pro se</u> Defendant, as here, can defend himself,

-12-

including, but not limited to the following:

### A. Clearly Inadequate Law Library

1. Federal Reporter 3d Series kept at different location, wherein Defendant must wait sometimes for days before a specific volume would arrive.

2. NO Lawyers Edition, LEd2 Supreme Court Reporter.

3. NO Federal Supplement 2d, FSupp2, District Court Reporters.

4. NO American Jurisprudence Volumes (i.e. encyclopedia).

5. NO Criminal Law Journal Reports.

6. NO "BAILEY'S" Criminal Law Motion Guides.

7. Incomplete "SHEAPARD'S" supplemental citations.

8. Inavailability of audio equipment for audio-tape review (i.e. essential evidence) in Law Library; and NO possibility of reviewing audio-tapes during the evening hours, or in the Defendant's cell.

9. Outdated "annotated" volumes for the Federal Statutes.

10. NO Federal Sentencing Guidelines, nor the U.S. Criminal Code and Rules book.

All the foregoing inadequacies are contrary to the DOJ's clearly established "REQUIRED" legal needs for a Federal facility Law Library.

### B. Inability to Properly Communicate with Legal Advisors

1. NCCC does not allow for "unmonitored" LEGAL phone calls to attorneys, et.al.

2. NCCC affords only collect phone calls, making some essential communications impossible, as some 'legal advisors' can not accept collect calls.

3. NCCC will not permit "legal books" to be mailed in from an attorney, investigator, paralegal, or other legal advisors.

4. Investigator, attorney, and/or legal advisors are not allowed to visit NCCC in the late evenings, e.g. to review trial transcripts or evidence.

5. Investigator(s), attorneys, and/or legal advisors not allowed to visit NCCC on weekends, unless pre-applied well in advance.

6. NCCC has no secure and separate depository for "legal mail" on the units.

C. Defendant denied "3500 material" into NCCC, as its "binders" were unacceptable. Therefore, throughout the trial; and prior to trial, the Defendant was unable to review his important "3500 material".

D. NCCC refuses to provide basic paper and/or even a pencil with which to take legal notes or to prepare legal papers.

E. Contrary to the DOJ's (i.e. Bureau Of Prisons), mandate in 2000, NCCC does not afford inmates access to "WESTLAW" data base legal resourses.

ALL the foregoing examples represent a clear violation of the 14th Amendment's Due Process Clause regarding "equal protection under the Law", for by being housed at NCCC, the pro se Defendant was denied the same standards of Legal means provided to other Federal inmates.

It may be that no one(1) of the individual foregoing inadequacies, in and of itself, is "dispositive" and thereby mandates either acquital or a new trial, however, when taken and analyzed within the "totality of the circumstances", it becomes clear that the pro se Defendant was denied the proper means by which to defend himself. See CHRICEOL v. PHILLIPS 169 F3 313 (1999); WILSON v. YAKLICH 148 F3 596 (1998).

### 13. Defendant Denied A Fair Trial

The case records and files, taken together with the trial transcripts clearly demonstrate that the Defendant was denied a fair trial. The reasons, as set forth below, are not an exhaustive list, but includes many of the incidents that created the severe, injurious, and compelling "prejudice" to the Defendant.

1. Defendant pro se allowed ONLY five(5) days to prepare for trial, as the "3500 material", previous trial transcripts, and case records and files NOT made available until such time.

2. Defendant not pro se, nor represented by counsel for twelve(12) of the ONLY seventeen(17) days the Judge scheduled for the re-trial.

3. Judge improperly "relieves" Defendant's retained-in-full "counsel of choice" against Defendant's wishes and objections.

4. Judge effectively forced the Defendant to proceed pro se.

5. The court improperly denied the Defendant from using his own allegedly forfeitable assets to further retain his "counsel of chouce", however, allowed at least seven (7) of the admittedly guilty co-conspirators to use their similarly situated assets.

6. Stand-by counsel appointment clearly states that five(5) days is insufficient time to prepare for trial. Furthermore, stand-by advisor, who lives and works in New Jersey, is so fatigued by travel, et.al., that he often falls asleep during the proceedings

7. Judge denies an adjournment to allow Defendant sufficient time to prepare for trial, and to arrange for proper "counsel".

8. All the previously outlined Due Process violations, including not holding a hearing to properly determine need for "anonymous and escorted jury"; no JAMES hearing; no suppression hearing(s); no WELTY and CURSIO hearings, etc.

9. Defendant forced to wear "prison clothes" for the WAGE "ID" hearing.

10. Defendant forced to wear "prison clothes" for Jury selection.

11. Government witnesses travel together to and from Courthouse; and thereby impermissibly allowed to discuss and orchestrate their testimony together.

12. Judge constantly demonstrates deep-seated antagonism towards the Defendant throughout proceedings; and previously refused to fule on "RECUSAL" motion at bar.

13. Judge manipulates and prejudices the Jury against the Defendant with unnecessary Jury removals; and clearly insulting comments, wherein, Defendant often denied opportunity to address Jury.

14. Judge acted more often as a "prosecutor" throughout the proceedings; and often attempted to intimidate the Defendant.

-14-

15. Judge misrepresented "material facts" and issues to the Jury, including the "LEDGER"; 'multiple conspiracies'; and Venue for the money laundering Count.

16. Judge refused to allow Defendant to submit "material and relevant" evidence to the Jury, e.g. University, tax, and employment records.

17. Judge further denied evidence of DEA Agents clearly established "misconduct" to be submitted to the Jury.

18. Defendant denied proper access to extremely "material and relevant" BRADY evidence, to wit, TIMEWELL and SHERRETT audio-tapes -- until AFTER the trial was finished.

19. Defendant further denied BRADY and/or '3500 material', including his "unredacted" FOIA files from the DEA, U.S. Customs Service, and U.S. Attorneys Office, ALL of which were also "subpoenaed" pursuant to Rule 17.

20. Judge improperly interrupts Defendant's cross-examination of TIMEWELL, twice, to allow Government to put on their witnesses -- clearly designed to purposefully disrupt the Defendant's case.

21. Government constantly displays severely "prejudicial" photographic evidence (i.e. photos of the alleged drugs), to the Jury throughout Defendant's cross-examination of Timewell. Going so far as to impermissibly re-displaying the evidence even after the Judge advises them to take it down from Jury's view.

22. Unbalanced and clearly prejudicial "jury instructions", including: a) lack of proper "multiple conspiracy instruction"; b) insufficient and incomplete "money laundering instruction"; c) no 'statute of limitations' instruction; and d) inconsistent and/or perjured statements and hearsay instruction.

23. Clearly improper and inaccurate APPRENDI based "interrogatories" concerning "essential substantive ELEMENT" of the alleged offense, to wit, the exact and precise amount and/or weight of the drugs. Wherein, the Defendant specifically requested for an "interrogatory" to determine the exact and precise level of liability based upon the weight of the drugs -- denied by the Court.

As previously noted, not one(1) single error, or even a few together would probably rise to the level of a "mistrial", however, when taken together in their totality it becomes clear that the defendant was denied a fair trial.

## 14. Indictment is Structurally and Jurisdictionally INVALID

As stated by Supreme Court Justice THOMAS, APPRENDI, supra, announced a "watershed change in constitutional law"; and as further stated by the Court in JONES v. U.S. 119 SCt. 1215 (1999), the Court held that separate unique statutes containing separate offenses (e.g. 21 U.S.C. §841), are, in fact, "separate elements" of the offense. See also, CASTILLO v. U.S. 120 SCt. 2090 (2000)(each separate element of a statute must be proved "beyond a reasonable doubt").

Both Counts in the instant action are improperly pled; and after APPRENDI, et. al., are legally and jurisdictionally invalid. And thus, the indictment, as pled to the Jury, is fatally flawed for the following reasons:

**A. COUNT ONE** - Conspiracy to Distribute Marijuana

As held in CASTILLO, id at 2096;

"the length and severity of an added mandatory sentence...
weighs in favor of treating such offense-related words
as referring to an element."

and after APPRENDI, Fifth and Sixth Amendment protections require that the government prove **any enhancement** facts at trial.

Furthermore, as pointed out by Supreme Court Justice O'CONNOR, subsequent to APPRENDI, an individual Count, as here, that includes multiple statutes within its pleading, to wit, §841(b)(1)(A) **and** §841(b)(1)(C), are now structurally, and thus, jurisdictionally flawed.

Finally, this Court must also consider the Constitutional issue as to "strict liability statutes", which on its face 21 U.S.C. §841 is -- especially when applied to 'marijuana', which has, in effect, been de-criminalized in several states throughout the United States.

**B. COUNT TWO** - Conspiracy to Launder Money

The money laundering statute 18 U.S.C. §1956, provides for a fine of not more than $500,000, "or twice the value of the property involved in the [money laundering] transaction, whichever is greater."  Thus, after APPRENDI, the government must allege in the indictment the "property" worth that was involved in the alleged money laundering **AND** prove that amount beyond a reasonable doubt at trial -- something the government failed to do in the instant action.

Furthermore, again as per Justice O'CONNOR, pursuant to APPRENDI, by improperly including two(2) separate and distinct "prongs", to wit, separate and distinct statutes within the pleading -- §1956(a)(1)(A)(i) **AND** §1956(a)(1)(B)(i) -- the government has erroneously created a structurally, and thus, jurisdictionally flawed indictment.

Finally, in addition to the fatally flawed indictment, the government, at trial, failed to address the two(2) separate and distinct "prongs" of their pleading; and further failed to prove "beyond reasonable doubt" each of the separate statutes individually.  Thereby creating a clear "UNANIMITY" concern as to the Jury's findings.

Consequently, the indictment is clearly invalid and must be dismissed.

-16-

### C. The Defendant's PRIOR

Based upon Supreme Court Justice THOMAS' recent enthusiastic statements, it strongly suggests that ALMENDAREZ-TORRES v. U.S. 118 SCt.1219 (1999), has been over-ruled by APPRENDI. As further stated by majority in APPRENDI, id. at 2362;

> "it is arguable that ALMENDAREZ-TORRES was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue wase contested." ·

Therefore, any "minimum mandatory triggers" are ELEMENTS of the offense, id. at 2368-69; and must be found by the Jury, to wit, the Defendant's 'prior'.

Ultimately, by alleging the Defendant's prior in the indictment, the U.S. Attorney (i.e. the Government), has ADMITTED that this enhancement fact IS A SUBSTAN-TIVE ELEMENT of the offense, see U.S. v. GAF 928 F2 1253 (2d Cir 1991).

However, by improperly and erroneously removing the 'prior' from the Jury's consideration at trial; and its requisite finding "beyond a reasonable doubt", the indictment, as pled to the jury, is legally **invalid**

Furthermore, as held by the Courts in U.S. v. DUBO 186 F3 1177 (1999); if properly challenged prior to trial, as here, an indictment's complete failure to recite an essential element of the charged offense (i.e. the Defendant's prior), is NOT a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment.  See U.S. v. PRENTISS 206 F3 960 (2000).

And, as further held in PRENTISS 206 F3 at 975:

> "[H]owever, even if challenged after the verdict, the failure of the indictment to allege all the essential elements of an offense is a jurisdictional defect requiring dismissal."

Finally, as the APPRENDI, CASTILLO, and JONES "Triology" makes abundantly clear, any ELEMENT which has the effect of raising a maximum sentence can NO longer be considered a sentencing enhancement -- and NOT the isolated 'statutory maximun only' mantra submitted by the government.  Rather, it is an ELEMENT that must be specifically alleged in the indictment, and proved beyond a reasonable doubt to the Jury.

Based upon the foregoing arguments, the government has clearly failed to understand and incorporate the Supreme Court's recent mandates from the APPRENDI Triology; and consequently submitted a legally flawed and invalid indictment to the Jury.  Thus, this Court must dismiss the indictment.

## 15. Interests Of Justice

The foregoing discussions and arguments pertaining to the instant trial; combined with the many improper and erroneous pre-trial developments, or lack thereof, clearly demonstrate a predisposed disposition to deny the Defendant anything even close to a fair trial.  See LONDONO-VILLA 735 FSupp 543 (S.D.N.Y. 1990).

Therefore, based upon ALL the foregoing errors, wherein one(1) or even several of these errors may not demand a "new trial", the "totality" of these numerous errors clearly supports the Defendant's position, and mandates at least a new trial.

Thus, in the "interests of justice"; and to maintain the integrity of the Judicial system, this Court must grant either an acquital, or a new trial.

Respectfully submitted,

Dated: East Meadow, New York
       July 19, 2001

Michael Vondette — Defendant pro se
100 Carman Avenue
NCCC #01003695
East Meadow, New York   11554

-18-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES OF AMERICA,

                  Plaintiff,   :      97-CR-1010 (S-2)(TCP)

   -vs-                :

                          :      AFFIRMATION OF SERVICE

MICHAEL VONDETTE,

                Defendant.
----------------------------------X

      Michael Vondette, defendant pro se in the above captioned case hereby swears and affirms, under the penalty of perjury, that true and correct copies of:

   MOTION FOR JUDGEMENT OF ACQUITAL AND/OR FOR A NEW TRIAL

has been sent by First class U.S. Mail, pre-paid, to the following address:

United States Attorneys Office
(E.D.N.Y.) AUSA Burton Ryan
U.S. Courthouse
600 Federal Plaza
Central Islip, N.Y.  11722

     with additional true and correct courtesy copies to the following:

The Honorable Thomas C. Platt
(E.D.N.Y.) U.S. District Court Judge
U.S. Courthouse
1044 Federal Plaza
Central Islip, N.Y. 11722

                              Respectfully submitted,

Dated; East Meadow, N.Y.
     July 19, 2001

                            Michael Vondette - Defendant pro se