

GOVERNMENT
EXHIBIT
6

Michael Vondette
100 Carman Avenue
NCCC#-01003995
East Meadow, N.Y. 11554

The Honorable Thomas C. Platt
U.S. District Court Judge
(E.D.N.Y.) U.S. Courthouse
1044 Federal Plaza
Central Islip, N.Y.  11722

Re: <u>UNITED STATES v. VONDETTE 97-CR-1010 (TCP)</u>
Sentencing Memorandum and PSI Report Objections

Dear Honorable Judge,

    The defendant <u>pro se</u> in the above mentioned case, MICHAEL VONDETTE, here-
inafter the ("Defendant"), pursuant to rule 32 of the Federal Rules of Criminal
Procedure, 18 U.S.C. 3553, and <u>U.S. v. FATICO</u> 444 US 1073 (1980)    , hereby submits
the herein sentencing memorandum with the incorporated memorandum of law, points,
and authorities; together with itemized "objections" to the Presentence Investi-
gation Report ("PSI") based upon the stated "factual inaccuracies" pertaining to
the relevant and material legal questions and matters of law regarding this Court's
potential up-coming evidentiary hearings and subsequent sentencing.

## BRIEF FACTUAL BACKROUND

    Defendant was named as a single defendant in Indictment #97-CR-1010 (TCP),
which was filed in October 1997, in the Eastern District of New York.

    Defendant was continuously incarcerated, absent set bail for forty-two(42)
months within the Eastern District of New York; and after two(2) superceding in-
dictments, started Trial #1 in April 2001.

    After a mis-trial was ordered in mid-May 2001, Defendant immediately begins
Trial #2 in May 2001.  Defendant is found guilty of two(2) counts of conspiracy af-
ter a seven(7) day trial ending in June 2001.

    Defendant receives his PSI around May 10, 2002, and receives an addendum
to same around May 16, 2002.

    Defendant is tentatively scheduled for sentencing for June 21, 2002. [Now July 12]

## INSTANT OFFENSE(S) LIABILITY ANALYSIS, DISCUSSIONS, AND ARGUMENTS

    Count one sentencing is pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 841(b)(1)(C),
and Count two pursuant to 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

The Honorable Judge Platt
Page 2 - Sentencing Memo
June 17, 2002

The government is clearly attempting to improperly "manipulate and en-trap" the Defendant pertaining to the proposed sentence, via the exaggerated use of several "factual inaccuracies", see e.g. U.S. v. TAPIA-ORTIZ 23 F3 738 (2d Cir 1994).

The Courts have clearly established that evidence that is speculative, unsupported, and or unreliable will meet neither the "preponderance standard", nor the requisite indicia of reliability.  See U.S. v. DESIMORE 119 F3 217 (2d Cir 1997); McMILLAN v. PENNSYLVANIA 477 U.S. 79 (1986).

In the instant analysis this Honorable Court must determine and rule on the government's obvious attempt to improperly and erroneously "enlarge the scope and scale" of the Defendant's alleged conduct liability based upon, among other things, non-applicable U.S. Government manipulated and controlled activity.  See e.g. U.S. v. STINSON 113 S.Ct. 1913 (1993); U.S. v. JOHNSON 964 F2 124 (2d Cir 1992); U.S. v. ARCHER 486 F2 670 (2d Cir 1973).

Furthermore, any "tainted transactions or activities" must be excluded from any sentencing computations.  See U.S. v. GOMEZ 103 F3 249 (2d Cir 1997); U.S. v. ROSA 17 F3 1531 (2d Cir 1994).

Finally, the Court should vacate the government's Count Three Forfeiture due to "collateral estoppel", "statute of limitations", and other "factual inaccu-racies".


## POINT I

### THE DEFENDANT'S BASE OFFENSE LEVEL IN COUNT ONE
### IS MISREPRESENTED AND OVERSTATED

The Defendant's sentencing level in Count One, the controlled substance conspiracy, was improperly computed.  The instant Count One includes two(2) separate and distinct statutory sentencing charges, 21 U.S.C. §§ 841(b)(1)(A) and 841 (b)(1)(C).  Both the U.S. Constitution and the U.S. Supreme Court in APPRENDI v. NEW JERSEY 530 U.S. 466 , 120 S.Ct. 2348 (2000), have determined that these two(2) different statutes represent two(2) separate and distinct criminal offenses, with very different statutory maximums and minimums, and requiring two(2) completely different sentencing computations based upon different factual determinations.

Moreover, Count One lists as multiple object(s) of the conspiracy the distribution of marijuana, hashish, and methaqualone, which according to the U.S. Sentencing Guidelines represent three(3) separate and distinct controlled substances.

The PSI has improperly and erroneously attempted to ignore the two(2) separate underlying substantive offenses, and forcibly weld together the alleged controlled substances into one overreaching liability of 42,187 Kilograms of marijuana, to wit, a factually inaccurate base offense level of 38.

## A.   The Correct Base Offense Level For Count One Is 12

The instant Count One states _inter alia_ that the Defendant "did knowingly and intentionally conspire to distribute and to possess with intent to distribute in excess of one thousand kilograms of hashish, in excess of one thousand kilograms of a mixture and substance containing marijuana and methaqualone", with the sentencing statutes 21 U.S.C. §§ 841(b)(1)(A) and **841(b)(1)(C)**.

Consequently, the government has alleged three(3) separate and distinct "object(s) of the conspiracy", to wit, hashish, marijuana [under §841(b)(1)(A)], and methaqualone [under §841(b)(1)(C).] The government, however, has either forgot or avoided the §841(b)(1)(C) aspect of Count One regarding the "methaqualone" in their PSI.

The Court at trial, on the other hand, properly addressed this issue with its comments regarding the interrogatory/special verdict, to wit: "I will not have this retyped. I told them to add methaqualone. This is what was submitted in the first trial, and no one had an exception." [See Tr. 1546]. The Court further stated in response to the government's erroneous request to ignore the methaqualone, to wit at Tr. 1549; THE COURT: **You wrote it in and the grand jury adopted it**.

Thus, the relevant and material question pertaining to the applicable sentence for Count One, is not whether there was sufficient evidence supporting a conviction for a marijuana/hashish conspiracy, but rather whether there was sufficient evidence supporting a conviction for a methaqualone conspiracy -- and the government's answer is yes, as the government's PSI clearly included "mehtaqualone" in its sentencing computations.

The PSI concludes that the Defendant is responsible for the sale of 3,000 "quaaludes" [i.e. "methaqualone"], equivalent to the sale of three(3) kilograms of marijuana pursuant to the U.S.S.Guidelines §1D1.1. Therefore, both the U.S. Attorneys Office, and the U.S. Probation Department have determined and concluded that sufficient evidence exists to support a "methaqualone" conspiracy. See e.g. U.S. v. OROZCO-PRADA 732 F2 1076 (2d Cir 1984)(defendant's sentence ultimately reduced, see OROZCO-PRADA, 636 FSupp 1537 (SDNY 1986). See also U.S. v. THOMAS, #98-1051 (2d Cir Dec/12/2001); U.S. v. WHITE, 240 F3 127 (2d Cir 2001).

More recently the Second Circuit in U.S. v. ZILLGITT, 2002 WL 517509 (2d Cir. (N.Y.)) following U.S. v. BARNES, 158 F3 662 (2d Cir 1998), has clearly established the principle of offense simplictor which is also referred to as "default sentencing". Wherein, the District Court must sentence the defendant as if convicted of a conspiracy involving **only** the drug that triggers the lowest statutory sentencing range. See also e.g. GRIFFIN v. U.S., 502 U.S. 46, 112 S.Ct. 466 (1991).

Consequently, the Defendant must be sentenced pursuant to the "methaqualone" conspiracy ONLY under 21 U.S.C. §841(b)(1)(C), involving the 3,000 'quaaludes' that equals three(3) kilograms of marijuana per the U.S.S.Guidelines — **which translates to a base offense level of 12**. See e.g. U.S. v. MARTINEZ-RIOS, 143 F3 612 (2d Cir 1998)(holding that a mathmatical error that increased a defendant's base offense level pursuant to the USSG affected his substantial rights).

Even assuming arguendo regarding the marijuana/hashish object(s) of the conspiracy under §841(b)(1)(A), the government, via "default sentencing", could only sentence the Defendant for the marijuana ONLY, at either a five(5) year statutory maximum [under §841(b)(1)(D)], or a base offense level of 32 based upon the questionable marijuana findings. Still in arguendo, the government and the sentencing Court have yet to resolve the fact that there exists NO Constitutional basis for the **bifurcation** [after a guilty finding with resulting prejudice] of an essential element of the offense - to wit, the amount of marijuana. And thus, since the Judge instructed the jury to NOT consider the amount of controlled substance until AFTER a guilty finding (see Tr. 1590-1592), the Defendant may be liable only under §841(b)(1)(D), based upon an indeterminate finding by the jury (i.e. a five(5) year maximum). See e.g. U.S. v. GREER 2000 WL 33709971 (2d Cir (Vt.)).

Furthermore, the Courts have established that when the Count includes offenses with different statutory maximums and multiple object(s) of the conspiracy, it is "plain error" for a Court to impose a sentence outside the statutory guidelines for the substantive offense which is the least serious object of the conspiracy. See e.g. U.S. v. RANDOLPH, 230 F3 243 (6th Cir 2000); U.S. DALE, 178 F3 429 (6th Cir 1999); BARNES, supra; ZILLGITT, supra.

For example, in RANDOLPH, supra, **as here**, defense counsel requested an interrogatory/special verdict regarding the specific amount of drugs, which the District Court denied (see Tr. 1492-1493). Therefore, as in RANDOLPH, the government can not expect a second "bite at the apple", and thus the Defendant must be sentenced within the lowest applicable statutory guidelines. See also, U.S. v. NICHOLSON, 231 F3 445 (10th Cir 2000)(applying principles established in APPRENDI to remand for resentencing).

Therefore, based upon all the foregoing discussions and matters of law, the Defendant's Count One base offense level is twelve(12) pursuant the USSG.

## B. Sentencing Manipulation And Entrapment Pertaining To Count One Drug Amount Computations

The government is erroneously attempting to "manipulate and entrap" the Defendant for sentencing purposes, by improperly and purposefully expanding the alleged "scope and scale" of the Defendant's alleged involvement. It is clear from the case files and trial records that the government has never been able to demonstrate, nor sustain a showing of "specific intent" on the part of the Defendant involving a specific amount of controlled substances. See e.g. U.S. v. SHONUBI, 103 F3 1085 (2d Cir 1997); U.S. v. CHALARCA, 95 F3 239 (2d Cir 1996).

As clearly articulated in APPRENDI and JONES v. U.S., 526 U.S. 227 (1999), the government cannot allege a "state of mind", wherein the government creates and imposes an alleged "purpose in mind" to improperly manipulate and invent the necessary "intent" to commit an offense. To wit, here, the "intent" to conspire to possess and or distribute a [government manipulated] specific amount of a controlled substance has been created solely by the government.

Concerning the hashish wrongly attributed to the Defendant [i.e. approximately 40,000+ kilograms of marijuana per the USSG], it is the U.S. Government,

[to wit, the DEA and U.S. Customs], and ONLY the U.S. Government Agents who, at all times and in all manner, maintain possession, custody, and control of the hashish — and ONLY the U.S. Government who manipulates and determines the amount of hashish to be involved, see U.S. v. KULIK #97-CR-110 (JSL)(C.D. CA.).

The Second Circuit has considered the concept of "sentencing entrapment" in U.S. v. KNECHT, 55 F3 54 (2d Cir 1995), when there is 'outrageous government misconduct' to support the claim.  The same issue was raised in U.S. v. GOMEZ, 103 F3 249 (2d Cir 1997) and U.S. v. PODLUG, 35 F3 699 (2d Cir 1994), again with the requirement of government misconduct needed to support the claim.  In the instant offense **there is "outrageous government misconduct"**, as found by U.S. District Court Judge LETTS [see U.S. v. KULIK, supra], involving the specific same hashish the government is seeking to improperly attribute to the Defendant for the express purpose of manipulating and erroneously expanding the Defendant's alleged liability for sentencing purposes only.  See also, U.S. v. STAUFER, 38 F3 1103 (9th Cir 1994).  As stated in GOMEZ at 256;

> "(W)e can foresee stutations in which exploitative manipulation of sentencing factors by government agents ..."

The Defendant needs a preponderance of the evidence to assert that the government was involved in "outrageous government misconduct", see U.S. v. RIEWE, 165 F3 727 (9th Cir 1999).  Here, we have evidence beyond a reasonable doubt, as found by U.S. District Court Judge LETTS, that the U.S. Government has committed "outrageous government misconduct" specifically involving the very same hashish the government now improperly attempts to include in the Defendant's sentencing computations.  See e.g. U.S. v. ARCHER, 486 F2 670 (2d Cir 1973).

The Second Circuit has further suggested that an additional downward adjustment would be appropriate when the other party, as here, is the U.S. Government, see U.S. v. SPEENBURGH, 990 F2 72 (2d Cir 1993).  Additionally, the Government manipulation of a sentence violates Due Process according to U.S. v. GIBBENS, 25 F3 28 (1st Cir 1994).

Finally, a downward adjustment is warranted pursuant to USSG §2D1.1 (see Application Note 15), wherein the Government, as here, controls and manipulates the offense to significantly increase the potential liability of the Defendant. See e.g. U.S. v. CABAN, 173 F3 89 (2d Cir 1999).

The Honorable Judge Platt
Page 7 - Sentencing Memo
June 27, 2002

### C. Inapplicable Alleged Relevant Conduct Regarding The 'Hashish' In The Count One Sentencing Computations

Pursuant to Rule 32(b) of the Federal Rules of Criminal Procedure regarding the U.S. Probation Department's PSI, one of the primary goals of the District Court before sentencing, is to uncover and expunge any unsubstantiated or uncorroborated "factual inaccuracies" erroneously submitted within the PSI pertaining to unfounded alleged relevant conduct.

As held in CORDOBA-MURGAS, 233 F3 704 (2d Cir 2000), and SHONUBI, supra:

"(t)he enhancement of a sentence based upon a defendant's 'relevant conduct', if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under the Sentencing Guidelines."

id. CORDUBA-MURGAS at 708.

In determining the amounts of controlled substances to be attributed to the Defendant, the Court is not bound by the fact that he was convicted of a generic conspiracy, because there is an important distinction between the standard for the conviction of a conspiracy and the guidelines standard for sentencing, see U.S. v. LANNI, 970 F2 1092 (2d Cir 1992); U.S.S.Guidelines §1B1.3, Note 2.

Thus, in sentencing the instant Defendant, this Court must make a particular "findings of fact" including "specific knowledgeable intent" on the part of the Defendant; and both the scope and foreseeability of the alleged agreement. See e.g., U.S. v. STUDLEY, 47 F3 569 (2d Cir 1995); U.S. v. PERRONE, 936 F2 1403 (2d Cir 1991). See also U.S.S.Guidelines §1B1.3, Amendment 78 (Application Notes) (defendant's specific conduct must be in furtherance of the illegal activity; and within scope of agreement AND foreseeable to the agreement).. For, the fact that a defendant may have been aware of the generallscope of the overall operation, is not enough to hold him accountable for the alleged activities of the whole operation. See e.g., STUDLEY, supra.

In this instance, the analysis of Defendant's knowledge, agreement, and activities establishes no evidence that he participated in any way in the agreement to import the hashish into Canada, nor the series of events, directed by the U.S. Government Agents [i.e. DEA and U.S. Customs], which brought the hashish into the United States.

Indeed, the Court consistently sustained the government's objections to any inquiry by Defendant into the facts surrounding the arrival of the hashish into the United States. There was no showing that the Defendant foresaw or agreed to a specific amount of hashish. The Defendant could, in arguendo, possibly be held to have agreed to participate in the shipment of an indeterminate amount of hashish put into a tractor-trailer by the U.S. Government Agents — who at all times controlled, manipulated, and determined what amounts were to be involved.

The government has established no evidence that the Defendant specifically intended and specifically agreed with any of the alleged co-conspirators [particularly the U.S. Government Agent co-conspirators], to any determinate amount of hashish. Because there exists no agreement pertaining to the specific amount of hashish, or any amount at all, with the Defendant, the government's alleged 40,000+ kilograms of marijuana (i.e. the hashish), is not within the scope of any agreement, nor foreseeable to any agreement, and thus cannot be included as relevant conduct.

Where, as here, the findings on foreseeability and scope of the alleged agreement are inadequate, the Defendant cannot be sentenced pursuant to the erroneous and unfounded "relevant conduct". See U.S. v. HERNANDEZ-SANTIAGO, 92 F3 97 (2d Cir 1996)(vacating for failure to make findings as to scope of agreement); U.S. v. LANNI, 970 F2 1092 (2d Cir 1992)(under Guidelines, defendant's responsibility narrower than it is under the law of conspiracy, so findings cannot be replaced simply be sentencing defendant on the amount of drugs involved in the conspiracy). See also, U.S. v. MARRERO-ORTIZ, 160 F3 768 (1st Cir 1998); U.S. v. GOINES, 988 F2 750 (7th Cir 1993); U.S. v. GREEN, 175 F3 822 (10th Cir 1999); U.S. v. GARCIA-SANCHEZ, 189 F3 1143 (9th Cir 1999).

### D. The Defendant Should Not Be Held Responsible For Any Of The Hashish Computed In Count One

There are several reasons why the Defendant should not be held responsible, nor liable for anyof the hashish involved in this case. First, the government is bound by the finding of the U.S. District Court for the Southern District of California [see, U.S. v. KULIK, 97CR-110, Judge LETTS], that the U.S. Government Agents manufactured the jurisdiction in connection with the hashish in this offense.

In addition, it was solely the decision of the U.S. Government Agents, and not of the Defendant, to send some amount of hashish across the country in order to give the New York based DEA a part in the overall seizure.

Furthermore, it is the same U.S. Government Agents who, at all times, maintained effective possession, custody, and control of the hashish; and upon their own volition, determined how much to send, the manner in which it was sent, and to purposefully make certain that the amount of hashish they [DEA] sent would trigger a specific U.S.S.Guidelines level for sentencing purposes (to wit, sentencing "manipulation and entrapment").

The same reasons that led to the U.S. District Court's dismissal of the importation charge [i.e. "outrageous government misconduct"], should lead, as a matter of fairness, to Defendant's not being held responsible for any amount of the hashish which was imported and distributed by the U.S. Government.  This and the California case records and files have established relevant and material – clear and convincing evidence that: **but for the actions of the U.S Government Agents, no criminal offense is committed in the United States.**

### POINT II

#### THE COURT SHOULD VACATE THE GOVERNMENT'S COUNT TWO, OR IN THE ALTERNATIVE, THE BASE OFFENSE LEVEL IS FOURTEEN (14)

Congress asked the Justice Department to report on its money laundering practices, see 28 U.S.C. §994 Note.  The Deptartment responded that the money laundering statutes, as here, "should not be used in cases where the money laundering activity is minimal or incidental to the underlying crime"  See Dept. of Justice, Report for the Senate and Hounse Jujdiciary Committee on the Charging and Plea Practice of Federal Prosecutions in Respect to the Offense of Money Laundering, at (June 17, 1996).

In the instant action, the alleged money laundering conduct is so attenuated as to be virtually unrecognizable as to the type of conduct for which the original money laundering sentencing guidelines were drafted. See e.g., U.S v. STUDLEY, 47 F3 569 (2d Cir 1995); U.S. v. SMITH, 1999 WL 592429 (3d Cir.(N.J.)).

Furthermore, the instant indictment's Count Two was unconstitutional, as the jury's finding lacked "unanimity"; and the government's allegations violated the "statute of limitations".

The Court's initial choice of guideline is a question of law subject to plenary review. This determination is a legal function that requires the Court to interpret the guidelines in light of its intention and purpose pertaining to the nature and seriousness of the Defendant's specific laundering conduct itself. See e.g., U.S. v. WOODS, 159 F3 1132 (8th Cir 1998); U.S. v. HENRY, 136 F3 12 (1st Cir 1998); U.S. v. SMITH, supra.

## A. Under APPRENDI [i.e. Constitutionally Deficient Proper "Notice"] The $5,800,000 Can NOT Be Used To Enhance Defendant's Sentence

Count Two charges the Defendant with a conspiracy for money laundering. Thus "money" (i.e. a specific amount of "money"), is clearly an essential element of the offense. The U.S. Constitution demands that, as APPRENDI and JONES illustrated, regardless of the legislative designation or intent, any factor considered an element of the offense must be included in the indictment in order that Due Process protections are not subsumed by statutory construction.

Therefore, as with drug amounts in a drug offense, the amount of money must be included in the indictment -- lacking in the instant Count Two. As was clearly established by APPRENDI and JONES "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." APPRENDI 120 S.Ct. at 2363, quoting JONES.

It is a matter of hornbook law that elements of the offense [i.e. "money" in a money laundering offense], and to wit, the overt acts needed to make a proper "factual determination" must be alleged in the indictment and proper notice provided to the Defendant. However, the government in the instant Count Two has failed to include the essential element of a specific amount of money [or, in fact, any money at all]; failed to include any alleged "overt acts"; and further failed to provide a "bill of particulars" in the attempt to rectify the fatal flaws.

Consequently, the government's alleged $5,800,000 Dollars that was improperly excluded from the indictment, can not now be used to erroneously enhance the Defendant's sentence. Furthermore, there exists NO Constitutional basis under which the government can "bifurcate" an essential element of an offense AFTER the jury has made a guilty finding [i.e. unconstitutional interrogatory/special verdict].

**B.** **The Government's Money Laundering Allegations Violate The "STATUTE OF LIMITATIONS", And Cannot Be Used In Sentence**

The Defendant was originally indicted in 1997. However, the bulk of the alleged money laundering transactions forming the basis of the government's interrogatory/special verdict [assuming arguendo that the interrogatory was not unconstitutional], took place in the 1980's.

The $770,000 from the 1986/87 "Indos", and both the $1,509,170 and the $2,553,000 involving Mr. SHERRETT's Thai marijuana in Oregon from 1988 -- are clearly outside the "statute of limitations", wherefor no amount should have been included. Furthermore, SHERRETT's $4+ Million was given directly to the U.S. Government Agents, and then deposited directly into the U.S. Treasury -- and therefore could not have been used to promote illegal activity, and thus is not involved in any money laundering activities; and again should not be included.

Although the government alleged a single conspiracy [which the Defendant contests and will continue to contest on Appeal], the money laundering transactions were charged, submitted, and argued at trial as separate acts involving separate co-conspirators. Thus, each transaction should be subject to its own statute of limitations. The Courts have established that "each transaction or transfer of money constitutes a separate offense"; and that "each individual financial transaction" represents a unique unit of prosecution. See U.S. v. KRAMER, 73 F3 1067 (11th Cir 1996); U.S. v. CABA, 911 FSupp 630 (EDNY 1996); U.S. v. CONLEY 826 FSupp 1536 (1993).

The fact that these monies should not be included is butressed by the fact that there was virtually no evidence as to any activity between 1988 to 1996, and since the money laundering conspiracy is contained in the indictment, the 5-year statute of limitations is the longest period that could arguably apply to the money transactions in question. There is not any indication or evidence that any actions were taken in furtherance of the purported conspiracy in this time. Thus, all of the objects of these transactions were completed once the money was turned over to the U.S. Government in 1988; and those conspiracies and all related transactions should be found to have ended. See U.S. v. ROSHKO, 969 F2 1 (2d Cir 1992).

Therefore, as to those transactions, the statute of limitations expired, and the proposed money enhancements should be set aside.

## C.    The Jury's Finding In Count Two Lacked "UNANIMITY"

The government in Count Two charged the Defendant in a conspiracy with two(2) different object(s), to wit, §1956(a)(1)(A)(i) to promote ; and §1956 (a)(1)(B)(i) to conceal. Two(2) different statutes, and two(2) different "prongs" of the money laundering charge. Pursuant to APPRENDI, et.al., everything pleaded in the indictment must be proven beyond a reasonable doubt, and the jury must find unanimously as to each element. Therefore, the government was required to prove individually each separate and distinct "prong". There exists insufficient evidence that the jury understood this requirement and made tha appropriate finding -- and thus this Count Two should be vacated. See e.g., U.S. v. SHVARTS, 90 FSupp2 219 (edny 2000); U.S. v. JACKSON, 935 F2 832 (1991).

The government failed to prove its contention that each of the individual alleged financial transactions was in and of itself a violation of each separate "prong". The government and the Court declined the Defendant's request to clearly articulate to the jury the distinction between the two(2) different "prong(s)" to avoid confusion and ambiguity. See e.g., U.S. v. HOLMES, 44 F3 1150 (2d Cir 1995); U.S. v. SKINNER, 946 F2 176 (2d Cir 1991).

The jury was clearly confused regarding the money laundering definition, as evidenced by its repeated questions during the deliberations. The Court's second money laundering jury instruction -- to which the Defendant objected -- did nothing to alleviate the jury's confusion regarding the difference between, for example, "money laundering" -vs- mere 'money spending' or the mere 'giving' of money. See U.S. v. CALDERON, 169 F3 718 (11th Cir 1999).

The juries confusion and resulting ambiguities regarding the money laundering definitions, taken together with the inherent confusion created by the multiple object(s) of the conspiracy and separate "prongs" of the statute have resulted in a lack of "unanimity" in their findings -- and thus Count Two should be set aside.

## D.    NO Relevant Conduct In Count Two Sentencing Computations

The U.S.S.Guidelines at §1B1.3 describe the "same course of conduct" as depending on similarity, regularity, and time interval between the various acts, and specifically provides that when one of these factors is absent, "a stronger presence of at least one of the other factors is required." See November 1, 1994,

Amendment to Application Note 9(B).

In the instant analysis, the alleged 'relevant conduct is extremely remote as to <u>temporal proximity</u>, to wit, 1988 and then 1996; and because no other relevant activities took place during these eight(8) years, there is no showing of similarity or regularity. The Courts have established what is to be considered as related temporally, see e.g., <u>U.S. v. HAHN</u>, 960 F2 903 (9th Cir 1992)(five(5) months between activities); <u>U.S. v. HILL</u>, 79 F3 1477 (6th Cir 1996)(more than a year); <u>U.S. v. SANTIAGO</u>, 906 F2 867 (2d Cir 1990); <u>U.S. v. MILLER</u>, 179 F3 961 (5th Cir 1998)(21 months).

The instant Count Two PSI allegation lacks all the requirements to establish "relevant conduct" through the "same course of conduct", or through a connection among participants and occasions to support a "common scheme", see <u>SHONUBI</u>, supra; USSG §1B1.3(a)(2).

The evidence indicates an EIGHT(8) YEAR elapse-time between dissimilar, irregular, and non-temporal activity; involving different locations; different <u>modus operandi</u>; and different individuals, And thus, the Court is precluded from including those alleged money laundering transactions pursuant to the government's unfounded claim of "relevant conduct". See e.g., <u>U.S. v. HOSKINS</u>, 173 F3 351 (6th Cir 1999); <u>U.S. v. RUIZ</u>, 178 F3 877 (7th Cir 1999); <u>U.S. v. GOMEZ</u>, 164 F3 1354 (11th Cir 1999); <u>U.S. v. LEWIS</u>, 987 F2 1349 (8th Cir 1993) (excluding 1982 incident from relevant conduct).

Consequently, pursuant to the U.S.S.Guidelines §2S1.1, effective on November 2001, the maximum base offense level is <u>FOURTEEN(14)</u>. According to the Guidelines the level is eight(8) for "money laundering" and an additional six(6) because the underlying activity involved a controlled substance. And as detailed in the foregoing discussion and memorandum of law, the government can NOT enhance the proposed sentence based upon any Dollar amount alleged by the government, but not included in the indictment, nor found by the jury, as [there exists no Constitutional basis under which to bifurcate an essential element of the offense - AFTER the jury has made a guilty finding with the resultant overwhelming prejudice to the Defendant]. And thus, if the Count Two is not vacated <u>in toto</u> for all the foregoing reasons, the base offense level for sentencing purposes in <u>FOURTEEN(14)</u>.

## POINT III

### THE DEFENDANT WARRANTS A FOUR(4) POINT DOWNWARD ADJUSTMENT FOR MITIGATING ROLE – CONTRAVENING HIS MISCLASSIFICATION AS LEADER

At the risk of being redundant, APPRENDI at 2363 and JONES at 252-53, held that "(i)t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed."

The "elements rule" as re-affirmed in APPRENDI and JONES mandates a Federal indictment to allege all the facts underlying "enhancements", and then they must be proved at trial or not at all. The element of leadership is clearly crucial to culpability and stigma.

The government's "leadership enhancement" allegation is but a **vindictive ploy and maneuver** designed to target and punish the Defendant for exercising his Constitutional right to trial. Moreover, a trial that resulted from the government's refusal to ever negotiate with Defendant in good faith. This bogus enhancement allegation has no basis in fact or evidence, whereas, on the contrary, there is substantial evidence to support a four(4) level downward adjustment pursuant to U.S.S.Guidelines §3B1.2(a), mitigating role.

### A.  Defendant Erroneously "Enhanced" As An Organizer

Because the alleged "leadership enhancement" fact could increase the Defendant's sentence beyond the prescribed statutory maximum, APPRENDI applies. Accordingly, the issue of leadership must be charged in the indictment, and proved beyond a reasonable doubt. The Defendant needed advance notice of a sentence enhancement allegation "in order that he may prepare his defense accordingly.", APPRENDI quoting ARCHIBOLD's 1862 treatise [id 2357]. See also, U.S. v. FIELDS, 242 F3 393 (D.C. Cir 2001); VALENCIA v. U.S., 121 S.Ct. 222 (2001).

As far back as MULLANEY v. WILBER, 421 U.S. 684 (1975), and upheld by PATTERSON v. NEW YORK 432 U.S. 197 (1977); and then re-inforced and butressed by APPRENDI and JONES, the Supreme Court mandates that a legislature can Not create a presumption of guilt for a fact which would shift the burden of rebutting that presumption to the Defendant -- to wit, the U.S.S.Commission and "leadership enhancement". Thus, it is impermissible, as here, to allocate the burden of proving integral components to the Defendant, after trial -- as the burden of proving all elements rests with the government.

Furthermore, even in McMILLAN v. PENNSYLVANIA, 477 U.S. 79 (1986), the Supreme Court made it clear that a defendant may not primarily be punished for an alleged part of an offense that is guised as a sentencing factor.

Finally, the "materiality" of the alleged "leadership enhancement" is clearly supported by the huge increase of sentence that results from a factual "leadership finding", and thus pursuant to U.S. v. GAUDIN, 515 U.S. 505, 115 S.Ct. 2310 (1995) and U.S. v. ALI, 68 F3 1468 (2d Cir 1995), this "material element" must be found by a jury beyond a reasonable doubt.

Even assuming arguendo, the facts as set forth at trial do not support the PSI's allegation that the Defendant directed activities of sundry alleged co-conspirators. Furthermore, four(4) of these individuals [SHERRETT-MATSU-ZAKI-AUCHARD-SINGER], each have their own PSI(s) that catagorize them as directing their own independent activities; and no mention of the Defendant at all.

The evidence demonstrates that the Defendant did NOT organize or lead any of the alleged co-conspirators; and neither the PSI, nor the government has provided any "factual findings" in support of their spurious claim. Rather, the Defendant was not more than a courier/messenger/deliveryman - and thus the enhancement is not warranted.

The U.S.S.Guidelines provide, in §3B1.1, Application Note 4, in pertinent part, that in determining this enhancement:

> "(f)actors the court should consider include the exercise of decisiohmaking authority, the nature of participation in the offense, the claimed right to a larger share in the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of illegal activity, and the degree of control and authority exercised over others."

In interpreting this section, the Second Circuit has analyzed the relevant factors and made the appropriate "findings of fact", see U.S. v. ZICHETTELLO, 208 F3 72 (2d Cir 2000); U.S. v. KOCZUK, 252 F3 91 (2d Cor 2001); U.S. v. MORENO, 181 F3 206 (2d Cir 1999); U.S. v. PAYNE, 63 F3 1200 (2d Cir 1995). Using these standards, it is clear that the Defendant was not an organizer.

Other Circuits have reached the same conclusion, as in U.S. v. BAYLOR, 97 F3 542 (D.C. Cir 1996)(all persons receiving an enhancement must exercise some actual control over the others); U.S. v. GLINTON, 154 F3 1245 (11th Cir 1998) (status as middleman, standing alone, does not make one a manager or supervisor);

U.S. v. GRAHAM, 162 F3 1180 (D.C. Cir 1998)(only an especially culpable sub-class of dealers can be singled out for incarceration for an even longer time); U.S. v. SOSTRE, 967 F2 728 (1st Cir 1992)(being an "essential" participant is not alone sufficient to trigger enhancement).

### B. Defendant Warrants A Four(4) Level Downward Adjustment Pursuant To U.S.S.G. §3B1.2(a) - Mitigating Role

The evidence from the case files and trial records regarding the Defendant's role consisted, in the main, of evidence that he either picked up or dropped off someone else's money, passed on messages, arranges for transportation at someone else's direction, or the like. In fact, it was frequently admitted by the government's witnesses at trial that the Defendant was merely a "courier" [see Tr. 431, 494, 496, 534], or a "messenger" [see Tr.#1@1048, 1050; Tr. 727]; or a "deliveryman" [see Tr. 495, 496, 534].

In short, the Defendant was a low-level independent worker, who occasionally associated himself with others as a subordinate. The Defendant, based upon the evidence at trial, was the general all-purpose "go-fer", who was relegated to the menial and incidental activities. See USSG Appendix C, Amendment 635

One sure way to determine an individual's role in an alleged offense, is to ascertain 'who is the easiest person to replace' within the overall hierarchy. In the instant object(s) of the Count Onerconspiracy, it is the Defendant who is the easiest person to replace. See e.g., U.S. v. RODRIGUEZ-DEVARON, 175 F3 930.

The defendant has established relevant and material trial-based evidence that he was the lowest level worker who's activities were neither extensive, nor pivotal, to wit, the proverbial "low man on the totem pole" — and consequently, warrants a four(4) level downward adjustment pursuant to his mitigating role in the conspiracy charged in Count One. See U.S.S.G. §3B1.2(a).

### POINT IV

### THE GOVERNMENT IS PRECLUDED FROM USING DEFENDANT'S 1975 PRIOR IN THE SENTENCING COMPUTATIONS

The prosecution filed a "bill of information" pursuant to 21 U.S.C. §851 prior to Defendant's trial in order to enhance the potential sentence under §841 (b), pertaining to a 1975 Federal conviction in Vermont [i.e. 9 month sentence].

However, the government may not use this twenty-seven(27) year old con-
viction to enhance the Defendant's sentence because of the following: 1) ex poste
facto violation; 2) prior was "adjudged a young adult offender"; 3) statute of
limitations violation; 4) Rule of Lenity; 5) the doctrine of "collateral conse-
quences"; and 6) for reasons articulated in APPRENDI.

In the alternative, assuming arguendo regarding all the foregoing, the
government still cannot use the prior, as [according to the government's own
theory] it falls within the "same course of conduct" and/or a "common scheme or
plan", as part of the government's alleged conspiracy in Count One as pleaded in
their indictment(s).

Consequently, either way, the government may not use the 1975 prior in
their sentencing computations.  Furthermore, this herein "written response" is
hereby submitted pursuant to 21 U.S.C. §851(c), as the Defendant formally objects
to and/or denies the government's improper §851 "Bill of Attainder".  The Defen-
dant further hereby requests a formal hearing to determine the "factual issues"
at hand; and that the Court enter [preferably in writing] its complete "findings
of fact" and "conclusions of law".

## A.   The 1975 Prior Conviction Is Non-Applicable To Sentencing Computations

### 1. Ex Poste Facto Clause Violation

The statutory maximum for the 1975 conviction was five(5) years [under
21 U.S.C. §841 in 1975]; and the Defendant was sentenced to only nine(9) months.
Thus, to now attempt to sentence the Defendant for TEN(10) more years pursuant to
§841(b) [27 years later], is clearly a violation of the U.S. Constitution's Ex
Poste Facto Clause part of the Double Jeopardy Clause.  See U.S. Constitution, Art.
I, §9, cl.3; and Fifth Amendment.

The Supreme Court has made it clear that the Double Jeopardy Clause of the
Fifth Amendment "protects against multiple punishments for the same offense", NORTH
CAROLINA v. PEARCE, 395 U.S. 711, 89 S.Ct. 2072 (1969).

The Supreme Court further clarified in COLLINS v. YOUNGBLOOD, 497 U.S. 37,
110 S.Ct. 2715 (1990) and CAL. DEPT. OF CORRECTIONS v. MORALES, 514 U.S. 499. 115
S.Ct. 1597 (1995), that ex poste facto violations occur whenever a law, as applied;
2) aggravates a crime, or makes it greater than it was when committed; 3) that
changes the punishment and inflicts a greater punishment than the law annexed to
the crime when committed.

In short, an ex poste facto violation exists, as here, when the govern-
ment attempts to apply a law that "improperly raises the penalty from whatever the
law provided at the time of the original offense"; and that subtle ex poste facto
violations are no more permissible than overt ones, see COLLINS, supra; MORALES,
supra; Art. I, §9, cl. 3 and Art. I, §10, cl.1 of Federal Constitution.

Furthermore, the application, or rather the attempted submission of the
§851 statute within the instant action, is really nothing more than an improper
"**bill of attainder**" -- which is clearly prohibited in the U.S. Constitution at Art
I, §9, cl.3. This improper §851 ploy is impermissible, as it represents a "legis-
lative judgement of conviction, an [erroneous] exercise of judicial power by the
legislature without a trial, and in disregard of teh first principle of natural
justice."

## 2. Prior Inapplicable as Defendant Adjudged A "Young Adult Offender"

The Defendant was sentenced [to nine(9) months] as a "young adult offender"
pursuant to 18 U.S.C. §4209; and unable to benefit from the provisions of the Youth
Corrections Act -- a different statute altogether. See Vermont U.S. District Court
Judgement of Conviction 12/19/75 [Docket #75-65].

As clearly articulated in the Defendant's Petition To Enter Plea Of Guilty
And Order Entering Plea [at Page 2, ¶9], and defense counsel Gary Brown's "Certi-
ficate Of Counsel"[at Page 4, ¶3], the sentence was as a "young adult", to wit:

"(I)f at this time I am at least 18 and not more than 26 years of
age, I know that the Court may sentence me under the provisions of
the Youth Corrections Act or as a Young Adult Offender for an
indeterminate sentence ..."

and as the Defendant was 25 years of age in December 1975, he qualifies as a Young
Adult Offender.

According to the Black's Law Dictionary, Abridged Sixth Ed. 1991, "adjudged"
is defined as; "to pass on judicially, or to sentence. Judgement of a court of
competent jurisdiction that implies a judicial determination of a fact, and the
entry of a judgement." Thus, the Defendant was sentenced as a "young adult offen-
der" ("YAO"), with the applicable "special parole" only for that specific class
of offenders.

Upon information and relief, the Defendant was "unconditionally discharged"
only six(6) months after his release in 1976, and therefore satisfied all of the

requirements of a "young adult offender"[to wit, Defendant was discharged <u>prior</u> to the expiration of the sentence], and is thus eligible for any applicable considerations thereof.  See 18 U.S.C. §5021 [as of 1976].

There is no requirement for a showing of innocence of legal errors, as apparently the YAO statute specifically articulated provisions under which the prior is set aside [expunged], i.e. "completely exonerated of any criminal purpose."  See e.g. <u>U.S. v. BEAULIEAU</u>, 959 F2 375 (2d Cir 1992); <u>U.S. v. CORRADO</u>, 53 F3 620 (3d Cir 1995)(government concedes FYCA conviction should not be counted); <u>U.S. v. DOE</u>, 980 F2 876 (3d Cir 1992)(FYCA calls for actual removal of any records related to conviction); <u>INS. v. MESTRE-MORERA</u>, 462 F2 1030 (1st Cir 1972)(FYCA conviction may not be used to deport defendant); <u>U.S. v. KAMMERDIENER</u>, 945 F2 300 (9th Cir 1991) (YCA conviction not counted in criminal history).  See also, <u>TUTEN v. U.S.</u>, 460 U.S. 660, 103 S.Ct. 1412 (1983).

### 3. Using 1975 Prior Violates Statute of Limitations

The Defendant was indicted in 1997, with an alleged commencement of illegal activity beginning in 1980.  However, the trial records have determined that the earliest activity was not until 1986/87 (towit, the "Indos") -- more than ten(10) years after the 1975 prior.

Pursuant to the USSGuidelines §4A1.2(e)(2), any prior sentence with a sentence less than a year, as here, that was not imposed within ten(10) years of the defendant's commencement of the instant offense can not be included in sentencing computations.

Moreover, the Federal Rules of Evidence 609(b) states that evidence of a conviction is not admissible if a period of more than ten(10) years has elapsed since the date of the conviction or release therefor.  Furthermore, the PSI has rightfully excluded this 1975 prior from its criminal history calculations.

In short, it has been approximately <u>twenty-six(26) YEARS</u> since this prior sentence [of ONLY nine(9) months] was instituted, and therefore, it can not now be used <u>AGAIN</u> to enhance the Defednant's sentence.

Finally, Congress has intended for enhanced sentences for recidivism, as long as the prior offenses occurred after the passage of the enhancement provision, see <u>GRYGER v. BURKE</u>, 334 U.S. 728 (1948).

The Honorable Judge Platt
Page 20 - Sentencing Memo
June 27, 2002

Ultimately, there is no specific provision of the Controlled Substances Penalties Amendments Act of 1984 to expand the 21 U.S.C. §841(b) penalty liability retroactively, and thus a 1975 conviction [before the 1984 §841(b) Amendments], may not be used in the instant sentencing computations.

### 4. The Rule Of Lenity

"The rule of lenity requires the sentencing court to impose the lesser of two penalties where there is an actual ambiguity over which penalty should apply." U.S. v. CANALES, 91 F3 363 (2d Cir 1996). It further states that "any ambiguity concerning the scope of a criminal statute, however, must be 'resolved in favor of lenity.'" U.S. v. COLLADO, 106 F3 1097 (2d Cir 1997).

The Second Circuit in U.S. v. COLLADO, supra, concluded that 21 U.S.C. §851 was ambiguous and applied the rule of lenity. They further stated Id. at 1102, that Congress could have drafted §851 to express either meaning clearly, and so the inherent ambiguity of the statute as legislated supports neither meaning. See also, U.S. v. ESPINOSA, 827 F2 604 (9th Cir 1987); U.S. v. ADAMS, 914 F2 1404 (10th Cir 1990); U.S. v. BURRELL, 963 F2 976 (7th Cir 1992).

As Circuit Judge Winter articulated in his COLLADO concurrance "the government's reading of Section 851 creates a redundancy that makes virtually no sense."

Clearly, any ambiguous laws which impose penal sanctions must be strictly construed against the government. "The rule of lenity has been applied not only toresolve issues about the substantive scope of criminal statutes, but to answer questions about the severity of sentencing." U.S. v. THOMPSON, 504 U.S. 504 (1992). Further, Title 21 is a "civil" statute by design and law, per Congress, and therefore 21 U.S.C. §851 is a civil law being improperly used as criminal in nature, see U.S. v. JOHNSON, 845 FSupp 864 (1994).

Finally, this Court must infer the rationale most favorable to the Defendant. If the Court is unclear as to the applicability of a prior conviction, then this Court must afford the Defendant the benefit of the doubt, U.S. v. MARTINEZ, 946 F2 200 (9th Cir 1991). See also, U.S. v. DAURAY, 215 F3 257 (2d Cir 2000).

Consequently, as §851 is clearly ambiguous, this Honorable Court should preclude the Defendant's prior conviction from any sentencing considerations.

## 5. The Doctrine Of "Collateral Consequences"

The doctrine of collateral consequences has been clearly established. See e.g. U.S. v. KASSAR, 47 F3 562 (2d Cir 1995); U.S. v. MARTIN-TRIGONA, 759 F2 1017 (2d Cir 1985); U.S. v. MARES-MOLINA, 913 F2 770 (9th Cir 1990). The import of these cases is that the length of a sentence, and the inclusion of a questionable prior may have important collateral effect or consequence on future sentencing.

The results of including the prior may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected [to wit, Career Criminal or "3 strikes" statutes could result in a severely disproportionate sentence for even a minor future conviction]; and Defendant's Criminal History Category ("CHC") may be adversely affected in future computations.

There exists the added prejudice and additional stigma which could be used to impeach Defendant's credibility in the future by erroneously including the suspect prior conviction. See U.S. v. RIVERA, 164 F3 130 (2d Cir 1999).

The error would be both "obvious and substantial", as the apocryphal §851 is not "speculative" at all; it clearly increases the "actual term of confinement" by over 1300% [to wit, 9-months -vs- 10-years], and therefore egrigiously affects the fairness, integrity, and public reputation of the judicial proceedings.

## 6. APPRENDI Prohibits Use Of Prior

U.S. v. ALMENDAREZ-TORRES, 118 S.Ct. 1219 (1998), has been, in effect, overruled by APPRENDI, which now mandates that a prior conviction, as an "implied necessary element", must be included in the indictment and found beyond a reasonable doubt by the jury.

The APPRENDI Court found the ALMENDAREZ-TORRES "..represents, at best, an exceptional departure from the historical practice [of requiring the jury to determine facts which are necessary to impose a particular punishment]" Id. at 2361-62.

It further held that "... it is [arguably] that ALMENDAREZ-TORRES was incorrectly decided, and ... a logical application of our reasoning [in APPRENDI] should apply if the recidivist issue were contested in this case." Id. at 2362. And that "ALMENDAREZ-TORRES was [a narrow exception to the general rules] and was based on its [unique facts]", Id. at 2362 -- to wit, deportation and illegal re-entry only.

Furthermore, Justice Thomas "... confessed error in siding with <u>ALMEN-DAREZ-TORRES</u> majority." Id. at 2379; and consequently, after <u>APPRENDI</u>, due process protections require that this enhancement fact [i.e. prior] be treated accorgingly as an **essential element** of the offense.  See e.g. <u>U.S. v. PRENTISS</u>, 206 F3 960 (2000).

This Court correctly recognized this issue of requiring the jury to make a finding beyond a reasonable doubt [see Tr. 1554-58], however, failed to submit this "implied necessary element" to the jury — a fatal error, as the prior may not now be included in any sentencing computations.

Finally, if one of the foregoing is not dispositive <u>per se</u>, the totality of the circumstances would remove the Defendant's prior conviction from the HEARTLAND application as intended by Congress.

## B.  <u>Prior As "Same Course Of Conduct" — In Arquendo</u>

In the alternative, even assuming <u>arguendo</u> on behalf of the government to contravene the foregoing [i.e. disregarding the U.S. Constitution and the U.S. Supreme Court], the Defendant's prior conviction still may not be used in the sentencing computations.

By expanding the instant indictment to 1980 [i.e. within the 5-year statute of limitations], and considering that the previous indictment had been expanded to 1974, it becomes clear that the government's theory and intent was to include the 1975 prior as part of the "same course of conduct".  And the Courts have established that including prior convictions that were part of the same course of conduct as the instant offense is **plain error.**  See <u>U.S. v. THOMAS</u>, 54 F3 73 (2d Cir 1995); <u>U.S. v. RIVERS</u>, 50 F3 1126 (2d Cir 1995); <u>U.S. v. FORD</u>, 88 F3 1350 (4th Cir 1996).

Pursuant to the USSGuidelines §1B1.3, relevant conduct includes "all acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction", see §1B1.3(a)(2).  However, acts may be found to be part of the "same course of conduct" even if they were not performed pursuant to a single scheme or plan.  See <u>U.S. v. THOMAS</u>, supra; <u>U.S. v. RIVERS</u>, supra.  Therefore, the government has effectively claimed that the Defendant's prior was, in their opinion, part of the overall "same course of conduct".

It is the government, in their indictment(s), and repeatedly at trial, who has alleged a "single conspiracy", and therefore the Double Jeopardy Clause bars it from dividing a single offense into separate charges.  See e.g., U.S. v. GORE, 154 F3 34 (2d Cir 1998).

As a general matter, the party with an affirmative goal and presumptive access to proof on a given issue [the government here] normally has the burden of proof as to that issue, see J. Wigmore, Evidence §§2485-2486, 3d ed. 1940.  In the instant context of sentencing, it is the government who seeks increased punishment, and thus has the burden of proving that the circumstances warrant such an increase.  See e.g., U.S. v.FONT-RAMIREZ, 944 F2 42 (1st Cir 1991)(burden on government to prove sufficient facts for any enhancement).

Here, the government has failed to establish a clear record that sufficiently lends itself to an analysis to support their allegation that Defendant's 1975 prior conviction was not part of the "same course of conduct" as pleaded in their instant indictment.  Furthermore, the government has pointed to nothing in the files and case records that demonstrates the conduct was not related.

## POINT V

### THE FORFEITURE SHOULD BE VACATED IN TOTO

The criminal forfeiture statute provides, in 21 U.S.C. §853, that a defendant shall forfeit "any property constituting, or derived from, and proceeds the person obtained, directly or indirectly, as the result of" the criminal act alleged.  Clearly, the single dominant and controlling requirement is "proceeds" from some alleged illegal activity.  Consequently, if there are no "proceeds" [obtained by Defendant], or the "proceeds" [as here] have all been previously collected by the U.S. Government -- there can be NO forfeiture of any kind by the Defendant.

Furthermore, all the alleged "proceeds" have been positively identified, and thus located by the government by virtue of their having already forfeited and seized monies in excess of their own proposed amounts [from the responsible co-conspirators] -- and therefore, the government can NOT allege "substitution of assets". See 21 U.S.C. §853(p).

Additionally, as held in U.S. v. HURLEY, 63 F3 1 (1st Cir 1995), the government can collect the proceeds only once; and Courts have further established that:

> "(N)ot every member of a conspiracy must forfeit all of the
> proceeds allegedly generated by the conspiracy. Generally,
> a defendant should not be considered to have 'obtained' the
> proceeds that merely passed through his hands."

See U.S. v. SACCOCCIA, 823 F.Supp. 924 (1993); 18 U.S.C. §982(b)(2); U.S. v. REGAN, 699 F.Supp. 36 (SDNY 1988).

Moreover, the Courts have declared that the defendant(s) are entitled to a reduction of any forfeiture order by the value of any tangible items [including cash] which the government has already seized/forfieted. See U.S. v. McCARROLL, 1996 WL 355371 (N.D. I11)); U.S. v. ACOSTA, 881 F2 1039 (11th Cir 1989). See also, U.S. v. JARRETT, 133 F3 516 (1998)(government must subtract the purchase price by the "owners" who have no connection with defendant at time of purchase).

## A. Statute Of Limitations Prohibits Forfeiture

The Defendant was originally indicted in 1997. However, the bulk of the transactions forming the basis of the forfeiture took place in the 1980(s). These transactions [involving $1,509,170 and $2,553,000 in proceeds from Mr. SHERRETT's Thai marijuana; and the $770,000 from the "Indos"] are clearly outside the statute of limitations wherefor no amount should have been forfeited as to them.

Dismissing the aforementioned forfeiture is bolstered by the fact that there was virtually no evidence as to any activity between 1988 and 1996. There is no indication that any activities were taken in furtherance of the purported conspiracy in this time. All of the object(s) of those transactions were completed once the sales took place, and therefore those conspiracies should be found to have ended. See U.S. v. ROSHKO, 969 F2 1 (2d Cir 1992); U.S. v. TOUSSIE, 397 U.S. 112, 25 LEd2 156 (1970)(the limitation period is measured from the point at which the activity is complete). Thus, as to those forfeitures, the statute of limitations expired, and the forfeiture should be set aside.

All the forfeitures were charged to the jury as separate acts. Thus, each act of forfeiture should be subject to its own statute of limitations. Moreover, the government does not seek to forfeit any instrumentalities or actual proceeds of any activity, but simply an amount the government has alleged as "substitute proceeds".

Since it is contained in the indictment, the 5-year statute of limitations is the longest period that could arguably apply to the forfeiture of the funds in question. See 18 U.S.C. §3282.

However, as noted before, the forfeiture herein is not of property directly traceable to the offense.  Under 18 U.S.C. §984(2)(b), a civil forfeiture of substitute property [i.e. property not directly traceable to the offense forming the basis of the fordeiture — as here], **must be brought within one year**.  No other statute of limitations is mentioned in any of the forfeiture statutes, and therefore, as this apparently is the applicable statute of limitations, all of the forfeitures should be set aside as each of the alleged transactions took place more than one year prior to the bringing of the indictment.

### B. Estoppel Precludes Forfeitures

Prior to the commencement of Defendant's first trial, the government, from persons alleged to have been involved in the conspiracy charged in this indictment, received in excess of $10,000,000 [ten(10) Million Dollars] in forfeited property.  Moreover, the U.S. Government further received both the $1,509,170 and $2,553,000 from Mr. SHERRETT in Ordgon [in 1988], which was erroneously ordered forfeited from the Defendant.

At the hearing on the forfeiture action, the government conceded that it had received the amounts Defendant alleged it had received, but asserted that it was entitled to receive them from the Defendant again.  **The government is wrong.**  See U.S. v. CLEVLAND, 1997 WL 602186 (E.D. La.))(the U.S. can collect the properties and proceeds subject to forfeiture only once); U.S. v. McCARROLL, 1996 WL 355371 (N.D. Ill.))(the government may collect once on its forfeitures); U.S. v. JARRETT, 133 F3 519 (7th Cir 1998); U.S. v. DEFRIES, 129 F3 1293 (D.C. Cir 1997); U.S. v. HURLEY, supra.  See also, U.S. v. ORTIZ, 182 F3 902 (2d Cir 1999)(application of collateral estoppel from a criminal proceeding to a subsequent civil proceeding, and vice-versa, is not in doubt).

The government seems to interpret the forfeiture statute as authorizing it to collect the same amount of money from any person who ever touched the money — again, **the government is wrong**. See 18 U.S.C. §982(b)(2), which states in pertinent part:

> ".. shall not be used to order a defendant to forfeit assets in
> place of the actual property laundered where such defendant acted
> merely as an intermediary who handled but did not retain the
> property in the course of the .. offense,"

The government's expansive reading is not in keeping with the structure of the statute. As 21 U.S.C. §853(c) provides that, where forfeiture property has been transferred to a third person, the property will be subject to a special verdict of forfeiture form the transferee. Furthermore, the statute provides for the forfeiture of substitute property ONLY where the property to be forfeited cannot be located [not an issue here], or has become comingled with other property and cannot be separated [also non-applicable here]. See 21 U.S.C. §853(p).

In this case, both the $1,509,170 and the $2,553,000 was transferred directly to the U.S. Government [in Oregon 1988], and the government has retained that property. The government further concedes [see Tr. 1615] that "there is no reference as to what happened to the $770,000 that TREMBLEY got" [i.e. the "Indos" in 1986/87], we don't seek to forfeit under money laundering. In addition, as the government admits, it has already obtained approximately another $8,000,000 [eight (8) Million Dollars] in forfeitures from Mr. SHERRETT and Mr. TIMEWELL [owner of "Indos"]. Therefore, under the statute, the U.S. Government is clearly not entitled to obtain that same property AGAIN from the Defendant.

However, the government has gone further in its forfeitures. In fact, it has obtained from other alleged co-conspirators all of the money it now seeks from the Defendant [to wit, several additional Million Dollars from MATSUZAKI - SINGER - BOWLER]. There is nothing in the forfeiture statute that permits the government repeatedly to forfeit the same property. In this case the forfeiture from the Defendant is based upon the allegation that he is a member of a conspiracy that had engaged in all of the alleged transactions. Thus, the co-conspirators are all alleged to be agents of each other, and therefore, the principle of "joint and several liability" serves to satisfy any alleged liability attributed to the Defendant. Consequently, the forfeiture should be set aside.

## C.  Failure To Prove The Existence Of Forfeitable Property

In order to obtain property from a defendant, the government must show that the defendant has a beneficial interest in the property, see U.S. v. REGAN, supra. In this case, the government did not prove that the Defendant had a beneficial interest in any of the funds that it seeks to forfeit. In fact, the government has never established that any of the alleged proceeds from any of the transactions belonged to the Defendant.

As to most of the funds the government seeks to forfeit, the Defendant
was simply a courier. He took funds from the owner and transferred them to the
owner's transferee. There was no demonstration whatsoever that the Defendant had
any interest in any of those funds. If he had no property interest in the funds,
they are not forfeitable from him. See 18 U.S.C. §982(b)(2), which states in per-
tinent part:

> "(T)he substitution of assets ... shall not be used to order a
> defendant to forfeit assets in place of the actual property ..
> where such defendant acted merely as an intermediary who handled
> but did not retain the property ..."

In fact, the proof presented by the Defendant demonstrated that he had
legitimate income during the years in question [i.e. payed both Federal and State
income taxes],kand that he was also an insured and bonded licensed general contrac-
tor [who personally constructed his own house] -- and the jury apparently so found,
by refusing to forfeit monies used to purchase his automobiles, or monies obtained
from the sale of some gold bar(s).

The jury finding that the other monies were forfeitable apparently resul-
ted from confusion caused by the Court's ambiguous instructions to the jury. Spe-
cifically, when the jury asked whether or not the monies could be collected [i.e.
forfeited] again, the Court responded that the jury was "not to be concerned" with
determining that fact [see Tr. 1679]. This erroneous instruction represents rever-
sible "**plain error**", as the Judge has improperly removed from the jury their fact-
ual determination of "relevant and material evidence".

This, in effect, indicated to the jury that it was not to be concerned
with either the previous collection by the U.S. Government [i.e. estoppel] and/or
of the Defendant's non-ownership of the funds. Thus, the jury ordered forfeited
only property that the Defendant never had an interest in, and did not forfeit the
only property which was shown actually to be owned by the Defendant. This indi-
cates both jury confusion and, probably, the jury's belief [if properly instructed]
that there should be no forfeiture from the Defendant.

As clearly stated in Rule 32.2(b)(4) - Criminal Forfeiture, from the Fed.
Rules of Criminal Procedures; "the jury shall determine whether the government has
established the requisite nexus between the property and the offense committed by
the defendant." Here, there is no nexus whatsoever between thepproperty and the
offense.

Furthermore, the jury was not permitted to make the necessary finding pertaining to the lack of a nexus -- a lack thereof the government concedes; and thus, the forfeiture should be set aside.

## D.  The Forfeiture Is Excessive

The Court is considering the government's motion for an Order of Forfeiture [of substitute assets only] in the amount of $2,027,845.  This amount is excessive because; (1) all the alleged transactions fall outside the "substitute assets" statute of limitations of one(1) year; (2) the government has already forfeited/seized these proceeds from the principal owners/organizers [i.e. joint and several liability]; (3) has forfeited/seized amounts in excess of what they claim to entitled to herein [to wit, estoppel]; and (4) there was no proof that the Defendant received or had any title to any of the allegedly forfeitable funds at any time -- thereby rendering the forfeiture excessive and punitive.

In fact, in addition to being outside the statute of limitations for any "substitute assets" (and all the foregoing), the trial records clearly establish that the "proceeds" were simply handed [through NO money laundering transactions of any kind] directly to the owner/organizers of the illegal activity -- who then either gave the proceeds directly to the U.S. Government, or had the government forfeit/seize the proceeds from them.  Under these circumstances, the forfeiture should be vacated.

The government's continued assertion that the forfeiture contained in the indictment can be a repeated forfeiture from any person who ever had any contact with the property runs afoul of U.S. v. BAJAKAJIAN, 524 U.s 321 (1998).  In that case, the Supreme Court held that a forfeiture imposed as part of an indictment is subject to the Excessive Fines Clause of the Eighth Amendment.  Here, the level of punishment faced by the Defendant, plus the forfeiture, as "substitute assets" only, [i.e. Defendant's life savings, all his retirement funds, and his only home] -- of proceeds/funds already obtained from those held liable -- must be regarded as being excessive, and running afoul of the Eighth Amendment.

The government's attempt to arrogate "substitut assets" based upon alleged proceeds that are arguably not subject to forfeiture at all [estoppel and statute of limitations] -- from the lowest-level messenger/courier Defendant, is clearly outside the "heartland" application of the forfeiture statutes, as well as being excessive.

## POINT VI

### THE COURT SHOULD USE CLEAR AND CONVINCING EVIDENCE RATHER THAN A MERE PREPONDERANCE IN ALL ITS FACTUAL DETERMINATIONS

The dissent from U.S. v. ALMENDAREZ-TORRES, supra, by Justice Scalia, which becomes the majority opinion in APPRENDI and JONES is that it was:

"genuinely doubtful whether the Constitution permits a judge ... to determine by a mere preponderance of the evidence ... any fact that increases the maximum penalty to which a criminal defendant is subject."

As far back as McMILLAN v. PENNSYLVANIA, supra, the Supreme Court has stated that:

"there maybe an exception to the general rule that the preponderance standard satisfies Due Process when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense cf conviction."

see also U.S. v. RESTREPO, 946 F2 654 (9th Cir 1991); and even earlier the Court held that it is unconstitutional to use only a preponderance of the evidence standard in determining a defendant's guilt, see IN RE WINSHIP, 397 U.S. 358 (1970).

Furthermore, the Second Circuit in U.S. v. GIGANTE, 94 F3 53 (2d Cir 1996), stated that the preponderance standard "is no more than a threshold basis for adjustments and departures," Id. at 56 (emphasis in original), and that "the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures.", Id. The GIGANTE Ccurt further observed that "(W)here a higher standard [than preponderance], appropriate to a substantially enhanced sentence range is not met, the court should depart dcwnwardly.", Id.

The other Circuit Courts have apparently accomplished sub silentio a change in the standard of proof formula to "clear and convincing" concerning sentencing enhancements of four(4) or more levels that now represent a 'disproportionate' effect on the sentence. See e.g. U.S. v. JORDON, 256 F3 922 (9th Cir 2001); U.S. v. MEZAS de JESUS, 217 F3 638 (9th Cir 2000); U.S. v. CONCEPTION, 983 F2 369 (2d Cir 1992); U.S. v. KIKUMURA, 947 F2 72 (3d Cir 1991); U.S. v. LAM KWONG WAH, 966 F2 682 (D.C. Cir 1992).

In the instant analysis, there exists [in Count One] a twenty-six(26) level difference between the PSI's allegations, in contrast to the 'matter of law' based argument put forth by the Defendant. The difference in Count Two is a nineteen(19) level discrepancy between the government and the Defendant. And a $2,027,845 difference regarding the spurious Forfeiture claim [to wit, the entire forfeiture amount]; together with an eight(8) level discrepancy regarding the apocryphal leadership enhancement allegation. Consequently, this Honorable Court should make all these "factual determinations" using a clear and convincing evidentiary standard. .

The Supreme Court in APPRENDI, Id. at 2380 [Thomas concurrance] clearly challanges the sentencing guidelines stating that they operate as statutory maxima (quoting Justice Scalia's MISTRETA v. U.S., 488 U.S. 361 (1988)(that the guidelines are unconstitutional)), as there is no logical difference between enhancing maxima set by Congress and maxima set by the Guidelines. As stated in U.S. v. NORRIS, 128 FSupp2 739 (EDNY 2001) and U.S. v. KINTER, 235 F3 192 (4th Cir 2000), the Guidelines have "the force and effect of laws" and are thus "legally binding enactments in a manner indistinguishable from congressionally enacted criminal statutes", and therefore, are equivalent to statutory maximums. Consequently, pursuant to the holdings of APPRENDI, JONES, and the U.S. Constitution, with such grossly disproportionate guideline level discrepancies [arguably statutory discrepancies] involved within the instant PSI's "factual inaccuracies" -- this Court should use the standard of clear and convincing evidence in all its factual determinations. See e.g., U.S. v. VALENSIA, 222 F3 1173 (9th Cir 2000), vacated, VALENSIA v. U.S., 121 S.Ct. 1222 (2001)(totality of the circumstances); U.S. v. HOOPER, 177 F3 824 (1999).

### POINT VII

### APPROPRIATE DOWNWARD DEPARTURES

In determining whether a departure is appropriate, the sentencing court begins by considering whether some aspect of the case "take[s] it outside the Guidelines 'heartland' and make[s] of it a special, or unusual, case." KOON v. U,S., 518 U.S. 81, 116 S.Ct. 2305 (1996). Clearly, the Sentencing Commission has acknowledged the possibility that a combination of aspects, circumstances or conditions may set a case outside the heartland, even though none of

of the circumstances alone distinguish the case. See U.S.S.G. §5K2.0, comment.
Thus, as the Supreme Court explained in KOON v. U.S., supra, in promulgating the
Guidelines the Commission "did not adequately take into account cases that are,
for one reason or another, "unusual"", Id. [outside the heartland], and thus,
there is room under the Guidelines for federal judges to exercise traditional
sentencing discretion.

Indeed, the Guidelines themselves make clear that a court should consider,
in every case, not only in rare circumstances, whether a departure is appropriate,
see U.S.S.G. §1B1.1(i); U.S. v. EKHATOR, 17 F3 53 (2d Cir 1994). The Courts are
therefore free to depart from a proposed guideline range if "the court finds that
there exists an aggravating or mitigating circumstances of a kind, or to a degree,
not adequately taken into consideration by the Sentencing Commission,", 18 U.S.C.
§3553(b).

## A.   Disproportionate Sentencing Disparity

The Courts have established that a proper application of the law must be
followed "across the board". Downward departure to equalize sentencing disparity
is a proper ground for departure under appropriate circumstances. See U.S. v.
MEZA, 127 F3 545 (7th Cir 1996); 28 U.S.C. §991(b)(1)(B); U.S.S.G. Ch. 1, Pt. A,
ps 3 ("Congress sought reasonable uniformity in sentencing by narrowing the wide
disparity in sentences imposed for similar criminal offenses committed by similar
offenders"). See also, U.S. v. CAPERNA, 251 F3 827 (9th Cir 2001)..

The Second Circuit has also upheld the principle of downward departures
for disproportionate sentencing disparity in U.S. v. KOCZUK, 252 F3 91 (2d Cir 2002).
See also, U.S. v. WRIGHT, 211 F3 227 (5th Cir 2000); U.S. v. McMUTUARY, 217 F3 477
7th Cir 2000); U.S. v. DASS, 198 F3 1167 (9th Cir 1999),

The disparity analysis involves sentences imposed on other criminals invol-
ved in similar activity in the same jurisdiction; sentences imposed for commission
of the same crime in other jurisdictions, and similar offenses committed by similar
offenders. See U.S.S.G. Ch. 1, Pt. A(3) at 2 (November 1997); SOLEM v. HELM, 463
U.S. 277, 77 LEd2 637 (1983)(Eighth Amendment 'cruel and unusual punishment').
Thus, a sentence for one co-conspirator [or co-defendant] that is grossly dispro-
portionate to another similarly situated individual is outside the 'heartland'.

In this case, Mr. MATSUZAKI [catagorized as a leader in his PSI] and Mr. AUCHARD (see U.S. v. KULIK, supra) are the two individual(s) who orchestrated, arranged, and organized two(2) separate off-loads of hashish to AUSTRALIAN boats and then the distribution of all the hashish brought into the United States by the DEA Agents -- only a small portion of which is attributed to the Defendant. Their activities included meeting repeatedly with the DEA Agents, making several cash payments to the DEA Agents, discussing all aspects of the distribution with the Agents, discussed future conspiracies, and helped with the delivery of 4500 kilograms of hashish to Mr. SECOR in California [who apparently received a 5-year sentence]. All the herein activity was audio-taped and often video-taped -- and their sentences respectively [without cooperation and having gone to trial] was 6-years and 4-years.

To clearly demonstrate this disproportionate sentencing disparity, we can add all three(3) of their sentences together, to wit MATSUZAKI at 6-years; SECOR at 5-years; and AUCHARD at 4-years for a total of 15-years -- which represents ONLY one-half($\frac{1}{2}$) of the **minimum** 30-year sentence the PSI recommends for the low-level messenger/courier Defendant, who was less culpable, exercised no decision making, nor any managerial or leadership activities.

The Government's [U.S. Attorneys Office and U.S. Probation Department] PSI computations, no matter how much devoid of a "factual basis" or reality, as here, are largely unreviewable. However, the Court's function of sentencing which confirms and preserves the separation of powers between the judiciary and the executive branches cannot remain passive when an unexplained and unsubstantiated government position results in such disparate sentence. See, e.g., U.S. v. CONCEPTION, 983 F2 369 (2d Cir 1992). To do so, renders the Court irrelevant in the Sentencing process to an extent not permitted by the law, and as such is a violation of the equal protection component of the Fifth Amendment. See, e.g., U.S. v. CONTRERAS-GOMEZ, 991 F.Supp 1242 (1998).

As a matter of law, the government has not established a legal justification for its sentencing computations. Sentencing the Defendant to the government's apocryphal proposed guideline range would result in a sentence significantly above that of similarly situated defendant(s) in this Court's jurisdiction; and similarly situated defendant(s) charged with similar, if not identical, criminal offenses in other related jurisdictions -- thus, resulting in a disparate disproportionate sentence in contravention of the guideline policy in a manner NOT

The Honorable Judge Platt
Page 33 - Sentencing Memo
June 27, 2002

contemplated by the Sentencing Commission. See e.g., <u>U.S. v. SARDIN</u>, 921 F2 1064 (1990).

## B. <u>Departure For Substandard Non-Federal Pre-Sentence Confinement</u>

No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainee(s) would be kept in any detention facilities other than federal facilities. It is not within the purview of the various forbidden factors for departures recited by the Supreme⁻⁻ Court⁻⁻⁻⁻ in <u>KOON</u>, supra.

However, it is now beyond cavil that pursuant to <u>KOON</u> and U.S.S.G. §5K2.0, judges have the authority to depart based on the conditions of pre-sentence confinement. See, <u>U.S. v. BRINTON</u>, 139 F3 718 (9th Cir 1998)(30-month downward departure); <u>U.S. v. SUTTON</u>, 973 F.Supp 488 (D.N.J. 1997); <u>U.S. v. BAKEAS</u>, 987 F.Supp 44 (D.Mass 1997).

Furthermore, within the Second Circuit court(s), it has been clearly established that a departure is warranted for substandard non-federal pre-sentence confinement. See, <u>U.S. v. CARTY</u>, 264 F3 191 (2d Cir 2001)(pre-sentence confinement is appropriate basis for downward departure); <u>U.S. v. HERNANDEZ–SANTIAGO</u>, 92 F3 97 (2d Cir 1996)(3-level downward departure for pre-sentence 'harsher incarceration')

Moreover, the local District Courts have further determined departures to be applicable on the basis of federal inmates being confined in sub-standard County non-federal facilities. See e.g., <u>U.S. v. FRANCIS</u>,129 F.Supp2 612 (SDNY 2001)(1-level downward departure for County pre-sentence confinement); <u>U.S. v. AFZAC,</u> 99-CR-858 (EDNY February 2, 2001)(Judge MISHLER credits five days for every one that is spent at Nassau County Jail); <u>U.S. v. AVILA-BRIANZA</u>, 00-M-704 (EDNY December 27, 2000)(Judge SPATT downward departs and acknowledged that the conditions at the Nassau County Jail warranted consideration).

It is irrefutable and uncontrovertable that the conditions at Nassau County Jail are substandard to such an unusual degree as to pose a hardship on the Defendant, and warrant a downward departure. Ingrained at Nassau County, brutality is a way of life for the inmates at this facility. The U.S. Department of Justice demanded an investigation concerning the brutal substandard conditions

which resulted in a scathing and damning report filed by the U.S. Attorney for
the E.D.N.Y., LORETTA LYNCH in or around September 2000. Recently, in February
2002, the U.S. Department of Justice was compelled to file a federal lawsuit on
Nassau County Jail because of its continued substandard conditions and treatment.

In BRINTON, supra, that court cited approximately 30 separate and dis-
tinct conditions under which the defendant was held, andgranted a 30-month down-
ward departure. These conditions included: 1) unsanitary enviornment; 2) inade-
quate food; 3) overcrowding; 4) excessive confinement in cells; 5) inadequate law
library and access; 6) lack of fresh air; 7) limited recreation and facilities;
8) abusive guards, harassment and threats; 9) excessive shakedowns; 10) limited
commissary; 11) poor medical attention; 12) violent atmosphere; 13) non-function-
al plumbing; 14) lack of privacy in showers/toilets; 15) lack of pesticide con-
trol, roaches/rodents; 16) federal inmates integrated with others; 17) federal
inmates discriminated against -- while each of these conditions exists at Nassau
County Jail, there are still additional conditions that other federal detainees
are not subject to, to wit, collect only and unavailable confidential legal calls;
severe local County gang activity; limited visits; lack of religious diets; lack
of mental health professionals and counselors.

The Fifth and Fourteenth Amendments, in part, address the principles of
Due Process and Equal Protection under the law -- both of which have been denied
to the Defendant, as a Federal detainee confined at Nassau County Jail. Further-
more, the Fourteenth Amendment's Due Process protections extend to insure a pre-
sentenced detainees rights [under the Eighth Amendment] to NOT be subjected to
"cruel and unusual punishment".

Consequently, based on all the foregoing reasons, and as clearly estab-
lished in the U.S. v. CARTY, supra, and U.S. v. FRANCIS, supra, holdings, this
Court should grant Defendant a substantial downward departure for his confinement
in Nassau County Jail.

## C.  Other Applicable Downward Departures Under §5K2.0

Serious factual and legal issues are presented by evidence of the Defen-
dant's long pretrial incarceration under onerous conditions, the government's
control over funding for legal counsel [compelling Defendant to proceed pro se],
pretrial detention that by virtue of its inordinate length has crossed-over into
punishment, and serious debilitating "medical condition".

This case illustrates the danger of Due Process violations by intensive pressure on the Defendant to plead guilty and cooperate because of improper lengthy pretrial incarceration [i.e. forty-two(42) months] -- clearly excessive coercion largely controlled by the prosecution -- to the extent of chilling the Defendant's rights to a jury trial.

A court may depart if the defendant has suffered from unusual stress due to a lengthy or particulary stressful incarceration, see U.S. v. EKWUNOH, 888 F.Supp 369 (SDNY 1994); U.S. v. HOFFENBERG, 1997 WL 96563 (SDNY March 5, 1997). Lengthy pretrial incarceration, as here, and the stress and uncertainty which accompanies such lack of freedom has removed this case from the "heartland" of the guidelines sufficiently to warrant a departure.

The court in SUTTON, supra, recognized these conditions as a permissible ground for departure, holding:

"[u]nusual pretrial confinement, however, in length or severity of condition, can properly be considered by the sentencing court."

Furthermore, the Defendant has contracted Hepatitis C, a potentially lif-threatening liver disease, apparently while incarcerated pre-sentence almost 5-years by the government. The Sentencing Commission considers an "extraordinany physical impairment" a legitimate reason for imposing a sentence below the applicable guideline range. U.S.S.G. Manual §5H1.4 (2000). See e.g., U.S. v. HAMMOND, 37 F.Supp2 204 (EDNY 1999); U.S. v. ROTH, 1995 WL 35676 (SDNY 1995) (liver disease).

Moreover, the government created a "conflict of interest" between the Defendant and his retained counsel by denying the Defendant access to his funds via a sophistic Forfeiture allegation based upon "substitute assets" only, that in fact, was outside the applicable one(1)-year statute of limitations. This, after the government permitted up to six(6) of the alleged co-conspirators [all admittedly guilty] to use their forfeitable assets, and further denied the Defendant a MONSANTO hearing to properly determine the relevant facts. See e.g., U.S. v. SCHWIMMER, 968 F2 1570 (2d Cir 1992); U.S. v. MARQUEZ, 909 F2 738 (2d Cir 1990); CUYLER v. SULLIVAN, 446 U.S. 335, 100 S.Ct. 1708 (1980).

In this instance, all the Defendant's retained counsel -- for fear of non-payment for a trial -- did everything within their power to coerce a plea/cooperation agreement from the Defendant.

Specifically, Mr. FREEMAN colluded with the government in every way possible; Mr. KALINA moved to be relieved [i.e. alleged conflict of interest], and then abandoned the Defendant; and Ms. AMSTERDAM and Mr. JACOBS asked to be relieved [against Defendant's wishes] after the First trial due to insufficient funds for the Second trial. All of these attorneys had a financial incentive [improperly created by the government] to make decisions divergent from the best interests of the Defendant.

This "conflict of interest" was forced upon defense counsel by the government's attenuated and legally questionable position that it owned [through "substitute assets" only] essentially all of Defendant's assets through forfeiture. Even though there exists no Constitutional, nor Supreme Court basis under which the government -- without a formal "evidentiary hearing" on the propriety of the long-term "temporary" restraining order -- can withhold assets not directly connected to the alleged criminal activity. See e.g., U.S. v. GOTTI, 996 F.Supp 321 (SDNY 1998); U.S. v. RIBADENIERA, 105 F3 833 (2d Cir 1997); U.S. v. DACCARETT, 6 F3 37 (2d Cir 1993).

As articulated in KOON, a departure from the guidelines on any ground not considered by the Sentencing Commission in establishing the guidelines is permitted. See e.g., U.S. V. MOE, 65 F3 245 (2d Cir 1995). Therefore, in the instant analysis, the inordinate 42-months of pretrial detention [and 13-month pre-sentence substandard County Jail confinement], see e.g., ZADVYDAS v. DAVIS 533 U.S. 678, 121 S.Ct. 2491 (2001)(indefinite detention of non-convicted persons is unconstitutional); retained counsel effectively coerced into a "conflict of interest" by government's improper, erroneous, and SELECTIVE "temporary" restraining order of Defendant's "substitute assets", see e.g., U.S. v. $31,990 IN U.S. CURRANCY, 982 F2 851 (2d Cir 1993); and the Defendant's serious medical condition warrants, at the minimum, a 2-point downward departure, see e.g., U.S. v. SPEED JOYEROS, S.A. (May 2002) from U.S. v. HEBRONI, 187 F.Supp2 75 (SDNY 2002) (2-level downward for rigor/length of pretrial detention; denial of bail; and the destruction of livelihood). See also, U.S. v. RIOUX, 97 F3 648 (2d Cir 1996)(a downward departure granted for combination of factors).

Consequently, based upon all the foregoing reasons, as a totality of the circumstances, this Court should grant a downward departure pursuant to U.S.S.G. §5K2.0.

## POINT VIII

### OBJECTIONS TO PSI - AND - MOTION FOR FATICO HEARING(S)

Essentially, this entire "sentencing memorandum" serves as a detailed memorandum of law based "objection" to the instant PSI. Furthermore, the Defendant's "Preliminary Objections To PSI" submitted to the U.S. Probation Department on June 14, 2002, is hereby incorporated with the same force and effect, as if set forth herein at length.

In short, pertaining to the specific sentencing-only computations contained in the instant PSI -- they are all "factually inaccurate" -- and the Defendant "objects" to each and every one.

Furthermore, the Defendant hereby respectfully contends and submits [i.e. moves], that the following evidentiaty hearing(s) pursuant to U.S. v. FATICO, 444 U.S. 1073 (1980), will be necessary to properly resolve these "factual inaccuracies", to wit:

1. **For Count One**: determine the accurate amount of marijuana that can be proven and legally attributed to the Defendant. The issues include §841(b)(1)(C) -vs- §841(b)(1)(D); government's burden of proof regarding Defendant's "specific intent", foreseeability, reasonable capability to personally produce amounts, the government's artificially inflated amounts via spurious reverse-sting allegations [i.e. sentencing manipulation/entrapment], statute of limitations, default statutory sentencing, and unconstitutional bifurcation of elements of the offense [i.e. APPRENDI-based issues].

2. **For Count Two**: determine venue, unanimity of jury finding(s) [i.e. two(2) separate and distinct "prongs"], applicable statute of limitations of "transactions", constitutionally inadequate Count Two, as pleaded in indictment [i.e. NO specific money amount included, nor identifiable overt acts -- lack of proper "NOTICE"], and unconstitutional bifurcation of essential and material elements of the offense [APPRENDI-based issues].

3. **Leadership Enhancement -And- Forfeiture [Count Three] Together**: wherein the same co-conspirator(s) who testified at trial will need to testify for the court to make its fact-based determinations. In this "evidentiary hearing", each and every co-conspirator alleged to have been "controlled" by the Defendant must testify as to his explicit activity -- for there is neither evidence, nor trial

testimony to establish the government's fabricated leadership allegation. In
fact, the PSI has merely attempted to **"bootstrap"** – without any factual basis –
a bogus unsubstantiated allegation into an inferred fact on the strength of only
its mere assertion. The Court's proper issue is whether the Defendant is entitled
to a 2-level or 4-level downward adjustment for mitigating role pursuant to U.S.S.
G. §3B1.2.

As for the Forfeiture, based upon the controlling principle of "joint
and several liability", the same aforementioned co-conspirator(s) must testify
as to the exact amounts of funds the government has previously forfeited/seized
from them individually; and the Court must determine ["substitute assets"] the
applicable statute of limitations and estoppel prohibitions against the forfei-
ture – as a matter of law.

4. <u>Prior Conviction</u>: whereas the Defendant has submitted his written re-
sponse in objection to the government's 21 U.S.C. §851 [pursuant to §851(c)]; and
this Court must make factual legal determinations concerning <u>ex poste facto</u>, the
statute of limitations, double jeopardy, young adult offender status, rule of len-
ity, improper 'bill of attainder', and <u>APPRENDI</u>-based issues.

Pursuant to U.S.S.G. §6A1.3, "The court shall resolve disputed sentencing
factors at a sentencing hearing in accordance with Rule 32(c)(1) of the Federal
Rules of Criminal Procedures. See e.g., <u>U.S. v. PEDRAZA</u>, 27 F3 1515 (10th Cir
1994)(holding that the court must make independent findings when the defendant
disputes the facts). See also, <u>U.S. v. FATICO</u>, supra. The courts, for example,
are required to make specific independent findings identifying the five partici-
pants and the discrete extensive activity when seeking to impose an upward adjust-
ment for role in the offense, see <u>U.S. v. TAI</u>, 994 F2 1204 (7th Cir 1993). And
the Court risks reversal where it fails to make explicit findings with regard to
all the disputed facts. See e.g., <u>U.S. v. MATURO</u>, 982 F2 57 (2d Cir 1992); <u>U.S.
v. WILLIAMS</u>, 152 F3 294 (4th Cir 1998).

Moreover, Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedures
requires the court to either resolve factual disputes raised by the parties at
sentencing, or expressly disclaim reliance on those disputed facts, see <u>U.S. v.
ROSADO-UBIERA</u>, 947 F2 644 (2d Cir 1991).

Finally, the Defendant hereby formally respectfully requests this Honorable Court to enter [preferably in writing] its "findings of fact" and "conclusions of law" upon which it basis each and every of its "factual determinations" pertaining to all the factual inaccuracies in the instant PSI — objected to by the Defendant.

## CONCLUSION

Based upon the foregoing memorandum of law based discussion, and pursuant to the Supreme Court holdings in APPRENDI and Second Circuit findings in U.S. v. ZILLGITT and U.S. v. THOMAS, 274 F3 655 (2d Cir 2001); U.S. v. GREER, the Court should sentence the Defendant to **"time served"**, as his 57-months of pre-sentence incarceration is more than sufficient to satisfy his liability. Furthermore, based upon statutory requirements, the Court should set aside the governments spurious Forfeiture charge. In the alternative, should the government disagree and reject the Court's findings, the Court shall vacate the jury's findings [i.e. order a mistrial] and Order a **new trial** based upon a properly pleaded indictment -- as held in ZILLGITT and GREER.

### COUNT ONE

The overriding and prevailing issue at hand, is the fact that the government's indictment is unconstitutional. Count One lists three(3) different and distinct "object(s)" of multiple conspiracies under two(2) vastly different statutes [i.e. §841(b)(1)(C) -vs- §841(b)(1)(A)]; Count Two lacks proper "notice" regarding essential elements of the offense; and Count Three, as a matter of law is invalid [i.e. statute of limitations and estoppel]. These fatal flaws are further exacerbated by the fact that the indictment was submitted post-APPRENDI, wherein the government had sufficient time to analyze this "sea change in Constitutional law" Supreme Court decision and avoid the Constitutional errors contained therein.

As the Court clearly recognized and repeatedly mentioned at the trial of the matter, the government is bound under their apocryphal indictment, to wit, at [Tr. 1547-1548]:

> "(Y)ou have it in your indictment. You wrote the indictment ...
> the grand jury adopted it. You can't change the indictmnet now."

and at [Tr. 1549]:

> "(B)ring the jury in. I will not hear any more, Mr. RYAN. You wrote the indictment. The grand jury adopted it. This is what he was charged with. <u>You can't amend it now</u>."  (emphasis added)

and finally at [Tr. 1553]:

> "(M)r. RYAN, you prepared these things. You prepared it in this form. You prepared the indictment. You can't go back and forth like a yo-yo."

Some Courts have held that [post-<u>APPRENDI</u>] 21 U.S.C. §841 is <u>per se</u> unconstitutional, see e.g., <u>U.S. v. BUCKLAND</u>, 259 F3 1157 (9th Cir 2001), and it is beyond peradventure that there exists a substantial Constitutional issue as to all "strict liability" statute(s), which on its face, 21 U.S.C. §841 is. See e.g., <u>U.S. v. REEMAN</u>, 2000 LEXIS 21756 (6th Cir).— and therefore, a mere preponderance of evidence is clearly insufficient for the Court's instant "factual determinations".

In this instance, the government has failed to prove that this particular Defendant agreed, specifically intended, or could even accomplish the underlying substantive drug offense involving the [U.S. Government Agents manipulated] threshold quantities as erroneously submitted in the PSI. Furthermore, and most important, the sentencing Court in Count One cannot speculate as to which object(s) of the conspiracies, or which offense statute the jury found [i.e. §841(b)(1)(C) -vs- §841(b)(1)(A)] to support the original conviction. To do so would invade the province of the jury. This Court may not examine the evidence presented at trial to determine whether the jury, if instructed differently, could have, would have, or even should have found [the more serious basis for the conspiracy].

Both the U.S. Attorneys Office and the U.S. Probation Department have determined that sufficient evidence was presented at trial to support a conspiracy under 21 U.S.C. §841(b)(1)(C), and consequently, pursuant to the clearly established doctrine of "default statutory sentencing" [i.e. "<u>offense</u> <u>simplicter</u>"], the Defendant must be sentenced **only** to the least serious statute — therefore, the Defendant's total offense level for Count One, based upon 3-kilograms of marijuana [converted "methaqualone"] under U.S.S.G. §2D1.1, is <u>12</u>, to wit, 12 to 15 months at Criminal History Category ("CHC") I.

## NO LEADERSHIP ENHANCEMENT

The government failed to comply with the U.S. Constitution and APPRENDI-based findings pertaining to proper "notice" by refusing to submit the issue of "leadership" to the jury for the required reasonable doubt standard. Furthermore, both the Court and the government failed to address the issue at trial, and failed to address and explain the "materiality" of the issue with specific "jury instructions".

Moreover, the government has failed to establish a clear record that sufficiently lends itself to an analysis to support their allegation(s). Further, the government has pointed to no specific evidence from the case files and records that supports or substantiates their sophistic claim(s) of leadership.

In short, the PSI has impermissibly used mere allegations as proposed statements of fact, and attempted to support the implied assertion [i.e. of leadership] based solely on the unsubstantiated allegation in and of itself, to wit, improper "**bootstraping**".

The government can NOT arbitrarily and capriciously, as here, invent a non-existent "leadership enhancement", particularly, when the relevant trial testimony, from government witnesses, clearly establishes that the Defendant, in fact, warrants a 2-level or 4-level downward adjustment pursuant to U.S.S.G. §3B1.2 - mitigating role.

## COUNT TWO

Money and the amount thereof, is clearly an essential element of the money laundering statute. The U.S. Constitution demands that, as APPRENDI illustrated, regardless of the legislative designation or intent, any factor considered an element of the offense must be included in the indictment in order that Due Process protections are not subsumed by statutory construction.

Therefore, having failed to include the element of the money in the instant indictment, the Defendant can be held liable ONLY for the generic finding of guilty regarding the Count Two money laundering conspiracy [notwithstanding venue, notice, statute of limitations, and heartland considerations], and not any specific monetary liability — as there exists no Constitutional basis under which the the government can bifurcate an essential element to a post-trial determination - with its compelling dispositive prejudice.

The Honorable Judge    -att
Page 42 - Sentencing Memo
June 27, 2002

Consequently, pursuant to the November 2001 U.S.S.G. §2S1.1, the Defendant's total offense level for Count Two is 14, to wit, 15 to 21 months under CHC I.

## INAPPLICABLE PRIOR

The U.S. Constitution bars a court from retroactively applying a prior that would inflict greater punishment for the offense than the law allowed when the offense was committed, to wit:

> "(r)esolution of the Constitutional issue need not be certain;
> there need only be a "substantial doubt" or an indication that
> the Constitutional question in 'non-frivolous'."

see U.S. v. MASSEY, 48 F3 1560 (1995); U.S. v. LOUIS VUITTON, 765 F2 971 (2d Cir (1986).

The Defendant's 1975 prior has ex poste facto, young adult offender status, statute of limitations, double jeopardy, bill of attainder, rule of lenity, and in arguendo "same course of conduct" concerns -- wherein any one may be dispositive, and the totality of the analysis would surely preclude using the prior at sentencing.

## FORFEITURE SET ASIDE - OR STAYED

The government seeks to forfeit via "substitute assets" only, alleged "proceeds" that are outside the applicable statute of limitations , never shown to have been "obtained" by the Defendant, towhich the Defendant had no title or interest, and pursuant to "joint and several liability" and estoppel have already been collected repeatedly by the government -- and therefore, the Defendant's "substitute assets" are not subject to forfeiture.

The Court at [Tr. 1689-1691] recognizes the potential impropriety of the government's forfeiture allegations when it advised the government to "not proceed until it is necessary, or an ancillary proceeding until it is necessary with respect to the question of collectability", and further instructed the government that they might be able to only enter a qualified or contested judgement.  Whereas the Court appears to contest the collectability issue only, as a matter of law, the government, by statutory limits, cannot forfeit [under "substitute assets" only] any of the Defendant's "property/assets".

The Honorable Judge
Page 43 - Sentencing Memo
June 27, 2002

Consequently, because the evidence clearly supports, as a matter of law, that the government is prohibited from the forfeiture under "substitute assets"; andthe Court clearly has legal reservations regarding the legitimacy of the government's allegations -- if the Forfeiture Count is not set aside, then in the alternative, to exercise proper caution, this Court should stay any Preliminary Orders of Forfeiture until the relevant and material legal questions are resolved by the Appellate Court. And since the Defendant's assets/property are all detained under a <u>lis pendens</u> "restraining order", there will be no type of prejudice to the government by staying the forfeiture decisions.

<u>OBJECTIONS TO PSI</u>

The PSI's theory, rather than factual determinations, is to use unsubstantiated and uncorroborated conclusory statements to provide the sole foundation for its own admission as implied fact. The mere identification of a potential relevant issue is insufficient to justify its admission as fact, wherein the Defendant is provided no opportunity to cross examine or properly determine the factual basis of the allegations being used to establish the "bootstraped" fact.

Moreover, the instant PSI's overreaching attempt to act as sentencer, rather than as fact-determiner, with its apparent failure to exercise due diligence, illustrates quite clearly the erosion of the jury and the right to have elements of an offense decided beyond a reasonable doubt that the Supreme Court so explicitly decided to protect in <u>APPRENDI</u> and <u>JONES</u>.

The Courts have further prohibited an increased sentence "above an otherwise appropriate norm", wherein the prosecution, in conjunction with the U.S. Probation Department, within their PSI have, as here:

> "Created an unacceptable risk ... [of] penalizing the defendant
> for exercising his Constitutional right to stand trial."

see, <u>U.S. v. CRUZ</u>, 977 F2 732 (2d Cir 1992).

Finally, the predominant gravamen of the instant sentencing memorandum of law is that <u>APPRENDI</u> and <u>BARNES</u> does matter, even in the face of alleged overwhelming evidence, because, as it turns out "overwhelming evidence" does not matter in cases, as here, with defective indictments.

'The Honorable Jude Platt
Page 44 - Sentencing Memo
June 27, 2002

In closing, to exercise proper caution and understanding regarding
the Court's findings, the Defendant respectfully requests for this Honorable
Court to enter [preferably in writing] clarification(s) pertaining to the
"findings of fact" and "conclusions of law" upon which the Court may have
based their decision(s) on.

Respectfully submitted,

Michael Vondette - Defendant pro se
100 Carman Avenue, CC#-01003695
East Meadow, N.Y.  11554

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x

UNITED STATES OF AMERICA,

                              Plaintiff,    :        97-CR-1010 (TCP)

        -vs-
                                                     AFFIRMATION OF SERVICE
                                            :

MICHAEL VONDETTE,

                              Defendant.
-------------------------------------------x

        Michael vondette, defendant pro se in the above captioned case, does
hereby swear and affirm, under the penalties of perjury, that a true and correct
copy of:

                SENTENCING MEMORANDUM and PSI REPORT OBJECTIONS

has been sent by prepaid First-class U.S. Mail to the following addresses:

The Honorable Judge Platt
(E.D.N.Y.) U.S. District Court Judge
1010 Federal Plaza
Central Islip, N.Y. 11722


U.S. Probation Department
(E.D.N.Y.) U.S. Courthouse
200 Federal Plaza
Central Islip, N.Y. 11722


U.S. Attorneys Office
(E.D.N.Y.) AUSA B.RYAN
600 Federal Plaza
Central Islip, N.Y. 11722



Dated: Nassau, New York
       June 28, 2002


                                    Respectfully submitted,


                                    Michael Vondette - Defendant pro se
                                    100 Carman Avenue, CC#-01003695
                                    East Meadow, N.Y. 11554



Michael Vondette
100 Carman Avenue
NCCC#-01003695
East Meadow, N.Y. 11554

U.S. Probation Department
(E.D.N.Y.) U.S. Courthouse                      July 24, 2002
202 Federal Plaza
Central Islip, N.Y. 11722

Re: U.S. v. VONDETTE 97-CR-1010 (S-2)(TCP)
    Second Addendum Reply - Resubmit Objections to PSR

Dear Mr. Jingeleski - Probation,

    The defendant pro se in the above mentioned case, Michael Vondette
[hereinafter the ("Defendant")], hereby submits the herein letter-reply to the
U.S. Probation Department's Second Addendum to their Presentence Investigation
Report ("PSR"); and simultaneously re-submits his objections to the PSR pur-
suant to Rule 32 of the Federal Rules of Criminal Procedures.

    First and foremost, the PSR's base and total offense levels are factu-
ally inaccurate for both COunt One and Count Two.  Furthermore, the Defendant
does not warrant a leadership enhancement; the PSR's choice of Sentencing Guide-
line Manual is ex poste facto prohibited; and the PSR's prior conviction "enhance-
ment" is also ex poste facto precluded.  In short, the PSR's sentencing computa-
tions, as outlined below, are factually incorrect.

## Count One Offense Levels Are In Error - As A Matter Of Law

    The original PSR, First Addendum, and now the Second Addundum all im-
properly refused to include 21 U.S.C. §841(b)(1)(C), as pleaded in the indict-
ment, in its sentencing computations.  Neither the U.S. Probation Department,
nor the U.S. Attorneys Office can amend the indictment after the fact and pre-
clude this stand-alone statute from its  factual determinations.

    Furthermore, and more on point to the instant objection, is the fact
that the government [i.e. U.S. Probation Department and U.S. Attorneys Office]
can NOT use any alleged "relevant conduct" in their computations, nor can they
use anything outside what is specifically contained and pleaded in the indict-
ment, to wit, one thousand(1000) kilograms of marijuana and one thousand(1000)
kilograms of hashish in any sentencing calculations.

U.S. Probation Department
Page 2 - Second Addendum Reply
July 24, 2002

The fact that the government can use only these amounts [again assuming _arguendo_ in contrast to Defendant's original objections to the PSR] is based upon the Defendant's request at trial for the jury to decide and determine the precise and exact amount of controlled substances to which the Defendant could be held liable — which was denied by the Court (with the prosecution's tacit agreement). The interrogatory requested by the Defendant at [Tr. 1492, 1493], was as follows:

> " [I] would request the interrogatory under B-1, other than the vague statement of 1000 kilograms or more of hashish, that the jury, based on the testimony they heard; and they are normally considered versed enough to do that, that they determine exactly how much hashish the defendant is liable for, number one. And, number two, they determine exactly how much marijuana they believe the defendant is responsible for, not just blanket statements of 1000 kilograms or more. They should specifically specify how much they consider and they find the defendant to be liable for."

Consequently, once the Court and the prosecution denied this interrogatory request, the government is bound solely on what is specifically pleaded in the indictment – and _nothing_ more. This case does not involve a plea-agreement, but rather a jury trial, wherein the jury — and not the government — is the _fact-finder_. The government, in its PSR, is prohibited by the U.S. Constitution and the U.S. Supreme Court from superimposing itself as the fact-finder and merely anticipating what the jury would have, could have, or even should have found.

Therefore, based upon the instant indictment, as pleaded, [again in _arguendo_ contrary to Defendant's original objections to the PSR], the Defendant can be held liable for _only_ 1000 kilograms of marijuana and 1000 kilograms of hashish [to wit, 5000 kilograms of marijuana pursuant to U.S.S.G. §2D1.1], for a maximum total of 6000 kilograms of marijuana, which pursuant to §2D1.1 (c) Drug Quantity Table equals a total offense level of **34** [i.e. 3000 to 10,000 kilograms of marijuana]. See U.S.S.G. Manual effective November 2001. Thus, the instant PSR is wrong in its calculations of an offense level of 38 — and it must be corrected.

The jury – the fact-finder – made a finding beyond reasonable doubt of **ONLY** those amounts as pleaded in the indictment, and nothing more.

U.S. Probation Department
Page 3 - Second Addendum Reply
July 24, 2002

Moreover, whenever a defendant is exposed to any sentence greater than the maximum set out for a violation involving an unspecified amount of the drug at issue [i.e. for marijuana §841(b)(1)(D) at a 5-year maximum] – as here – that drug quantity, pursuant to the penalty provisions of §841(b), must be charged in the indictment and proven to the jury beyond a reasonable doubt, see U.S. v. BUCK-LAND, 277 F3 1173 (2d Cir 2002). In this instance [ignoring the U.S. Constitution, §841(b)(1)(C), and "default sentencing", as articulated in previous objections to the PSR] the jury found only sufficient drug amounts (i.e. 6000 kilograms from above) to warrant an offense level of 34 and NOT 38.

## No Leadership Enhancement Is Applicable

The burden of proof is on the government to establish actual evidence to support their allegation — and they have failed to do so. The Second Addendum merely states that evidence was "detailed" in its original PSR. However, NO evidence of any type whatsoever was submitted within that particular PSR, that is, other than another unsubstantiated ["bootstrapped"] conclusory and simplistic unfounded allegation.

To the contrary, the Defendant has repeatedly submitted overwhelming evidence, substantiated from the trial records, that clearly establishes that the Defendant warrants a four(4)-level downward adjustment pursuant to U.S.S.G. Manual §3B1.2(a)-mitigating role. See Tr. 370, 371, 431, 432, 433, 493, 494, 495, 496, 532, 534, 535, 727, 741, 760, 928, 930, 951, 974, 977, 1138, #1 @ 1048, 1050, 1093, 1199.

## Ex Poste Facto Mandates Using November 2001 U.S.S.G. Manual

Both the Second Addundum and the original PSR point out the fact regarding an ex poste facto issue relating to the application of the proper Sentencing Guidelines to be used.

However, the governemnt is incorrect as to which Guideline Manual is to be used, and which creates an ex poste facto violation. It is, in fact, the older Guideline [i.e. 1998], as used by the government, that creates a higher sentence in Count Two, and thus shall not be used. The different calculations confirming the error in using the older Guidelines Manual is delineated below.

U.S. Probation Department
Page 4 - Second Addendum Reply
July 24, 2002

Using the older Guidelines Manual, as submitted in the PSR, the calculations were as follows:

| | | | | |
|---|---|---|---|---|
| Base Offense Level | pursuant to | [§2S1.1(a)(1)] | = | 23 |
| Special Offense Characteristics (controlled substance) | | [§2S1.1(b)(1)] | = | 3 |
| Corresponding Money Amount ($5.8+ Million) | | [§2S1.1(b)(2)(H)] | = | 7 |
| | | Total Offense Level | = | <u>33</u> |

In contrast to the newer [November 2001] Sentencing Guidelines Manual computations as follows:

| | | | | |
|---|---|---|---|---|
| Base Offense Level | pursuant to | [§2S1.1(a)(2)] | = | 8 |
| Special Offense Characteristics (controlled substance) | | [§2S1.1(b)(1)] | = | 6 |
| Corresponding Money Amount ($5.8+ Million) | | [§2B2.1(b)(1)(Q)] | = | 16 |
| | | Total Offense Level | = | <u>30</u> |

Consequently, as is clearly outlined above, the government's original PSR computations for the Count Two total offense level of <u>33</u> violates the <u>ex poste facto</u> protections afforded by the U.S. Constitution. Therefore, [in <u>arquendo</u> and ignoring U.S. Constitution and <u>APPRENDI</u>-based objections as articulated in the Defendant's primary objection(s)], the factually accurate total offense level for Count Two is <u>30</u> and NOT <u>33</u> — and must be corrected by proper Addendum to the PSR.

## Defendant's Prior Conviction Is Inapplicable

The Second Addendum merely mentions the <u>ex poste facto</u> issue concerning the prior conviction sentencing "enhancement", however, does not appear to understand the Constitutional limitations it represents.

There is no specific and discrete statutory citation within 21 U.S.C. §841 for creating a unique criminal offense for violating the provisions of §841 after having a prior conviction become final — and therefore, the prior, <u>in and of itself, becomes a sentencing "enhancement" ONLY</u>, based solely on that prior.

U.S. Probation Department
Page 5 - Second Addendum Reply
July 24, 2002

The government has apparently ignored the fact that - as a matter of law - the U.S. Constitution supercedes and trumps any law that violates the ex poste facto Clause of the Double Jeopardy Clause of the Constitution, see U.S. Constitution Art. I, §9, cl. 3., and Fifth Amendment.

The Second Addendum simply states that the prior conviction "enhancement" "provision makes no reference to a time limit, a statute of limitations or an age limit which would suggest that the conviction is not applicable." [see Page 2, ¶3]. This illconceived and simplistic rationale completely omits the U.S. Constitution's prohibition of ex posts facto laws exactly like this instant prior conviction enhancement.

As applied here, there are two(2) separate and distinct ex poste facto violations in attempting to apply the prior conviction "enhancement" provision of 21 U.S.C. §841(b).  In short, the U.S. Constitution forbids the retroactive application of a law that increases the punishment for criminal acts, or alters the definition of a crime.  Here [as detailed in Defendant's original objection(s) to the PSR], 1) the statutory maximum for the Defendant's prior was 5-years, and thus the government is prohibited from sentencing the Defendant to another 10-years for the same offense 27-years later, and 2) the prior conviction "enhancement", to wit, a different definition within the statute, was added to §841(b) in 1984 -- clearly after the Defendant's 1975 prior -- and thus is again prohibited by the U.S. Constitution.  See, e.g. CAL. DEPT. OF CORRECTIONS v. MORALES, 514 U.S. 499, 115 S.Ct. 1597 (1995); COLLINS v. YOUNGBLOOD, 497 U.S. 37, 110 S.Ct. 2716 (1990).

Moreover, ... the instant Second Addendum simply mis-states the prior conviction 'enhancement' by stating that 21 U.S.C. §841(b) provides that "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment ..." -- the PSR is factually incorrect.

The fact is that the prior conviction "enhancement" affects different parts of §841(b) in vastly different ways.  The instant indictment [in Count One] includes §841(b)(1)(C) which calls for a different statutory maximum by raising the sentence possibilities from zero to twenty years [0-20 years] to zero to thirty years [0-30 years]; and includes §841(b)(1)(A) which calls for a different statutory minimum from 10-years to life [10-life] to 20-years to life [20-life].

U.S. Probation Department
Page 6 - Second Addendum Reply
July 24, 2002

The government cannot reconcile the incompatibility -- within the same Count One -- of having the prior conviction 'enhancement' affect both the statutory minimum and maximum simultaneously.

Furthermore, the Second Circuit in U.S. v. MARTINO #01-CR-1301 (2d Cir June 24, 2002), upheld its previous findings as articulated and adopted from U.S. v. GARCIA, 32 F3 1017 (7th Cir 1994), which states that when applying the §841(b) prior conviction enhancement, the appropriate focus is "on the degree of criminal activity that occurs after a defendant's drug-related conviction is final rather than when the conspiracy began."

In the instant analysis, according to the government's submissions and all the trial testimony, the Defendant was not involved in any substantiated and corroborated illegal activity until 1988, to wit, thirteen(13)-years after his prior conviction from 1975. During which time the Defendant returned to College as a full-time student and subsequently graduated in June 1983 from the University of California Santa Barbara [documented in PSR], and then continued his full-time studies, while employed full-time, at Crafton Hills College in Yucaipa California into 1985 [i.e. EMT and Paramedic studies].

The Second Circuit has stated that the dispositive question is "whether or not the defendant ceased criminal activity after the prior conviction.", see U.S. v. MARTINO, supra. And here, the answer to that question is a resounding YES, and thus the prior conviction "enhancement" is inapplicable to the instant sentencing computations.

Finally, the government appears to have further potential problems with its unfounded insistence on including the Defendant's prior conviction in that the Defendant was found guilty of a conspiracy only [i.e. 21 U.S.C. §846], and not of a substantive violation of 21 U.S.C. §841(a).

The conspiracy statute §846 states in relevant part:

"[A]ny person who attempts or conspires to commit any offense defined in this subchapter ..."          (emphasis added)

however, the prior conviction "enhancement" aspect of §841(b) is not, in and of itself, a discrete criminal offense subject to sanction under §846. This problem is further exacerbated by the differing applications of the prior "enhancement", as either affecting the statutory minimum -vs- the statutory maxi-

U.S. Probation Department
Page 7 – Second Addendum Reply
July 24, 2002

mum depending on which substantive offense the Defendant is held liable for based on which applicable statute that has been pleaded in the indictment.

Ultimately, based on all the foregoing, together with the myriad legal reasons as articulated in detail in the Defendant's previous objection(s) to the PSR, it becomes crystal clear that – as a matter of law – the government is precluded from using the Defendant's 1975 prior conviction in any of its sentencing calculations.

## PSR Addendums ON THE RECORD

In the Second Addendum at Page 2, ¶ 4, it mentions that the Defendant wishes to note his legal address is 12922 Harbor Blvd., #677, Garden Grove, Ca., 92640; and that ¶ 44 of the PSR is incorrect. However, the Second Addendum does not state that "on the record" these changes are to be adopted within the PSR.

Therefore, the Defendant hereby requests that the PSR, on the record, recognize and accept that the foregoing address is indeed the "domicile" to be used for any and all sentencing purposes; and that ¶ 44 of the PSR is in fact incorrect and is to be deleted.

Furthermore, should there be any subsequent changes or adjustments to the PSR, the Defendant respectfully requests they by made clear, on the record, to avoid any confusion or mis-application of the instant PSR.

## Motion(s) For Downward Departures

The instant Second Addendum takes no position regarding the Defendant's Motion(s) for downward departures [see Page 3], however, to further support his motions the Defendant hereby includes a copy of the Federal action filed against Nassau County Executive, Sheriff's Department, and Sheriff of Nassau County pertaining to the very conditions the Defendant asserts warrant a downward departure [See EXHIBIT A].

In short, this suit against those in charge of Nassau County Jail alleges that NCCC engages in a pattern of using excessive force against inmates, lack of proper training and supervisory staff; and deliberate indifference to the inmates medical needs -- all in violation of the Eighth and Fourteenth Amendments. Thus establishing clear and convincing evidence in support of Defendant's Motion for a downward departure.

U.S. Probation Department
Page 8 – Second Addendum Reply
July 24, 2002

## Forfeiture Should Be Set Aside/Vacated

The second Addendum does not address this issue at all, eventhough the Defendant submitted both factual evidence, and overwhelming factual legal arguments, to wit, matters of law, to clearly establish that the government has no legal basis under which it can get a money judgement to arrogate the Defendant's assets/property, as "substitute assets", pursuant to a forfeiture in this case.

In short, the government is bound by, and thus prohibited by 1) the principal of "joint and several liability"; 2) expired statute of limitations; 3) estoppel; 4) no property interest, nor title to alleged "proceeds"; and 5) proof of other legitimate and impeccable sources for Defendant's assets/property — any one of which is dispositive of the forfeiture allegations.

To set the record straight regarding the alleged "proceeds", the Defendant will set forth at length below the facts concerning the reality that the government has already collected all its alleged "proceeds".

First, the government alleges $770,000 Dollars of alleged proceeds from 1986/87 concerning the TIMEWELL to SINGER "Indos" deal; all of which has been collected [i.e. forfeited/seized] from both these principal(s) [See Tr. 744, 745, 746, 751, 932].

Next, the government alleges $300+ thousand Dollars of alleged profit proceeds from 1988 concerning the SHERRETT to TIMEWELL to SINGER "Thai" deal; all of which has been collected [i.e. forfeited/seized] from these principal(s) [See Tr. 744, 745, 746, 751, 932, 1085, 1086, 1100, 1101].

Then, the government alleges $760,000 Dollars of alleged proceeds from 1996 concerning the FITZGERALD to MATSUZUKI to BOWLER "California" deal, to wit, $450,000 delivered by MATSUZAKI/AUCHARD to FITZGERALD in California on BOWLER'S behalf; $200,000 delivered by MATSUZAKI to "Patty" in Manhattan, N.Y. on BOWLER'S behalf; and $110,000 delivered by AUCHARD to BOWLER in Switzerland for BOWLER — all of which has been collected from these principal(s) [See Tr.#1 1084, 1110].

Consequently, there can be no forfeiture, nor money judgement against the Defendant when, as here, there are no "proceeds" left to be collected. It is not a question of collectability of the alleged proceeds, but rather that without proceeds, there can be no forfeiture per se.

U.S. Probation Department
Page 9 - Second Addendum Reply
July 24, 2002

In this instance, the principle of "joint and several liability" holds that any funds [i.e. "proceeds"] collected from any of the co-conspirators must be deducted from the alleged proceed amounts, which here, eliminates all of the instant proceeds. And then, "estoppel" regarding the clearly established principal that the government can collect the "proceeds" only once -- further prohibits the government from a forfeiture or a money judgement of any kind, [See Defendant's detailed memorandum of law in previous objection(s) at Pages 23-28].

The burden of proof is on the government to establish factual evidence to prove that the principal co-conspirators, to wit, SHERRETT, TIMEWELL, SINGER, BOWLER, and MATSAZUKI - those responsible for the proceeds - have NOT already had approximately $15 Million Dollars collected [i.e. forfeited/seized] from them in connection with the conspiracy pleaded in the instant indictment. Failure to satisfy this burden (or even the $2+ Million forfeiture amount), means the government is precluded and prohibited from any forfeiture or money judgement against the Defendant.

Furthermore, in the event of a Fatico hearing regarding the bogus forfeiture allegation, the government must disclose all the "relevant and material" exculpatory evidence thus far improperly withheld from the Defendant [i.e. BRADY violation] pertaining to any and all forfeitures/seizures from each and every of the alleged co-conspirators.

## Special Verdict Is Unconstitutional

The burden of proof is again on the government to contravene the U.S. Supreme Court holdings in APPRENDI pertaining to essential elements of the offense. The findings from APPRENDI make the government's **bifurcation** of the essential elements into a separate proceeding AFTER the jury-trial unconstitutional.

The government must establish and support the Constitutional basis under which it can arbitrarily **bifurcate** the fact-finding of the essential elements in this way. Particularly, after a guilty finding with its inherent severe and compelling prejudice to the Defendant. Without clearly establishing the Constitutional basis, upon which interests, the Special Verdict is unconstitutional.

Respectfully submitted,

Michael Vondette - Defendant pro se



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT

★   AUG 2 8 2002

9131 0 ⌀

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

               Plaintiff,

    - against -

MICHAEL VONDETTE,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
AND
ORDER

97-CR-1010 (TCP)

PLATT, DISTRICT JUDGE.

       By a "Motion for Judgment of Acquital [sic] and/or for a New Trial" dated July 19, 2002, pro se defendant Michael Vondette ("Vondette") moves pursuant to Rule 29(a)(33) of the Federal Rules of Criminal Procedure: (1) for an order of acquital [sic] and/or for a New Trial and; (2) to vacate the Order of Forfeiture.

       In its responsive memorandum dated June 26, 2002, the Government enumerates twenty-nine separate grounds for the relief Vondette seeks and answers Vondette's contentions in considerable detail. In light of the proof adduced at trial and the verdict in this case, little maybe gained by rehashing Vondette's innumerable arguments, the great majority of which were addressed by the Government in memos and letters and by the Court in both oral and written

orders in the four and a half year course of this case.

The same is essentially the case in defendant's second set of objections to his Pre-Sentence Report ("PSR") dated June 28, 2002, consisting of forty-four pages. In his first set of objections (five pages) dated June 14, 2002, Vondette set forth some twenty-one "factual inaccuracies" as to which the United States Probation Department has filed replies in its "second addendum."

In the four and a half year period between the first Indictment of Vondette on October 31, 1997 and the first trial, which began on April 16, 2001, Vondette made over eighty-one motions. During that same period, the Government submitted at least thirty-seven replies, consisting of approximately three hundred pages, and the Court wrote some seventeen Memoranda and Orders aggregating close to one hundred pages. Additionally, the Court issued several oral decisions from the Bench.

As indicated on October 31, 1997, the original four count Indictment against Vondette was filed.

On October 20, 1998, a four count Superseding Indictment was filed.

On November 9, 2000, the Superseding Indictment (on which Vondette was tried) was filed consisting of two conspiracy counts: (1) the first for

-2-

distributing in excess of one thousand kilos of a mixture and substance containing

marijuana and methaqualone; and (2) the second for money laundering involving

financial transactions effecting interstate commerce, namely, the transfer of

currency derived from the proceeds of the distribution of controlled substances.

In addition to several Waivers of Speedy Trial and Orders of

Excludable Delay during the four and a half year period, on July 10, 1998, in the

presence of the Government's attorney, Vondette and his retained counsel Robert

Kalina, Esq., and with their consent, the Court found and declared the case to be a

"complex case" and classified it as such under the Speedy Trial Act. That

classification was never changed between that date and the date of trial.

The evidence against Vondette in both three week trials conducted

by this Court was overwhelming. At the end of seven years of purchasing and

selling multiple tons of hashish and marijuana, at the time of his arrest alone,

Vondette was engaged in the purchase and resale of nearly nine tons of hashish

having a street value of at least $18 million. Vondette's meritless assertions and

post trial motions illustrate the lack of merit in the great majority of his motions.

Vondette's most significant post trial motion alleged that the evidence in the case

was insufficient and that he was not given a fair trial. The meritless nature of that

motion is best illustrated by the following:

-3-

In the second set of his motions addressed to the PSR, Vondette argues for a four level downward adjustment on the basis of his "mitigating role" in the two conspiracies by, inter alia, characterizing himself as:

1.  A "low-level independent worker, who occasionally associated himself with others as a subordinate;"

2.  "Characterizing himself as . . . merely who was the general all-purpose 'go-fer' who was relegated to the menial and incidental activities;"

3.  "the lowest level worker who's [sic] activities as who's [sic] activities were neither extensive, nor pivotal, to wit, the proverbial 'low man on the totem pole;'"

4.  "merely a 'courier'. . . or a 'messenger'. . . or a 'deliveryman;'" and

5.  A person whose "role consisted of, in the main, of evidence that he either picked up or dropped off someone else's money, passed on messages, arranges [sic] for transportation at someone else's direction, or the like."

From the forgoing, Vondette argues that the Government's indictment is unconstitutional, and (1) he should be sentenced to "time served," (2) the Court should set aside the Government's forfeiture charge or, in the alternative, (3) the Court should vacate the jury's findings (i.e. order a mistrial); and (4) the Court should order a new trial.

Suffice it to say for the purposes of these motions (in addition to that said in the Government's and Probation Office's answers thereto) that the answers to virtually all of Vondette's arguments are found in the Special Verdict Form, (Exhibit 14). That Special Verdict Form set forth the jury's findings of fact beyond a reasonable doubt, and all of the details and amounts of drugs and drug money attributed to Vondette (See the attached copy of Exhibit 14). The contrast between those findings and Vondette's self-described role say it all.

In sum, as the Probation Department sets forth in its Second Addendum to the Pre-Sentence Report, when differing controlled substances are combined to obtain a single offense level by converting those substances to their marijuana equivalent, Vondette was found responsible for the purchase, sale and distribution of a total of 42,187.8 kilograms of marijuana, or in excess of forty-one (41) tons thereof. Moreover, in its Special Verdict Form (Exhibit 14), the jury found with respect to the Count One conspiracy, that the dollar amount of the proceeds of defendant's drug activity was approximately $6 million and with respect to Count Two approximately $2.68 million. All of these findings were consistent, and of course, made beyond a reasonable doubt by the jury after hearing all of the evidence.

In addition, defendant has requested in his papers four Evidentiary

-5-

(Fatico) Hearings with respect to the following:

1.      Count One: to "determine the accurate amount of marijuana that can be proven and legally attributed to the Defendant."

2.      Count Two: to "determine venue, unanimity of jury finding(s), applicable statute of limitations of 'transactions' constitutionally inadequate Count Two, as pleaded in indictment [i.e. NO specific money amount included, nor identifiable overt acts - - lack of proper "NOTICE"], and unconstitutional bifurcation of essential and material elements of the offense [APPRENDI-based issues]."

3.      Count Three: "Leadership Enhancement - and - Forfeiture Together: to determine the leadership allegation or whether 'the Defendant is entitled to a 2-level or 4-level downward adjustment for mitigating role pursuant to U.S.S.G. §3B1.2" and to determine "the exact amounts of funds the government has previously forfeited/seized from [co-conspirators] individually;" and . . . to determine "["substitute assets"] the applicable statute of limitations and estoppel prohibitions against the forfeiture - as a matter of law." . . .

4.      Prior Conviction: "to make factual legal determinations concerning ex poste facto [sic], the statute of limitations, double jeopardy, young adult offender status, rule of lenity, improper 'bill of attainder', and APPRENDI-based issues."

On July 29, 2002, the Court requested a Supplemental

Memorandum from the Government with respect to those questions. The

-6-

Government complied by submitting a letter dated July 30, 2002. In addition to
the detailed responses contained in that letter, the Court merely adds the
following:

    With respect to the Count One, the short answer to
the Vondette's request is stated in the jury's findings
beyond a reasonable doubt of the jury in Exhibit 14.

    As to Count Two, the answer, again, with respect to
the unanimity of the jury's finding and the specific amounts
and overt acts are found in Exhibit 14.

    Similarly, with respect to Count Three, Exhibit 14
details the leadership factor and the reasons against any
downward adjustment.

    Exhibit 14 also identifies five of the other
participants as does paragraph seventeen of the Probation
Department's PSR. With respect to the Vondette's prior
drug conviction, as the Government points out in its main
Memorandum at page seven, "the defendant was offered the
opportunity to have his prior drug conviction proved before
the jury, but he, with the assistance of standby counsel, he

-7-

[sic] declined that opportunity and admitted his prior

conviction before the Court." (Tr. 1578-1581).

Finally, it should be noted that during the course of the four and a

half years of Vondette's innumerable pre-trial motions, he attempted five separate

appeals to the Court of Appeals for the Second Circuit, all of which were

dismissed as improvidently or prematurely made. To dispel any lingering possible

doubts with respect to the depth of the treatment that the Government and the

Court have given to Vondette's innumerable contentions we are attaching a

complete copy of the Docket Sheet. That Docket Sheet summarizes all of the

activity in this case since its inception on October 31, 1997.

Under all of the circumstances, Vondette's motions must be and

the same hereby are denied.

SO ORDERED.

_____

District Judge, United States District Court

Dated: Central Islip, New York
       August 2 8, 2002

-8-



**MANDATE**

SANY PF EDNY

97 - CR - 1010

FILED

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

**SUMMARY ORDER**    ★    MAY 2 3 2005    ★

LONG ISLAND OFFICE

**THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL
REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS
OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS
OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A
RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL
OR RES JUDICATA.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the
Thurgood Marshall United States Courthouse, at Foley Square, in the City of New York, on the
27ᵗʰ day of August two thousand and three.

Present:    ROSEMARY S. POOLER,
ROBERT D. SACK,
RICHARD C. WESLEY,
Circuit Judges.

UNITED STATES OF AMERICA,

Appellee,

- v. -                              02-1528(L), 02-1529(CON)

MICHAEL J. VONDETTE, also known as Steven, also
known as Big, also known as Big Guy, also known as
Mike, also known as Michael J. Von Dette, also known
as M. J. Vondette, also known as Glenn Titus,

Defendant-Appellant.

Appearing for Defendant-Appellant: PAULA SCHWARTZ FROME, Kase & Druker (James O.
Druker, on the brief), Garden City, NY
Appearing for Appellee:         BURTON T. RYAN, JR., Assistant United States Attorney,
Eastern District of New York (Roslynn R. Mauskopf, U.S.
Attorney, Cecil C. Scott, Charles P. Kelly, Assistant U.S.
Attorneys, on the brief), Brooklyn, NY

Appeal from the September 6, 2002, judgment of the United States District Court for the
Eastern District of New York (Thomas C. Platt, Judge), convicting defendant after a jury trial of

ISSUED AS MANDATE: 5-16-05

conspiring to distribute hashish, marijuana, and methaqualone in violation of 21 U.S.C. § 846
and of conspiring to launder money in violation of 18 U.S.C. § 1956(h).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED,
AND DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED**.

Michael J. Vondette appeals his conviction following a jury trial on one count of
conspiring to distribute hashish, marijuana, and methaqualone and on one count of conspiring to
launder money. The prosecution involved a drug trafficking organization, which the government
calls the "Vondette/Tremblay group." The conspiracy charge against Vondette encompassed a
time period from January 1980 until October 1997.

This particular prosecution arose directly out of a large shipment of hashish arriving from
Asia that was destined for Canada. Patrick Bowler, one of the organizers of the hashish
shipment, had worked with Vondette before. Undercover Drug Enforcement Administration
("DEA") agents, who had infiltrated the operation, told Bowler and the other organizers that the
small boat that was supposed to take the hashish from the high seas to Canada had mechanical
problems and would have to stop in Los Angeles first. Although the organizers were not happy
about this change because of the "draconian" American drug laws, they ultimately agreed to a
brief stop in Los Angeles. The small DEA-controlled boat then traveled to Los Angeles.

Around that time, Bowler recruited Vondette to transport some of the hashish to
Montreal. Vondette assumed responsibility for transporting two tractor-trailer shipping
containers, each holding four to four-and-a-half tons of hashish. After the first container arrived
in Newark, Vondette arranged for a Staten Island customs broker to pick it up. The broker
contracted the job to a Staten Island-based trucking company. By following the truck, DEA
agents were able to find co-conspirators who chose to cooperate, and the DEA eventually was
able to identify and locate Vondette.

Due to problems finding and keeping counsel, Vondette began the first trial pro se, but
then retained attorneys. The first trial resulted in a mistrial when the jury could not reach a
verdict. The attorneys who represented Vondette at the first trial asked to be relieved because of
Vondette's inability to pay them and his unwillingness to plead guilty. The court relieved the
attorneys. Another attorney was appointed to be Vondette's advisor at the second trial. Evidence
at the trial included testimony about the large hashish shipment as well as evidence about earlier
drug transactions. Various aspects of the trial will be discussed at greater length below. The trial
lasted for three weeks, and resulted in a guilty verdict. After the verdict, the jury heard further
arguments regarding forfeiture and returned a special verdict indicating what sums of money
were subject to forfeiture. The court found that the offense level was 42, after the grouping of
the two counts. The court sentenced Vondette to 480 months incarceration, five years supervised
release, a $25,000 fine, a $200 special assessment, and forfeiture of $2,027,845.

This appeal followed. Vondette challenges several aspects of his trial. He argues that 1)
the government engaged in outrageous conduct by manufacturing federal jurisdiction; 2) the

Case 9:97-cr-01010-JS   Document 468-3   Filed 08/10/06   Page 69 of 74 PageID #:
Case 9:97-cr-01010-TCP   Document 424   Filed 05/23/2005   Page 3 of 8
663

court erred in refusing to give a multiple conspiracy charge; 3) the court's conduct during trial deprived him of a fair trial; 4) the court's charge was improper; 5) venue in the Eastern District of New York was improper; and 6) the court abused its discretion by empaneling an anonymous jury. Vondette also challenges the court's application of the sentencing guidelines and the forfeiture order.

Defendant contends that the government should be foreclosed from prosecuting him because prior to the government's intervention, the hashish shipment part of the case involved only a potential violation of the laws of Canada. He relies on United States v. Archer, 486 F.2d 670, 682 (2d Cir. 1973) (preventing prosecution where federal officers themselves supplied the interstate element and acted to insure that this element was present). Defendant also notes that a district court in California dismissed the importation charges against some of the importer-defendants because the government interfered with the conspirators' pre-existing plan and brought the drugs into the United States against their wishes.

However, defendant's situation is clearly distinguishable from Archer and from the case of the importer-defendants. In United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996), we noted that "[c]ourts that have construed Archer have taken pains to limit its applicability." Id. at 1065. The Court elaborated on the manufactured jurisdiction theory at some length:

These cases make clear that the "manufactured jurisdiction" concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime.

Id. at 1065–66 (internal citations omitted). Although Vondette contends that each of the theories apply in his case, only the third theory merits discussion. The Wallace Court explained:

Courts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the FBI introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met, despite the surface similarity to Archer.

Id. at 1066. Even if the government created federal jurisdiction by bringing the hashish into the United States, Vondette then took the voluntary step of agreeing to transport the drugs.

Vondette argues that the evidence at trial clearly established the existence of multiple conspiracies, in contrast to the single charged conspiracy. The government stresses that all the

3

Case 9:97-cr-01010-JS    Document 468-3    Filed 08/10/06    Page 70 of 74 PageID #:
Case 9:97-cr-01010-TCP    Document 424    Filed 05/23/2005    Page 4 of 8
664

proof involved drug trafficking by the Vondette/Tremblay group. It is true that "where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury." United States v. Alkins, 925 F.2d 541, 553–54 (2d Cir. 1991) (internal quotation marks omitted). On the other hand, "[i]f the evidence admits of no possibility that there was more than one conspiracy, a multiple conspiracies charge is not necessary." Id. at 554.

The appellant must also show that the failure to give the requested charge created prejudice. Even if a multiple conspiracies charge was appropriate, reversal is necessary only if appellant "demonstrate[s] both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge." Id. (internal quotation marks omitted). Although Vondette could possibly demonstrate that the proof was susceptible to the interpretation of either a single conspiracy or multiple conspiracies, he did not demonstrate prejudice. Prejudice is particularly difficult for a defendant to demonstrate in cases involving one defendant. See United States v. Cusimano, 123 F.3d 83, 89 (2d Cir. 1997). Prejudice is also more difficult to demonstrate when the alleged multiple conspiracies involve "substantially the same conduct." Id. The admission of evidence of a few earlier drug deals which may or may not have involved a common purpose and mutual dependence and assistance did not cause Vondette prejudice.

Vondette claims that the district court made inappropriate comments which would have left the jury with the impression that the district court believed Vondette was guilty. We have explained:

> The [Circuit] court's role is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether it appeared clear to the jury that the court believed the accused is guilty.

United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996) (internal citations, quotation marks and brackets omitted).

Vondette proceeded pro se (with standby counsel) below. The trial court did rebuke him on a number of occasions when he persisted in pursuing lines of questioning or strategies to which the district court had already sustained objections. The district court does appear to have been frustrated by Vondette at various points. On the other hand, Vondette did need to be reined in quite frequently in order to ensure an orderly trial. See United States v. Pisani, 773 F.2d 397, 403–04 (2d Cir. 1985) (finding that the court's comments did not deprive defendant of a fair trial because at least some of the comments "were provoked by counsel's continuing to do things that the court had specifically cautioned him to avoid"). Here, given that the trial court's comments were largely directed towards Vondette's activities as advocate, the jury would not have been convinced that the judge believed Vondette was guilty. Nonetheless, we emphasize that the judge would have been well-advised to have crafted a more careful instruction to tell the jury not

4

Case 9:97-cr-01010-JS   Document 468-3   Filed 08/10/06   Page 71 of 74 PageID #:
Case 9:97-cr-01010-TCP   Document 424   Filed 05/23/2005   Page 5 of 8
665

to treat his corrections of defendant as signs of his thoughts about the defendant's guilt, but rather as necessary steps to maintain order in the courtroom.

Vondette argues that some of the jury instructions were erroneous and confusing. In addition, he contends that the district court constructively amended the indictment. The wording of the indictment did indeed cause some initial confusion. The court originally instructed the jury on the drug conspiracy count as follows:

> The first question is: Do you find that the government proved beyond a reasonable doubt that the conspiracy charged in the indictment involved hashish, marijuana and a mixture of a substance containing marijuana or methaquaalone?
> B, do you find that the government proved beyond a reasonable doubt that the defendant conspired to distribute with the intent to distribute 1,000 kilograms or more of hashish? Two, 1,000 kilograms or more of a substance - of a mixture containing marijuana and methaquaalone?

Tr. at 1542–43 (emphasis added). The district court also altered the written special verdict sheet. The government attempted to convince the court to instruct the jury that it should consider whether the conspiracy involved 1,000 kilograms of a substance containing marijuana or methaqualone, but the court initially denied this request because it believed this would alter the indictment.

However, after the district court received a question from the jury asking if the special verdict applied to both counts, it opined that "what is confusing about count one is how badly this whole thing is worded." The government again tried to convince the judge that the special interrogatory questions about drug quantity were only necessary for sentencing purposes, and therefore could be changed without constructively altering the indictment. This time the court agreed with the government, and reinstructed the jury on count one. If the jury found the defendant guilty of the base offense, the court instructed that the jury should then turn to the special interrogatories. The court first asked the jury to find whether the government proved beyond a reasonable doubt that the conspiracy involved 1000 kilograms or more of hashish. It then changed the second part of the interrogatories: "So it would be [changed to] read 1,000 kilograms or more of marijuana, or a substance [ ]or a mixture containing marijuana." The end result is that the jury was no longer instructed to find any amount of methaqualone.

It does appear that some confusion resulted from the original jury instructions. However, the court's alteration of the interrogatories remedied the confusion and was in accordance with the law. The removal of methaqualone from the special interrogatories did not constructively amend the indictment. It was unnecessary for the jury to find any particular amount of methaqualone for sentencing purposes. See 21 U.S.C. § 841(b)(1)(C). The jury was instructed to make specific findings regarding the hashish and the marijuana, and these findings allowed the court to impose a sentence of ten years to life under the statute. 21 U.S.C. § 841(b)(1)(A); see also United States v. Thomas, 274 F.3d 655 (2d Cir. 2001) (en banc).

5

Vondette also claims that the trial judge's charge to the jury on the money laundering count suffered from vacillation and confusion. In particular, Vondette claims that because the indictment had been charged in the conjunctive, the government could not prove its case in the disjunctive. However, "[a]n indictment charging a conspiracy to achieve two or more unlawful goals, in the conjunctive, can properly be supported by proof of any of the alleged goals." United States v. Thomas, 54 F.3d 73, 81 (2d Cir. 1995). Therefore, the variation between the conjunctive in the indictment and the disjunctive in the charge was not error.

Vondette contends that no acts sufficient to support venue for the narcotics conspiracy charge occurred in the Eastern District. However, with a conspiracy offense, venue is appropriate "in any district in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987). The acts relied on here by the government to establish venue in the Eastern District were overt acts in furtherance of the conspiracy. Most notably, Vondette engaged a customs broker in Staten Island, who arranged for the load to be transported to its upstate destination.

Defendant argues that the district court's decision to empanel an anonymous jury was not properly justified. He also takes issue with the court's failure to offer the jurors an explanation for their anonymity, although he did not request any instruction. We review the decision to empanel an anonymous jury for abuse of discretion. United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994). An anonymous jury may be appropriate if there is strong reason to believe that the jury needs protection and reasonable precautions are taken to minimize any prejudicial effects on the defendants. United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991). The evidence in this case most notably included threats made to cooperating witnesses by other participants in the transactions. Thus, given the abuse of discretion standard, the empaneling of the anonymous jury was not in error.

However, Vondette's argument that the court did not give the jury any explanation whatsoever for the empaneling of an anonymous jury is more substantial. The Court has suggested that "reasonable precautions must be taken to minimize the effect that [an anonymous jury] might have on the jurors' opinions of the defendant[ ]," United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985) (emphasis added), and that a "court should not order the empaneling of an anonymous jury without . . . taking reasonable precautions to minimize any prejudicial effects on the defendant," United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991) (emphasis added). This would seem to support Vondette's argument.

In United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989), the Court noted approvingly that the district court had instructed the jury that the anonymous jury was "a common practice . . . [and] is in no way unusual," which would minimize any prejudicial effect on the defendant. However, in United States v. Vario, 943 F.3d 236 (2d Cir. 1991), the Court took this principle a step further:

Although the district judge here did not instruct the jury in order to explain their anonymity, there is no reason to believe that the absence of instructions led the jurors to

6

Case 9:97-cr-01010-JS   Document 468-3   Filed 08/10/06   Page 73 of 74 PageID #:
Case 9:97-cr-01010-TCP   Document 424   Filed 05/23/2005   Page 7 of 8
667

conclude other than that "[i]t is a common practice" to keep jurors' names and identities
in confidence, an instruction we approved when given explicitly in [Tutino].

Id. at 241. Vario was approvingly cited in Wong, 40 F.3d at 1377, for the proposition that "[n]o
request was made for [an explanation to the jurors about their anonymous status], so the issue
was waived." Following this precedent, we cannot say that the failure to instruct the jury was
plain error. Nonetheless, an instruction would certainly have been preferable.

Vondette makes a number of challenges to his sentence, but they all lack merit. Vondette
argues that the amount of hashish involved was improperly calculated. However, the evidence at
trial demonstrated that Vondette agreed to transport two tractor trailers of hashish. The 8,164.8
kilograms represents the hashish in the two trailers. Vondette also argues that the evidence at
trial does not support the court's finding that he was an organizer within the drug organization.
He contends that he was a mere courier and that he was subordinate or at most equal to the other
members of the conspiracy. However, the court did not commit clear error in adopting the PSR's
finding that Vondette directed the activities of numerous other participants.

Vondette argues that because he has no assets, the court should not have imposed a fine.
The PSR had agreed that Vondette could not afford to pay a fine, given the forfeiture order.
However, the fact that the district court was aware that Vondette had retained appellate lawyers
by the time of sentencing strongly suggests that he was not without assets. United States v.
Rivera, 22 F.3d 430, 440 (2d Cir. 1994) (noting that even the fact that defendant was
contemplating retaining counsel raised the district court's finding beyond mere speculation).
Therefore, the fine appears to have been properly imposed in this instance.

Vondette makes various challenges to the court's forfeiture order: 1) the forfeiture was
excessive because the government had already obtained the full forfeitable proceeds from other
members of the conspiracy; 2) forfeiture of proceeds which Vondette merely transferred as a
courier and in which he had no interest was not proper; 3) Vondette's IRA accounts were not
forfeitable under the anti-alienation provisions of ERISA; 4) Vondette's home was not forfeitable
because he had personally built the house with material purchased with his legitimate earnings;
and 5) the statute of limitations had run on some of the transactions forming the basis of the
forfeiture. These challenges have no merit.

The jury returned a special verdict finding Vondette liable for well over eight million
dollars. The court found Vondette liable for only a portion of that amount, however, resulting in
a total forfeiture order of $2,027,845. The order of the district court took into consideration the
amounts forfeited by co-conspirators. Vondette does not point to any particular item ordered
forfeited by the court which one of his co-conspirators already forfeited. Nor did the court err in
finding that Vondette had an interest in each of the amounts forfeited. Vondette's protestation
that he was a mere courier is belied by the record, which supports an enhancement for managerial
status.

The question of whether the IRA accounts are forfeitable appears to be one of first

7

Case 9:97-cr-01010-JS   Document 468-3   Filed 08/10/06   Page 74 of 74 PageID #:
Case 9:97-cr-01010-TCP   Document 424   Filed 05/23/2005   Page 8 of 8
668

impression in this Circuit. Vondette relies on the anti-alienation provision of 29 U.S.C. § 1056, which he contends have been and should be interpreted strictly. We find the Seventh Circuit's analysis of analogous RICO forfeiture provisions convincing. We agree with the Seventh Circuit's holding that ERISA accounts were not meant to be protected from criminal forfeiture. United States v. Infelise, 159 F.3d 300, 303–04 (7th Cir. 1998).

Vondette argues that he proved to the court that he had personally built his home in Oregon, purchasing construction materials with his legitimate earnings. The court properly found that the home and the IRAs were forfeitable as substitute property. Given the court's finding that the government was unable to find any other property belonging to Vondette "despite the exercise of due diligence," the application of the substitute property provisions was appropriate. 21 U.S.C. § 853(p)(1)-(2). Lastly, because the jury convicted Vondette of conspiracy, his statute of limitations argument fails. The last acts of the conspiracy fell within the statute of limitations, so the court may consider earlier acts in creating the forfeiture order.

We have considered all other arguments raised by Vondette and find them to be without merit. We therefore affirm the judgment of the district court in all respects.

FOR THE COURT:
ROSEANN B. MACKECHNIE, Clerk
By: _Lucille Carr_

Roseann B. Mackechnie, CLERK
by _____
DEPUTY CLERK
8